UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WEATHERFORD TECHNOLOGY HOLDINGS, LLC, WEATHERFORD U.S., L.P. | DOCKET 2:17CV456 |
| | NOVEMBER 8, 2018 |
| VS. | 9:03 A.M. |
| TESCO CORPORATION, ET AL | MARSHALL, TEXAS |

---

VOLUME 1 OF 1, PAGES 1 THROUGH 237

REPORTER'S TRANSCRIPT OF PRETRIAL HEARING

BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

FOR THE PLAINTIFFS:

LESLIE V. PAYNE
JAMES BOONE BAXTER
CHRISTOPHER MICHAEL FIRST
HEIM, PAYNE & CHORUSH, LLP-HOUSTON
HERITAGE PLAZA
1111 BAGBY STREET, SUITE 2100
HOUSTON, TEXAS 77002

DOUGLAS RON WILSON
HEIM, PAYNE & CHORUSH, LLP-AUSTIN
9442 CAPITAL OF TEXAS HWY NORTH
PLAZA ONE, SUITE 500
AUSTIN, TEXAS 78759

FOR THE DEFENDANTS:

JOHN WESLEY RALEY, III
ROBERT M BOWICK, JR
RALEY & BOWICK, LLP
1800 AUGUSTA, SUITE 300
HOUSTON, TEXAS 77057

COURT REPORTER: CHRISTINA L. BICKHAM, CRR, RMR
FEDERAL OFFICIAL REPORTER
300 WILLOW, SUITE 221
BEAUMONT, TEXAS 77701

PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION
.

(OPEN COURT, ALL PARTIES PRESENT.)

THE COURT: Be seated, please.

All right. This is the time set for a pretrial hearing in the *Weatherford versus Tesco* matter. That's Civil Case Number 2:17cv456. The court will call for announcements at this time.

What says the Plaintiff?

MR. PAYNE: Your Honor, good morning. Les Payne for Plaintiffs. With me today are Doug Wilson, Chris First, and Boone Baxter. Also Mr. James Kurka, Weatherford's in-house counsel, is here. All of us will be arguing today depending on the order of the motions.

THE COURT: You have plenty to go around.

MR. PAYNE: Yes, we do indeed. Thank you. We are ready. Thank you.

THE COURT: All right. What's the announcement for Defendant?

MR. RALEY: Your Honor, John Raley and Bobby Bowick, my law partner, are here for Tesco; and our in-house counsel for Tesco, Mr. Keith Nicholson, is here as well.

THE COURT: Are you ready to proceed?

MR. RALEY: Yes, sir, your Honor.

THE COURT: Ms. Lockhart, get me a court security officer in here who can control his telephone,

please.

DEPUTY CLERK: All right.

THE COURT: All right, counsel. Before we get into the various disputed items for today's pretrial hearing, I want to go over some general housekeeping issues for you. As you are aware, this case is set for jury selection and trial to begin on December the 3rd of this year. The court intends to have the clerk play the patent video from the Federal Judicial Center to the venire panel prior to jury selection.

You are going to be given 30 minutes per side to conduct your *voir dire* examinations. As is the court's practice, each side will be entitled to use up to but not more than 3 minutes of that 30 minutes for a very high-level nonargumentative thumbnail sketch of the disputed issues in the case just to give the jury panel some very basic structure before you proceed into areas of inquiry and questions as a part of the jury selection process.

If I believe or am persuaded that your three-minute overview is in the least argumentative, I will stop you and call you on it in the middle of the process before the panel; and I don't think you want me to do that so make sure it is not argumentative. And again it is not to exceed three minutes.

I'm going to seat eight jurors in this case. Each side is going to be afforded four peremptory challenges.

I'm going to authorize 11 hours per side for each side to put on their evidence as a part of their cases in chief. Each side will be afforded 30 minutes for its opening statements. Each side will be afforded 30 minutes for its closing arguments.

With regard to closing arguments, you certainly are entitled to divide your time between co-counsel. And with regard to the Plaintiffs' final closing, you can reserve as much of your 30 minutes for your final closing as you like with the one caveat that you must use at least 50 percent, or 15 of your 30 minutes, in your first closing argument. Plaintiff can't give a 2-minute first argument and a 28-minute final argument.

During the course of the trial and beginning on December the 3rd, the court will be in chambers not later than 7:30 each morning. It's my intention, once the jury is selected, to bring the jury in each morning at 8:30 to begin evidence that day. That intervening hour is there for counsel's benefit and the parties' benefits should there be issues developing overnight -- problems, disputes -- where you need the court's

guidance. If there aren't occurrences of that type, certainly you are not required to come see me during that hour; but I will be there and be available for you. That will help streamline the trial. That will help avoid wasting the designated trial time that I've given you and allow you to maximize your trial time during the course of the evidence.

As a part of this, you are required to meet and confer each night with regard to demonstratives that are going to be used during the preceding -- excuse me -- the next day's portion of the trial. And if there are disputes, the court needs to be advised that you have disputes that can't be worked through not later than 10:00 p.m. the night before.

The 10:00 p.m. is not a cutoff. You should continue to meet and confer in an attempt to narrow those, but it does me no good to get an e-mail at 5:00 a.m. and you show up at 7:30. So, 10:00 I need an e-mail through my clerks as to where you are. That doesn't mean you shouldn't continue to try and narrow your disputes.

Also, to avoid me looking at what came in at 10:00 p.m. and then you showing up at 7:30 with a vastly different universe of issues, I'm requiring that at 7:00 each morning if you have disputes to take up with me at 7:30, that you deliver a jointly prepared three-ring

binder with hard copies of the disputed demonstratives or other matters that the court needs to consider. That way I will have a fresh and current hard-copy version of what I can expect you to talk about with me at 7:30 in chambers. And that will be delivered to chambers by and not later than 7:00 a.m. in advance of any meeting with the court at or after 7:30 a.m.

I'm going to treat deposition clips on a rolling basis. I do not require that all disputes about all possible potential deposition testimony be raised in advance of the trial. I do require that you not bring me deposition clip disputes later than the day before the day you intend to use them. I don't want to hear about deposition clips on Wednesday that are to be used during Wednesday's portion of the trial. I should hear about those not later than Tuesday. That affords us time to make any adjustments in the clips themselves and greatly reduces the risk that there will be delays or breaks or disruptions in the trial process. But I'll take those up on a rolling basis as we go forward.

If there are deposition clips disputes that might be put before the jury on the first day, December the 3rd, then we need to deal with them before December the 3rd.

The court's practice is to defer presentation

and argument on motions under Rule 50(a) until all the evidence has been presented. That means when the Plaintiff rests their case, I will not hear motions under Rule 50(a) from the Defendants at that time. I will wait until the Defendants have put on their case-in-chief, until the Plaintiffs have put on any rebuttal case they have and all the evidence is before the jury. At that time, and as the rule prescribes, before the case is submitted to the jury, I will hear both Plaintiffs' and Defendants' motions under Rule 50(a).

After all the evidence is in, the court will hold an informal charge conference in which I will review your then most current submissions on the proposed charge and verdict form. I intend that to be informal and off the record, and I want a free and informal discussion with counsel about all the issues related to the Final Jury Instructions and the verdict.

After I've had the benefit of that informal charge conference, I will generate what I believe the final charge and verdict should be. I'll furnish that to you, and then I will conduct a formal charge conference on the record where any issues that you believe should be formally objected to on the record can be urged before the court.

During the trial counsel for neither party nor

your witnesses are to refer to any individual by first name only. The court finds that that practice is inherently confusing in the resulting record, and the court finds that reference to individuals by first name only is not in keeping with the requisite decorum appropriate for a United States District Court.

So, your witnesses can certainly talk about Dr. Smith or Mr. Jones or Mrs. Green but not Sam or Bill or Sally. If there are any questions, let me know. If your witnesses don't comply with this, then I will hold you responsible because it is your obligation to see that your witnesses are so instructed.

In the event there is going to be confidential or proprietary information submitted to the jury and presented during the course of the trial, then I refer you to this court's standing order on sealing the courtroom and sealing the record with regard to confidential or proprietary information.

I would request that to the extent it's feasible, that the presentation of confidential information and any necessary and corresponding need to seal the courtroom be grouped wherever possible so that we can avoid two questions with the courtroom sealed, unseal the courtroom three questions, and then seal the courtroom again for two more questions. I don't want

this to be a light switch that gets flipped on and flipped off.

To the extent you can group and bundle your confidential information or examination material, the court would appreciate that; and I direct that you, within all reasonable bounds, attempt to do that. But I refer you to my standing order on the procedures to be implemented.

The bottom line, for those of you that have not practiced before me in the past, do not come to me after the trial with wholesale requests to redact the record. That should be dealt with at the time the material is presented through sealing the courtroom, which will seal the transcript and alleviate that being included in the public portion of the transcript. Redactions in this court are reserved only for driver's license numbers, dates of birth, Social Security numbers, highly confidential individualized information that I really don't expect to come up during the course of this trial.

There has been a Juror Questionnaire prepared, submitted, and implemented in this case. Those completed questionnaires will be or are in the process of being returned to and accumulated by the clerk, the deputy in charge for this court, Ms. Clendening. I refer you to

Ms. Clendening as to when you can obtain copies of those Juror Questionnaires. The practice in this court is that you may receive those copies at the same time -- at the time the deputy in charge designates. It's typically sometime on the Thursday before Monday's jury selection.

You are entitled to have those. You are entitled to look at them, take advantage of the information that's set forth in there, and use them. You are not to copy them. You are not to scan them. You are not to reproduce them. You are not to retain any information in those Juror Questionnaires at all; and after the jury is selected and seated, at a convenient time you are to return the hard copies of those questionnaires to the deputy in charge.

The court makes it clear to the citizens who serve on jury duty in this court that their candid answers to sometimes personal information in Juror Questionnaires are not going to be kept by lawyers and pop up to surprise them three or four years later down the road in some other context. So, we are very careful to make sure that those questionnaires are used and implemented but not copied, not retained, not scanned, not otherwise reproduced. Again, I refer you to Ms. Clendening and her more precise instructions on the use of those Juror Questionnaires.

Given what I can see before me today, it is at least likely, I would say, that we are not going to cover and complete everything of a pretrial nature today. I could be wrong. I hope we do. But in the event we don't, you should know that I have reserved time on my calendar at 9:00 a.m. on Tuesday, November the 13th, to continue this pretrial hearing in the event we don't get finished today; and you need to keep that time clear on your calendars in case I need you back at that time.

The last thing I will take up under pretrial matters will be objections to exhibit disputes. I do that because I expect you will get substantial guidance from me during the argument and ruling by the court on all the other pretrial matters so that when you get to exhibits, you should already know what is out and what is in; and it should substantially streamline any disputes regarding exhibit objections.

To the extent there are surviving exhibit objections, I want the parties to group those in what are commonly referred to as "buckets," where multiple exhibits that raise common issues can be dealt with by the court as a group. The court can give you guidance on that one or more common issue such that it then will allow fair disposition of all those exhibits. We are not going to have time to take up one, two, three, four

individualized exhibits one at a time.

But I will do that at the very end of the pretrial process with the hope and assumption that what you have now laid out as disputed exhibits will substantially shrink, given the benefit of the court's guidance that you're going to receive throughout the remainder of the pretrial process. If we can get to those today and finish everything, that will be great. If not, we will do those on the 13th and any other substantive pretrial matters we don't finish today.

Whenever we finish the exhibit disputes, you should be clear on the fact that that should result in a fixed and finite universe of preadmitted exhibits. Those exhibits that survive any objections that have been raised and those exhibits that have not drawn an objection will constitute the totality of the preadmitted exhibits. Once we begin the trial, counsel from either party is free to use, offer, and publish those exhibits in the presence of the jury without a predicate, without any formal presentation. That, too, will streamline the trial. That, too, will maximize your designated trial time. That, too, will make the trial more coherent for the members of the jury.

Once an exhibit from the list of preadmitted exhibits has been used before the jury in open court,

then it becomes an admitted exhibit and becomes a part of the record in the case. Those items from the list of preadmitted exhibits that are never used before the jury remain preadmitted. They are not admitted. They are not a part of the record in the case.

To keep the distinction between what is preadmitted and what is admitted clear and concise throughout the trial process, beginning on the second day of the trial, which would be December the 4th, before I bring the jury in, I will direct a representative from each side to go to the podium and offer into the record orally identification of the items from the list of preadmitted exhibits that were used in the preceding day's portion of the trial. We'll do that on a rolling basis each morning so that I will have a rendition in the record as to what's been used from the list of preadmitted exhibits, and those items will constitute the admitted exhibits which are part of the record.

Items from the list of preadmitted exhibits which are not read into the record as a part of that process remain preadmitted and, again, are not evidence in the case nor are they part of the record of the case.

But you should be prepared to have someone from each trial team ready to go before 8:30 each morning starting on Day 2 to make an accurate offer in that

regard orally into the record from the podium, and I expect you to meet and confer with each other and make sure each of you know where the other is. We are not going to have time between 8:00 and 8:30 to have arguments over whether this was actually used in the preceding day or not. It should be a merely ministerial act of making sure the record is documented accurately.

I'm going to direct that the parties jointly collaborate and prepare ten juror notebooks for use during this trial. Those ten juror notebooks should be comprised of ordinary three-ring binders that contain within them a copy of the patent-in-suit, a copy of the court's claim constructions -- not the claim construction order opinion but a side-by-side chart of any construed term and the court's construction to the side of it, just the construed terms and just the constructions.

If a term has been given its plain and ordinary meaning, then that term should be listed on the left-hand side and "plain and ordinary meaning" should be listed on the right-hand side. No analysis, no argument, no verbiage from the claim construction opinion of the court, simply the terms that were considered and the constructions that were adopted. That claim construction chart should be included in the notebooks behind the patent-in-suit.

Behind the claim construction chart, you should have a section of witness pages. You should have a page for each witness who is going to appear or could appear at the trial, with their head-and-shoulders photograph superimposed at the top of that page and their name listed below their photograph. They are not to be characterized. It shouldn't be "Dr. John Smith, Plaintiffs' expert on damages." It should just be "Dr. John Smith." If they have an earned degree, a title, that's appropriate; otherwise, Mr. or Ms. The remainder of those pages can be simply ruled lines for note-taking; but there should be a single page for each potential witness, live or by deposition.

And these sections of the notebook should be clearly tabbed so that there is a tab between the patent-in-suit and the claim construction chart, there is a tab between the claim construction chart and the witness pages, and then there is a tab after all the witness pages; and behind the witness pages, there is a new three-hole punch legal pad inserted for additional note-taking. And in the front cover of each notebook, there should be a nonclicking ballpoint pen inserted. I needn't explain why it needs to be nonclicking.

Those juror notebooks should be delivered to chambers not later than 3:00 p.m. on November the 30th.

Also at a trial like this, counsel, it is inevitable that there will be multiple expert witnesses presented for each of the competing sides. I want you to understand that those expert witnesses must confine their testimony to the scope and the four corners of their written expert reports. Those expert reports should both define and confine the testimony of the expert witnesses.

Objections from the opposing party that an expert witness is testifying outside the scope of their report are inherently problematic in a jury trial such as this. The court does not have all these expert reports memorized. I do not have them at my fingertips.

When that objection is raised, the only way I can deal with it is to send the jury out of the courtroom, get the report, look at it, find the appropriate section, and determine if there is a basis or no basis to the objection. That is inherently disruptive. It delays the trial. It breaks the rhythm of the evidence; and it's something that while it may be necessary, it's to be avoided unless it is absolutely necessary.

I want you to know I have conducted trials where I have been persuaded that opposing parties have raised those kind of disruptive objections for strategic reasons, to break the other side's rhythm, or for some

basis other than a meritorious substantive basis of the objection.

If at any time an objection is raised like that that I am persuaded is for nonmeritorious, strategic bases, then I will take appropriate action of a punitive nature. I have reduced counsel's trial time. I have reduced counsel's closing argument time. I will do whatever I need to do to make sure, if that happens, it does not happen again.

So, I'm giving you fair warning. If you feel compelled for the best interest of your client to make such an objection, certainly you should make it; but be sure of where you stand before you do. The inherently disruptive nature of that kind of objection requiring that I send the jury out and break the presentation of the evidence makes this a different kind of objection than the ordinary evidentiary objection or the thing that's common in trial. And I want to put you on notice that I will view it in the way that I just described to you.

Also let me go back a minute to your overnight meet-and-confer obligations. I did not say this; but in the event there are not disputes overnight, I still need to get an e-mail from you to my law clerks so at least I know one way or the other. I would be very happy to get

that kind of e-mail. But if you have disputes, let me know. If you don't have disputes, let me know.

With regard to what I expect you to deliver to chambers if you do have disputes overnight, you can either do that in two notebooks where I have Plaintiffs' version and Defendants' version; or you can put them in a single notebook with a tab between them so I can clearly see where is Plaintiffs', where is Defendants'. But I need the most current version. These issues usually evolve over time. What you may be fighting about at 10:00 the night before may look nothing like what you have that next morning. If you come in at 7:30 and I've got just what you had at 10:00, I may be looking at something very different than what you have by 7:00 the next morning.

So, that's why I want, for surviving objections, a notebook delivered to chambers by 7:00. But make sure I clearly know and can see, either by separate notebooks or tabs in a single notebook, what is Plaintiffs' position, what is Defendants' position.

All right. Are there questions about any of the matters I've gone over with counsel so far? Plaintiff have any questions?

MR. PAYNE: No, your Honor. Thank you.

THE COURT: Defendants have any questions?

MR. RALEY: No, your Honor.

THE COURT: All right.

All right. The first disputed pretrial matter that we're going to take up has to do with Mr. Paul Meeks and Mr. John Walker. We have a motion by Plaintiff to prohibit Mr. Walker's participation. We have a motion by Defendants to quash a trial subpoena regarding Mr. Meeks. All this seems to run together and compels the court to take it up concurrently. This is clearly, from the papers, a very interesting situation. I'm interested to hear what you have to say. I'm going to begin with the presentation from the Plaintiff, and then I'll hear from the Defendant.

And just for the record, I assume Mr. Meeks is not present in any shape, form, or fashion; is that correct?

MR. RALEY: That is correct, your Honor.

THE COURT: All right. Mr. Payne, go ahead.

MR. PAYNE: Thank you. I was going to handle the Meeks motion. Mr. Wilson was going to handle the Walker motion. Would you like to hear the Walker motion first since you called Plaintiffs?

THE COURT: I'll hear it in whatever order you want to present it. If you want to do it between cooperating co-counsel, I'll leave that to you.

MR. PAYNE: Thank you.

THE COURT: I don't see any reason to segregate these. They run together in my view.

MR. PAYNE: Well, let me start then, please, with the Meeks motion that we received yesterday. Three quick points there. One is I want to give the court some further context; two, I want to address the motion itself and what's said in there; and, three, bring to the attention of the court something in the motion that we think is very inaccurate that may bear on the court's rulings.

First the context, your Honor. Defendants have made Mr. Meeks' credibility a central part of this case, yet they want to shield from the jury his dishonesty. For example, they have had their experts rely extensively on Mr. Meeks regarding the functionality of the infringing tool. I'd like to go through a brief chronology to put this into context.

First, the court will recall that Mr. Meeks signed a false declaration in support of their motion to transfer. He said, for example, that all of the documents were in Houston. That was false. He knew that was false. They tried to say that to get the case transferred.

Second, they had Mr. Meeks sign a second false

declaration in opposition to our motion to compel. That was forced because they had only produced 22 pages of documents. He said he had gone back and looked and that was the only 22 pages he could find. He said that -- you might recall -- what he really meant to say in his first declaration was that --

THE COURT: I remember the venue process vividly.

MR. PAYNE: Yes.

And then the court of course remembers that it struck his first declaration, finding that he had displayed a blatant disregard for the most basic requirements for truthfulness.

Now, at that point everyone knew that Mr. Meeks had been dishonest; so, everyone was clear about that at that point. In fact, the court in its order said that when you go out and you collect these documents pursuant to order on the motion to compel, get someone other than Mr. Meeks to sign the declaration about how you collected the documents, you may recall. So, everyone was clear on that.

At that point the Defendants could have cast aside Mr. Meeks, right? That was sometime in the summer. But they decided to double down, and they produced him as their 30(b)(6) deposition witness on a host of topics.

Now, they could have chosen Mr. Walker at that point or Mr. Saxena. They had a choice at that point, cut ties with Mr. Meeks and go with Mr. Walker. But they doubled down, and they stuck with Mr. Meeks in the 30(b)(6) deposition. Of course in his deposition, he conceded that he was dishonest in his declarations.

Then they decided to triple down, your Honor; and they designated Mr. Meeks' deposition testimony to play before the jury.

Then they decided to quadruple down because they had both of their experts rely extensively on Mr. Meeks. He's cited all over both expert reports, Ms. Webster, Dr. Rodgers -- for example, Dr. Rodgers relies extensively on Mr. Meeks for his noninfringement opinions.

So, they have placed repeatedly Mr. Meeks' credibility at issue. It is a central part of this trial. And what they are trying to do is substitute Mr. Walker for Mr. Meeks, who has been dishonest.

Again, back in the summer they could have made that substitution and we wouldn't be talking about these issues, but they kept on using Mr. Meeks. So, at trial, your Honor, I'm going to need to be able to cross-examine Mr. Meeks if he's here; and at the very least, I need to be able to cross-examine their two expert witnesses who

rely on Mr. Meeks about his dishonesty.

For example, Rule 608(b) -- if I could use the ELMO -- of the Federal Rules of Evidence allows the court, when a witness' credibility is at issue, to allow a party to cross-examine that witness on his prior dishonesty.

It says, "Specific instances of conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness' conduct" -- that's Mr. Meeks' conduct -- "in order to attack or support the witness' character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of the witness" -- Mr. Meeks -- "or another witness whose character the witness being cross-examined has testified about." That's the expert witnesses.

So, at the very least at trial we need to be able to cross-examine their expert witnesses who rely on Mr. Meeks about his lack of credibility.

Now back to the motion to quash that was filed yesterday. It's interesting that they don't have any declarations, your Honor. There is no sworn declarations to support any of these facts, unless I've missed

something.

THE COURT: And Mr. Meeks is clearly not here because I've already asked that question.

MR. PAYNE: Yeah. And why don't they have declarations about his going to Cabo, his 50th birthday party, when he was laid off, et cetera? I've asked basic questions like when was he laid off. I haven't gotten any answers. That was a surprise to us, of course. We learned about it a day or two ago.

But the fact that they don't have these sworn declarations to substantiate their arguments --

THE COURT: What about the --

MR. PAYNE: -- is a --

THE COURT: Excuse me. What about the statement in the motion to quash that you all were advised of this in his deposition?

MR. PAYNE: Nice segue because that's exactly where I was going. That is not true. That is not true. And, so, let me -- I've talked to Mr. Baxter about this. He is here if the court wants to ask him specific questions.

They have represented in this motion that they told -- that Mr. Bowick told Mr. Baxter that Mr. Meeks was going to be out of the country. At Mr. Meeks' deposition they say, quote, specifically Weatherford was

informed that Meeks was going to be in Cabo San Lucas Mexico celebrating his 50th birthday with his family and close family friends. This information was shared to ensure that Weatherford knew to gather whatever testimony it needed from Meeks during his deposition.

False. They are using a false premise to argue that the subpoena should be quashed. What happened, your Honor -- I discussed this with Mr. Baxter -- is that not in -- this did not take place in Mr. Meeks' deposition. This took place several weeks later at the deposition of their expert, Dr. Rodgers, when Mr. Bowick specifically told Mr. Baxter that he had reviewed the deposition transcript of Mr. Meeks -- obviously after his deposition -- and said, "I don't think we need to use his deposition testimony, and he may be on vacation anyway."

So, that took place well after Mr. Meeks' deposition. They never told us at Mr. Meeks' deposition that he was going to be out of the country and we had better get in all the cross-examination at that point. And Mr. Baxter is happy to submit a declaration to the court to that effect if the court sees fit. But this basic premise that they told us -- gave us advance warning and therefore the motion to quash should be granted is not correct, your Honor.

So, for those reasons we think the trial subpoena should be enforced. At the same time, I really need to be able to cross-examine the expert witnesses on Mr. Meeks' dishonesty. And perhaps, depending on the ruling on Mr. Walker, if Mr. Walker doesn't come to trial pursuant to the court's rulings and doesn't testify, you know, maybe Mr. Meeks doesn't need to be here. I don't know. It just depends on what happens.

But at the very least they should not be able to use Mr. Meeks as a sword to support their experts, for example, and shield the jury from his dishonesty. I mean, they have placed his credibility directly in the center of this case; and we need to have latitude, your Honor, to cross-examine on those points.

Now, we've taken the orders off the exhibit list; but we need to be able to use the court's findings that he was dishonest in connection with this very case. Thank you, your Honor.

THE COURT: Let me hear from Defendant, please.

MR. RALEY: John Raley, your Honor.

Just a point of clarification. I want to be very clear. We are only to address the subpoena issue and the motion to quash the subpoena; the issue regarding corporate representative testimony will be taken care of

next because counsel has split that argument. His argument overlapped a little bit; so, I just want to make sure what the court wants me to do.

THE COURT: I'm not going to enforce strict parameters here. I think this all runs together. I will go back and forth between both of you all until I'm satisfied I've heard everything I need to hear.

MR. RALEY: Fair enough. Thank you, your Honor.

Let me address the subpoena first, then. What Mr. Meeks signed and provided before this court was given him by our prior counsel, and I -- the testimony in Mr. Meeks' deposition is that that was given to him by prior counsel and he was told that he needed to sign it and he signed it and it was filed with the court. He admitted that he did not review it as carefully as he should have done.

Now, I can't speak for the conduct of prior counsel. I am aware of the court's ruling about the declaration. If I achieve nothing else this morning, I hope to assure the court that we are new counsel and we will do our very best to have probity in everything we do in this proceeding, your Honor.

It would seem clear to most people that the court's rulings about venue and discovery disputes have

no place in a jury trial. They are not probative to any issue before the jury. They are irrelevant; and to the extent there is any relevance, which I can't imagine, they would be barred by 403. Regardless, Plaintiffs' counsel wants to bring venue disputes and discovery disputes into the jury trial.

THE COURT: Well, let me say this.

MR. RALEY: Yes, your Honor.

THE COURT: I know there are pending motions *in limine* that specifically target this kind of evidence. I'm going to defer rulings on those until we get to the motions *in limine*.

I'm primarily concerned about Mr. Meeks at trial. I'm concerned about who the corporate representative is. I'm concerned about building a case around someone and then the day before pretrial saying, "He's been laid off; he's going out of the country; everybody knew about it" and the other side telling me, "We didn't know about it."

There's -- let's just say there are some very imprecise statements in your motion to quash that need to be refined. And I'm primarily concerned at this point about the individuals at trial for Defendants. Whether Plaintiffs' counsel is going to cross-examine witnesses on the matters that have been raised, I'm going to hold

that until we get to the *limine* disputes. Okay?

MR. RALEY: To clarify one thing, your Honor, our experts in no way rely on anything Mr. Meeks said about venue or discovery. They simply have read what he said about how the accused pusher arm works, and they have their own opinions about how the accused pusher arm works from their observations and also from the testimony of other witnesses. So, he is not the center of our case. He never has been. He was produced as a 30(b)(6) witness.

THE COURT: Is it not the case that Tesco provided him as a source of information to the experts about how the pusher arms work?

MR. RALEY: They reviewed his deposition testimony, your Honor. There was -- and there were portions of the deposition testimony about how the pusher arm works. There are similar portions in Buddy Scrantz's deposition, your Honor.

THE COURT: The expert reports that I've seen indicate that the experts refer multiple times to what information they got from Mr. Meeks.

MR. RALEY: Right.

THE COURT: I don't think you dispute that, do you?

MR. RALEY: No, sir.

THE COURT: Okay.

MR. RALEY: But it's about how it works, not about venue discovery.

THE COURT: I understand that, and I agree with you on that.

MR. RALEY: Yes, sir.

Regarding -- well, here is what I know about Mr. Meeks. I know that during his deposition my law partner, Bobby Bowick, told Boone Baxter -- what led to the event was Mr. Baxter asked Mr. Meeks if he would be available for trial.

Mr. Bowick asked him at a break, "Are you going to be available for trial?"

He says, "No. I have this family vacation."

Mr. Bowick told Mr. Baxter, "He's got this family vacation. He will not be available for trial."

Unfortunately, it's not on the record. I wish it had been on the record. But Mr. Bowick is an officer of the court and --

THE COURT: And so is Mr. Baxter.

MR. RALEY: And so is Mr. Baxter.

THE COURT: And they are both here, and I'm probably going to hear from both of them on this.

MR. RALEY: Yes, your Honor.

That's all I know to do. If your Honor needs

declarations, we can provide them; but, you know, officers of the court can stand --

THE COURT: Talk to me --

MR. RALEY: -- here and --

THE COURT: -- about Mr. Meeks' current status. Talk to me about this, quote, reduction in force. Is that Tesco? Is that Nabors? Who is that? When did it happen?

You know, Defendants' counsel signed off on a pretrial order in this case on October the 29th; and then on November the 7th, we get this motion to quash that said Meeks has been released by Tesco as part of a company-wide reduction in force. I gather that happened between those two dates.

MR. RALEY: With your permission, your Honor, Mr. Bowick has information about that.

THE COURT: All right. I'll hear from you.

MR. BOWICK: Your Honor, after -- sometime after the acquisition of Tesco by Nabors, Mr. Meeks assumed a role in sales at Nabors Drilling Technology USA, Incorporated.

THE COURT: And Mr. Meeks is listed in the Defendants' witness list in the pretrial order dated October 29th --

MR. BOWICK: Correct, your Honor.

THE COURT: -- as the -- let me finish -- as the global business manager for deepwater at Nabors Drilling Technologies, formerly Tesco Corp. US.

MR. BOWICK: Correct, your Honor.

THE COURT: Okay.

MR. BOWICK: We were informed last week that there was a reduction in force at Nabors, and he was one of the people -- one of the Nabors employees that was let go.

THE COURT: Last week?

MR. BOWICK: Yes, your Honor.

THE COURT: I've searched the Internet this morning, counsel. I don't find any press release, any public media release, any news release about a company-wide reduction in force.

MR. BOWICK: Your Honor --

THE COURT: What do you mean by "company-wide reduction in force"?

MR. BOWICK: Well, I don't mean they laid everybody in the company off. But with the price of oil fluctuating the way it has been, several -- I mean, Nabors has had several reductions in force periodically where they have let people go, especially non -- especially in roles like sales where it's not critical to the function of drilling oil wells.

THE COURT: How many people besides Mr. Meeks were included in this reduction in force?

MR. BOWICK: Your Honor, can I confer with in-house counsel and see if I can find out that answer?

THE COURT: You're telling me you don't know the answer?

MR. BOWICK: I don't know the answer sitting right here, your Honor.

THE COURT: Can you tell me why you didn't get Mr. Meeks to sign a declaration to attach to this motion to quash where he could provide the specificity that's clearly lacking?

MR. BOWICK: Your Honor, that was an option. I looked at it, as an officer of the court, that we could make a representation that, as an officer of the court, you don't need signed declarations or affidavits --

THE COURT: But you do need to provide specific information, and there is not any specificity in here. And you're telling me, to the questions that I'm asking, to add that specificity that you don't know. I mean, I don't know when he was let go. I don't know if he was one person let go or one of a thousand people let go. I don't know if he has any ongoing relationship with any party in this case right now.

He hasn't changed his profile online in

LinkedIn. We've checked that.

There is no public announcement that's been picked up on the Internet about any major reduction in force. I've got a pretrial order from a week ago that you signed off on saying he was an employee, he would be here, he would be a witness. You filed a sur-reply to the Plaintiffs' motion regarding Mr. Walker and never mentioned anything about Mr. Meeks' status or change in status in there, and that was filed after October 29th. There is just a lot of specific information missing from this motion to quash.

And certainly, you're not required to bring Mr. Meeks to make him available, to the court. You're not required to get a declaration from Mr. Meeks. And I'm not saying as an officer of the court, you're not entitled to make representations that on their face the court should consider and accept; but if you don't have specific knowledge of what I need to know about, then you need to go get it from somewhere and provide it to me; and you haven't done that.

MR. RALEY: We can do that, your Honor.

MR. BOWICK: Your Honor, we can do it. I can tell the court --

THE COURT: I gather neither of you gentlemen represent Mr. Meeks in his individual capacity.

MR. BOWICK: No, your Honor.
THE COURT: You are not his lawyers.
MR. BOWICK: No, your Honor.
THE COURT: You are not authorized to speak for him individually.
MR. BOWICK: No, your Honor.
Your Honor, we received an e-mail saying that he had been let go the day -- and we informed Weatherford's counsel I believe that same day that he had been laid off.
THE COURT: And do you have that e-mail with you?
MR. BOWICK: I might be able to pull it up on my computer.
THE COURT: And when did you receive it?
MR. BOWICK: I believe it was last week.
MR. RALEY: I've got it on my phone, your Honor.
MR. BOWICK: There's been lots of late nights this week; so, it's kind of running together.
THE COURT: It's only going to get worse from here.
MR. RALEY: Yes, your Honor.
THE COURT: And Mr. Meeks resides in or around Houston, Texas; is that correct?

MR. BOWICK: Correct, your Honor.

THE COURT: Counsel, I'm not particularly moved by what happened during the venue dispute in this case. That's -- that's substantially water under the bridge. But Mr. Meeks is a major, if not the primary, source of information that the Defendants made available to the experts to incorporate and consider in generating the opinions that are going to be an important part of this case; and I will just tell you this is suspicious that the day before pretrial we get a motion to quash, a week before pretrial we get a signed-off-on pretrial order where you list him as a witness as a representative of a Defendant company.

And then this motion to quash has very general, nonspecific representations in it; and I've got what appears to be two lawyers in the courtroom in front of me today that are both telling me totally different and irreconcilable things about what was said or what was not said at an earlier deposition.

This is a suspicious and troubling situation.

If you need some time to consult with your corporate representative who is here or if you need some time to review your e-mail traffic, if you need some time, I'll give you some time; and we'll recess. But I need to know some specifics. I need to know what

happened, when it happened, why it happened, how it happened, not just he's going to Mexico for his 50th birthday and can't be at trial. That's not going to cut it. And the motion to quash is the way you elected to present it to the court. It's your burden to persuade me on that.

MR. RALEY: Yes, your Honor. And at the first break, we'll talk to our counsel about it and report to you --

THE COURT: Let me hear the rest of your argument.

MR. RALEY: I can also show you the e-mail we got and the date of it. Mr. Payne will not be able to deny, I hope, that I informed him that Mr. Bowick had told Mr. Baxter about this during deposition. We've had many discussions about Mr. Meeks. I did not know until today that Mr. Baxter was going to deny that; so, that's news to me today. But we will find out all the information your Honor wants at the first break and get back to you and do the best we can on that.

Now, regarding the other issue, your Honor, there are several cases we've cited. A few things that are not disputed, which is good, Weatherford wrote a letter to Tesco about an alleged infringement of the '637 patent; and the letter is dated September 13th, 2016. We

have no information about when it was received and we've asked for that and they have not provided it. But that would be -- if it was received, that would be the approximate date of the providing of notice.

THE COURT: What in the world does this have to do with --

MR. RALEY: Oh, I'm sorry.

THE COURT: -- Mr. Meeks and Mr. Walker?

MR. RALEY: Okay. Well, I'm --

THE COURT: We're going to get to the marking dispute later.

MR. RALEY: Okay. Let me deal with that first, then.

THE COURT: I want to finish the argument on Meeks and Walker.

MR. RALEY: Okay. Your Honor, there are several cases that both sides have cited. Tesco has cited a Fifth Circuit case, *Union Pump*, that is -- was not selected for publication; and according to the Fifth Circuit Rule 47.5.4, it is not precedential. We have cited a published Fifth Circuit opinion, *Brazos River Authority versus GE Ionics*, 469 F.3d 416. And that --

THE COURT: For what purpose, counsel?

MR. RALEY: For the purpose of establishing that a corporate representative can testify at trial

regarding matters within the corporate knowledge, that that person is not testifying in an individual capacity but testifying on behalf of a corporation and that a hearsay objection to that will not lie because that is the testimony of the corporation. We cannot call a corporation to testify except through a human being.

And the case law permits companies to call corporate representatives to testify at trial. A case directly on point is *Sunflower Condominium Association* -- the words could have been written for this case -- *versus Owners Insurance*, which is a case dated October --

THE COURT: The issue is not whether your clients can appear and offer testimony --

MR. RALEY: Okay.

THE COURT: -- through a corporate representative. The issue is who is that corporate representative.

MR. RALEY: Good. They haven't --

THE COURT: Just a minute --

MR. RALEY: -- raised that --

THE COURT: -- counsel.

MR. RALEY: I apologize.

THE COURT: We're not going to talk at the same time.

MR. RALEY: I apologize.

THE COURT: And I'm not going to stop when you start; so, you're going to have to stop when I start. Okay?

MR. RALEY: I'm stopping. Yes, your Honor.

THE COURT: The issue is not can you be represented by a corporate representative and can they testify on behalf of the corporation if it goes beyond their own individual personal knowledge. That's a given.

The question is can you put up a corporate representative until the eve of trial and then pull a switch where the other side has prepared their trial efforts and testimony and examinations based on Individual A -- you know, a corporation should not be entitled to have a designated representative who stumbles along the way and then, at the last minute, without an opportunity to have a fair preparation time, be given somebody different as the representative. I'm not saying that happened here, but that's the allegation I'm getting from Plaintiff.

MR. RALEY: Your Honor, if I can respond. I'm sorry -- I apologize to the court for going into that other issue which you said is a given. They raised it in their briefing; so, I was responding to their briefing, not to the court's inquiry and for that I apologize. I will respond to the court 's inquiry.

Mr. Meeks was produced as a 30(b)(6) representative. Our position is that counsel was told during his deposition that he would not be available for trial. We started looking for another at that time.

Mr. Walker's name is known. We've put in our briefing when his name was provided and his title. And it all came up in depositions in this case; so, they are not surprised by that.

Another alternative is Sododh Saxena who was recently deposed in the IPR proceeding. According to the cases we've cited, your Honor, *Sunflower Condominium* and also *Coach versus Visitors Flea Market*, two cases directly on point, very recent -- the *Sunflower* case is in October of 2018, your Honor.

THE COURT: That's from the District of Colorado?

MR. RALEY: Yes, your Honor. And *Coach* is from the District of Florida. And then we, of course, cited the Fifth Circuit case, *Brazos*.

But what these cases recognize is in situations where a 30(b)(6) witness becomes unavailable or if there is some other issue, the corporation can call another individual as its corporate rep and that corporate rep can be impeached from the 30(b)(6) deposition.

THE COURT: Let me stop you and ask this question. You're telling me that you want to substitute Mr. Walker for Mr. Meeks because your concern is Mr. Meeks is not available.

MR. RALEY: That's part of the reason, your Honor.

THE COURT: Now, if the court, in response to the subpoena that's been served on Mr. Meeks, were to enforce that subpoena and require his presence at trial, then that would obviate your concern that he would not be available to be here, would it not?

MR. RALEY: It would -- that particular concern, yes, your Honor.

THE COURT: What other concern beyond his actual availability do you have --

MR. RALEY: Well, I'm a little --

THE COURT: -- that supports your request or rationale to substitute Walker for Meeks at trial?

MR. RALEY: I'm a little concerned about calling somebody who has just been laid off as a corporate representative. I hope the court can see why that is without me going into a lot of detail on that. My concern, obviously, is that he would be disgruntled because he's been laid off.

Also we have recently entered into a

streamlining stipulation where the only party -- Nabors will no longer be a party to this case; it will be Tesco. And Mr. Saxena is purely a Tesco -- well, he wears the hat of Tesco. Mr. Walker doesn't even wear that hat, according to recent testimony. So, he's more of a Nabors guy; so, that's why we were thinking about Mr. Saxena.

But the point is either one of them could be impeached from the 30(b)(6) deposition as if they gave it, and Mr. Saxena could also be impeached from his own deposition which he's recently given. So, Mr. Walker was disclosed previously. Mr. Saxena disclosed recently. But either one of them could be impeached from the 30(b)(6) deposition.

That is the remedy that the case law recognizes under these circumstances under the *Sunflower* case and under the *Coach* case. They're both very, very -- I won't say similar -- identical situations where a corporate representative had to be replaced and the remedy is impeachment from the deposition. If the witness testifies consistent with the deposition, there is no surprise. If the witness testifies inconsistent with the deposition, they can be impeached just as if it was the same human.

So, I submit to the court that the language -- I don't want to burden the court's time by reading it,

but it -- in *Sunflower* Defendant argues that the testimony from a "surprise witness" identified only as an unnamed representative of Plaintiff should be excluded because Plaintiff is "laying an ambush for Defendant at trial."

Exactly what is being argued here.

Defendant claims that allowing such testimony will deprive Defendant of the opportunity to cross-examine. Plaintiff responds it is entitled to have a corporate representative sit at counsel's table, testify on behalf of Plaintiff. They have already -- Defendant has already deposed Plaintiffs' corporate representative. That particular individual is, for some reason, not available to testify at trial. Plaintiff identified Ralph Reed in response as its corporate representative.

The court agrees that Plaintiff is entitled to have a corporate representative sit at counsel table, testify on behalf of Plaintiff at trial. Mr. Reed will be held to deposition testimony of Plaintiffs' 30(b)(6) deposition witness --

THE COURT: Let me stop you, counsel.

MR. RALEY: Yes, your Honor. So, it's just what we're saying. It's precisely on point. Yes, your Honor.

THE COURT: Now, there was -- I've seen the case. There is --

MR. RALEY: Yes, sir.

THE COURT: -- no need for you to read it to me.

MR. RALEY: Sorry.

THE COURT: What else do you have on this?

MR. RALEY: I'm just happy to answer any of your Honor's questions.

To go straight to the heart of what I think your Honor is asking, our current thinking is Mr. Saxena will be our corporate representative. He's been deposed. He can be impeached by the 30(b)(6). Mr. Walker remains an alternative, but we would prefer to have a Tesco guy if we can.

THE COURT: All right. I don't have any further questions at this point.

MR. RALEY: Thank you, your Honor.

THE COURT: I want to -- I want to ask a question of your co-counsel.

MR. RALEY: Yes, your Honor.

MR. BOWICK: Yes, your Honor. I got some answers for you during those arguments.

THE COURT: Well, I want to ask a question.

MR. BOWICK: Yes, sir.

THE COURT: You are telling me that at the deposition of Paul Meeks, you advised Plaintiffs' counsel during the deposition, before it was complete and before the parties and the witness left that day, that Mr. Meeks was going to be out of the country during this trial time and would not be available to attend in person; is that correct?

MR. BOWICK: That's correct, your Honor.

And I believe I -- what I said is if this trial goes forward on December 3rd -- because the question was posed was Mr. Meeks going to be at trial. And I asked him. That was the first time I had learned of this vacation. He said, "We've rented this house. We have four couples," et cetera --

THE COURT: I just want to know what you said.

MR. BOWICK: And my recollection of what I said to Mr. Baxter during the break when I got the information was, "If this trial goes forward on December 3rd, Mr. Meeks will not be available because he's going to be out of the country."

THE COURT: All right.

MR. BOWICK: I don't believe I even talked to Mr. Meeks after that, after his deposition.

THE COURT: You've answered my question.

Now, do you have an e-mail that you want to

show me?

MR. BOWICK: I can show you the e-mail, or I can tell you the date. I was mistaken. It was Tuesday --

THE COURT: Put the e-mail on the ELMO if you will.

MR. BOWICK: And, your Honor, I just want to make sure we're not waiving attorney-client communications here but -- this is correspondence from in-house counsel.

THE COURT: I'm not asking you to waive any privilege. I'm simply giving you an opportunity to present to me what you alluded to earlier.

MR. BOWICK: Yes --

THE COURT: That's your choice.

MR. RALEY: For this limited purpose, your Honor, to answer the court's question, we need to do this.

MR. BOWICK: Would you like me to zoom it?

THE COURT: I would like everybody to have a seat and be quiet and let me read this e-mail.

What is the date at the top? I'm having a little trouble reading it.

MR. BOWICK: Your Honor, it's Tuesday, November the 6th; and that e-mail was sent at 7:35 a.m.

And to give you some context, your Honor, Mr. Saxena was deposed on the previous --

THE COURT: I didn't ask for any context. I asked you a question; you answered it.

And is this Mr. Nicholson who sent the e-mail the same gentleman who is in the courtroom today?

MR. BOWICK: It is, your Honor.

THE COURT: All right. You can take this down.

MR. BOWICK: And, your Honor, to answer your question, there was 50 Nabors employees that were laid off on Monday, November 5th, 2018.

THE COURT: All right. Now, before I give Mr. Payne an opportunity to follow up, Mr. Baxter, you're here in the courtroom. You're an officer of the court as well. You've heard the representation from Mr. Bowick about the conversation during the Meeks deposition. I want you to go to the podium and tell me what you were told. I want your version of that conversation.

MR. BAXTER: Thank you, your Honor.

During that deposition I spoke to Mr. Meeks one time off the record. It was at the end of the deposition. We have the transcript. It was a very tense moment. I just was able to -- Mr. Meeks admitted he was dishonest in two declarations and that he was still --

that there were still documents that they had not produced.

As soon as the deposition finished, I went straight to him, shook his hand; and I said, "I'm sorry you had to go through that." That was the only thing I said to Mr. Meeks that day. I never --

THE COURT: Did Mr. Meeks say anything to you about his availability for trial?

MR. BAXTER: No, your Honor, he did not.

THE COURT: Did Mr. Bowick or anyone there as opposing counsel say anything to you about Mr. Meeks' unavailability for trial?

MR. BAXTER: No, your Honor, they did not.

Now, I just want to expand that just a moment -- for just a little bit. I'm the most inexperienced attorney on my team. If he had said that and I had held that information from my team, I'd be in a lot of trouble.

I never said that to my team. I never heard that. The first I heard that Mr. Meeks may not be available at trial is during Dr. Rodgers' deposition in September, months later, after Mr. Bowick had reviewed the transcripts.

THE COURT: Now, the date of this deposition with Mr. Meeks that we're talking about -- the date of

that deposition was what?

MR. BAXTER: July 27th.

THE COURT: And what Mr. Bowick just told me as an officer of the court, you're telling me did not happen.

MR. BAXTER: How could I speak to Mr. Meeks? I did not speak to Mr. Meeks. I did not hear anything about his unavailability --

THE COURT: The statement from Mr. Bowick was that he told you Mr. Meeks was not going to be available. And you're telling me that did not happen?

MR. BAXTER: That did not happen.

THE COURT: All right. Thank you, Mr. Baxter.

Mr. Payne, I'm going to let you respond at this point for Plaintiff.

MR. PAYNE: Your Honor, Mr. Wilson is going to argue the motion to strike on Mr. Walker.

THE COURT: That's fine.

MR. PAYNE: Thank you.

MR. WILSON: Thank you, your Honor. Douglas Wilson for Plaintiff Weatherford.

Let me just start by saying, your Honor, the situation we're in with John Walker and now Mr. Saxena, who Defendants want to substitute as a corporate representative, is a problem of their own making. They

are very concerned about putting on a laid-off witness in Mr. Meeks, but we filed our motion to strike Mr. Walker way before they laid off Mr. Meeks.

So, they have put themselves in this situation, unlike any of the cases that they cite to your Honor. The cases have this flavor of, you know, there was no gamesmanship here, there's no prejudice to Plaintiff here in these cases in which they have allowed a substitution of a corporate rep. That's not case here.

And, so, if I could start with Rule 26 which required disclosure of Mr. Walker early on and a supplement if Mr. Walker showed up and suddenly had relevant knowledge, Rule 26 says -- or requires the disclosure of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses. It's very straightforward. Mr. Walker is now such an individual, but he was not disclosed. And Mr. Saxena to date has not been disclosed. Mr. Saxena is not on their witness list and has not been disclosed in any way, shape, or form.

Now, Defendants argue that Rule 26 doesn't apply to corporate entities; and there are some cases that sort of hint at that. The problem with that is in the Fifth Circuit the Federal Rule of Evidence 602 applies to individuals whether they are corporate reps or

not. A corporate rep cannot testify outside of his or her personal knowledge. That's *Union Pump*. It's Fifth Circuit -- it's a Fifth Circuit case. They are correct. It's not precedential but it is being followed and we cited several cases that follow it in the Fifth Circuit, even cases outside the Fifth Circuit that follow it.

So, they say, well, that's not controlling authority. *Brazos River Authority* is the controlling authority here. But if I can show, your Honor -- so, this is *Brazos River Authority*. You can see at the top up here. This is *Brazos River Authority versus GE Ionics*. And you can see what happened in *Brazos River Authority*. The opinion says, *"Brazos River Authority* argues that the district court improperly restricted Brazos River Authority's questioning of Cajun's corporate representative, Todd Grigsby."

What was going on is the opposing party wanted to use the corporate rep and elicit testimony from the corporate rep outside the corporate rep's personal knowledge. And the Fifth Circuit says absolutely. That is totally fine.

It says, "At trial, *Brazos River Authority* called Grigsby. It had previously designated excerpts from his testimony to be presented if he did not appear to testify; he did, however, appear."

"Counsel for Cajun," you can see, "joined by counsel for Ionics, objected to further examination of Grigsby on the ground that he lacked personal knowledge."

What *Brazos River Authority* says is, hey, under Federal Rule of Civil Procedure 32, of course the opposing party can ask those questions at trial. They can use that deposition at trial. It's not hearsay for them. It's not hearsay for the opposing party. That's what *Brazos River Authority* says.

If you look at *Union Pump*, *Union Pump* actually cites *Brazos River Authority*. They are not contradictory. *Union Pump* deals with a situation where a party tries to put up its own corporate rep and have him testify outside of their personal knowledge, and the court says you can't do that. The court says, no, we're not going to permit you to do that.

Here is *Union Pump*. It says, "Federal Rule of Evidence 602 limits the scope of a witness' testimony to matters that are within his or her personal knowledge. *Union Pump* argues that Bixler was permitted to testify to matters that, although they were not within his own personal knowledge, were within the knowledge of the corporation because Bixler was designated as *Union Pump*'s corporate representative."

THE COURT: If you're going to read, you're

going to need to slow down.

MR. WILSON: Thank you, your Honor.

THE COURT: Everybody speaks twice as fast when they read as when they are not reading. Go ahead.

MR. WILSON: I apologize.

Here they are saying in this situation if you're calling your own corporate rep, that corporate rep cannot testify outside his or her own personal knowledge. They even cite *Brazos River Authority* you can see down here at the bottom. These cases are not inconsistent. They are entirely consistent, and there are multiple cases that follow *Union Pump* even though it's a nonprecedential opinion.

The point is -- the rule is if you are an individual who is going to testify, you can't testify outside your personal knowledge except in the limited context of a 30(b)(6) deposition. The adverse party is entitled, under Federal Rule of Civil Procedure 32, to use that testimony at trial against you if they so choose. That does not mean that you can use it yourself.

And that's the issue here. What they are trying to do is the evidence, as we have presented to the court, is Mr. Walker has no relevant knowledge. Mr. Saxena has no relevant knowledge. What they knew about was the interrelationship of the corporate entities

here, Nabors and Tesco.

Those are no longer at issue. Given that the parties have stipulated to their removal from the case and the only remaining claims to be tried are direct infringement by Tesco Offshore Services, LLC, there is nothing left for them -- there is nothing left that they have personal knowledge about that's relevant here.

And how do we know that? We know that because Mr. Walker was mentioned a couple of times during discovery, once by Mr. Meeks at his deposition, as someone he had talked to before his deposition; but he never said what Mr. Meeks knew.

Mr. Scrantz mentioned that Mr. Walker was his boss, but Mr. Scrantz himself testified that the only people who had anything to do with the pusher arm over its entire history were himself, Mr. Meeks, and Mr. Mawford, who is no longer with Tesco. So, despite knowing about Mr. Walker, Mr. Scrantz said he knew nothing about the pusher arm; and that's the issue here.

What they are trying to do is substitute in a replacement witness in the form of Mr. Walker to replace Mr. Meeks, and he's going to say what they tell him to say.

And while we're on that subject, let's talk about Mr. Saxena. They propose substituting Mr. Saxena.

I deposed Mr. Saxena a few weeks ago, and I deposed him in the context of the IPR proceeding. His deposition was narrowly tailored to his seven-page declaration that he submitted in the IPR, and it was in an effort to avoid a finding that Nabors was a real party in interest in the IPR proceeding. His deposition had to be narrowly confined to that declaration; and, in fact, Mr. Raley, during that declaration (sic), instructed me that he was going to have a very short leash if I ventured outside of that.

However, what we did establish during that deposition is that Mr. Saxena made a number of representations in his declaration for which he had no basis, some of which were contradicted by the testimony of Mr. Meeks, Mr. Scrantz, and by their own interrogatory answers.

So, the pattern is clear. What they plan to do is to put up a witness in the form of Mr. Walker or Mr. Saxena who will say what he's told to say even though he has no personal knowledge of what he's testifying about, in an effort to provide an alternative basis for their noninfringement theories instead of Mr. Meeks who is so easily subject to cross-examination based on his prior bad acts.

And that, your Honor, in a nutshell is, I

think, the issue here.

THE COURT: All right. Do you have anything else for me?

MR. WILSON: That's it, your Honor.

THE COURT: I want to go back to Mr. Bowick. You showed me the e-mail from Mr. Nicholson to you dated November the 6th. At any time prior to filing this motion to quash, did you communicate that to opposing counsel?

MR. BOWICK: Your Honor, Mr. Raley communicated that, I believe, on Tuesday to opposing counsel that Mr. Meeks had been laid off, the day we received that notice, the e-mail.

THE COURT: Is that correct, Ms. Raley?

MR. RALEY: I believe I told him orally, your Honor. That's my best memory. I told him as soon as I --

THE COURT: Told who?

MR. RALEY: Oh, Mr. Payne.

I could look and see if I sent him an e-mail; but I don't really remember, standing here, whether I did or not.

THE COURT: Mr. Payne, do you have any recollection of this conversation?

MR. PAYNE: I received an e-mail from

Mr. Raley around, I believe, 11:00 in the morning on Tuesday about the layoff of Mr. Meeks.

THE COURT: And this is Tuesday, November the 6th?

MR. PAYNE: Two days ago.

THE COURT: And then yesterday the motion to quash was filed, and here we are today.

Mr. Payne, do you have something -- anything further for the court on either of these matters?

MR. PAYNE: No, your Honor. Thank you.

THE COURT: Mr. Raley, do you have anything further?

MR. RALEY: Very briefly, your Honor. Thank you.

The court earlier said that whether a corporate representative could testify on behalf of the corporation regarding the corporation's general knowledge is a given. Your Honor was correct.

The argument presented by Tesco seems to be that a corporate Defendant can only offer testimony through its representative at trial if they are called by the adverse party. That's not the law. That's never been the law. *Brazos River* does not limit it to one side or the other.

The language of this Fifth Circuit opinion is

very clear. "If a certain fact is within the collective knowledge or subjective belief of Cajun, Grigsby should be prepared on this issue by Cajun, and allowed to testify as to it, even if it is not within his direct personal knowledge, provided the testimony is otherwise permissible lay testimony. Thus, if it was within the corporate knowledge of Cajun that BRA sent Cajun a warranty claim, Grigsby should be allowed to testify to it even if he did not have direct knowledge of it." That's what a corporate rep is about.

There is no interrogatory in this case "Who is your corporate representative?" And what I see from Tesco's argument is kind of a morphing of corporate representative versus individuals who have knowledge of a case that should be disclosed.

We've cited cases, your Honor, *Moore versus Computer Associates* and *Zubulake versus UBS Warburg,* on page 2 of our brief that say Rule 26 does not require the disclosure of the name of a corporate representative.

Mr. Saxena is a senior vice-president of TOSL. He has some knowledge of TOSL, but he can also testify as a corporate representative.

I mentioned the *Coach* case. If I could just share in closing some of the language from that case as well. It's in our briefing. The court finds nothing

disruptive about Coach -- this is another one of these cases with a new corporate representative -- about *Coach* calling Ms. Bangaree as the corporate representative at trial. Defendants understood Coach would prevent the testimony of a corporate representative, and they deposed Mr. Lau who was expected to serve in that capacity. Coach is now bound by Mr. Lau's deposition testimony and Defendants may use that testimony for any purpose. If Ms. Bangaree's testimony is consistent with Mr. Lau's, then Defendants will not be surprised. If her testimony is inconsistent with Mr. Lau's testimony, then Defendants can use Mr. Lau's deposition testimony to impeach Mr. Bangaree and Coach. For these reasons the court finds that the failure to sooner disclose Ms. Bangaree was justified and is harmless. Accordingly, the motion is denied.

So, there are several cases that seem to be exactly on point with this situation, your Honor; and we would appreciate the opportunity to call a corporate representative to represent Weatherford at trial regarding the general knowledge of -- to represent Tesco at trial regarding our general knowledge.

Thank you, your Honor.

THE COURT: Mr. Nicholson.

MR. NICHOLSON: Yes.

THE COURT: You're David Keith Nicholson?
MR. NICHOLSON: Keith David.
THE COURT: Keith David Nicholson.
And you're licensed to practice in this court?
MR. NICHOLSON: Yes.
THE COURT: Come to the podium. I have a couple questions for you.
MR. NICHOLSON: Yeah. I mean in Texas.
MR. RALEY: In Texas, your Honor, not in --
THE COURT: According to the Clerk's Office here, you are licensed to practice in the Eastern District. You are an officer of this court is what I'm trying to establish.
Tell me what you know about Mr. Meeks' fate as a part of this reduction in force.
MR. NICHOLSON: I received an e-mail --
THE COURT: And back up a minute.
MR. NICHOLSON: Okay.
THE COURT: Who is your current employer?
MR. NICHOLSON: Nabors Corporate Services.
THE COURT: Did you previously practice at Bracewell?
MR. NICHOLSON: I did.
THE COURT: Then you went in-house with Nabors?

MR. NICHOLSON: After a couple stops before that, yes.

THE COURT: How long have you been employed in-house with Nabors?

MR. NICHOLSON: Almost five years. Five years in January.

THE COURT: Tell me again -- pick up where you left off about Mr. Meeks.

MR. NICHOLSON: Okay. I received an e-mail from one of our HR managers. Can't remember exactly. It dealt with the reduction in force, but the last portion of the e-mail said, "Oh, by the way, one of the people that was reduced was Paul Meeks. I understand he's a witness in one of your cases. Just wanted to let you know he was one of the names on the list."

THE COURT: So, obviously the HR people at Nabors knew Mr. Meeks was a witness in this case when the decision was made to lay him off as a part of the reduction in force.

MR. NICHOLSON: I don't know how he knew. He didn't -- this particular individual didn't --

THE COURT: He obviously told you he was aware of that.

MR. NICHOLSON: Somebody -- he heard that from someone, yes.

THE COURT: And that came to you in the first communication where you learned Mr. Meeks was --

MR. NICHOLSON: Correct.

THE COURT: -- laid off as a part of the reduction in force?

MR. NICHOLSON: Correct.

THE COURT: And do you remember what date you received that information?

MR. NICHOLSON: I'm almost positive it would have been Monday the 5th -- no. Actually, it would have been Tuesday because he said "yesterday during the layoffs," because the layoffs took place on Monday. And, so, shortly after that was when I --

THE COURT: Now, let me ask you this: From your understanding, is this a permanent separation? Is this a go home without pay; we'll bring you back when we need you? Can you describe for me what this, quote, reduction in force characterization is?

MR. NICHOLSON: My understanding is these are all permanent, not to say that anybody might not be -- they are not prevented from being rehired down the road, but it's not a furlough situation or anything like that. These are permanent --

THE COURT: It's a termination of the employer-employee relationship.

MR. NICHOLSON: Correct.

THE COURT: Thank you. You may have a seat.

Counsel, I'm going to take a short recess. I'll be back in a few minutes.

Court stands in recess.

(Recess, 10:27 a.m. to 10:55 a.m.)

(Open court, all parties present.)

THE COURT: With regard to the Defendants' motion to quash the subpoena of Mr. Paul Meeks, that motion is denied. Mr. Meeks is subject to subpoena. Mr. Meeks is going to be required to appear and testify throughout the trial.

The court's reading of Rule 45 persuades me that the court should act in these circumstances to ensure that such is not an undue burden on Mr. Meeks personally. Therefore, I'm going to order Weatherford to bear the cost of Mr. Meeks' travel and accommodations and meals during the time he is here. And to the extent that he incurs costs in rescheduling travel for himself that is already scheduled, he's free to submit a request for reimbursement of that to Weatherford with a copy for the court to review.

The rule does not require me to provide for anyone other than the witness. And whether he intends to take his family, his friends, or it's a 50-member family

reunion, I don't care; but I am going to ensure that he personally doesn't bear an undue burden. But Mr. Meeks is required to be here.

And counsel for Defendants who brought the motion to quash, I am instructing you to communicate with Mr. Meeks immediately and make sure that he clearly understands the court's directive. Mr. Meeks is not here. Mr. Meeks chose not to be here. Mr. Meeks did not offer a declaration in support of the motion to quash, and none of the counsel here represent Mr. Meeks.

So, to ensure there is no question that he knows and complies with my directives and the subpoena that's been served, I'm directing defense counsel to communicate this directly to him immediately, as soon as the hearing is over today.

I'm very bothered by the fact that I probably have an officer of this court that has either lied or made a material misrepresentation to me. What Mr. Bowick told me and what Mr. Boone Baxter told me are really not reconcilable in my view. And I will remind everybody in the courtroom that lawsuits are a race for credibility, first with the court and then with the jury; and there has been damage to credibility today.

I'm not going to make a final decision at this moment as to who has misrepresented to me. I will tell

defense counsel I've been a young associate taking depositions before; and it is very hard for me to believe something as important about the witness not being available for trial was communicated to Mr. Baxter and he sat on it, forgot about it, didn't take time to let his partners and the rest of his trial team know about it. Nonetheless, this is the classic he said, she said situation but I don't see how both of you can be right and I'm very, very bothered by that.

With regard to the corporate representative, I'm not going to require that Mr. Meeks be the corporate representative at the trial table for the Defendants during the trial. However, the Defendants knew Mr. Meeks was a representative in this case for the Defendants when they unilaterally elected to terminate the relationship with him. To the extent there is any prejudice here, it was knowingly made and assumed by the Defendants when they elected to go forward with the termination of his employment.

Mr. Meeks was the employee of the Defendants and the corporate representative designated by the Defendants on the topics that he testified about when he gave his deposition. The Defendants are bound to those answers and to that testimony, and you are not going to put anybody up at trial that is going to substantively

tell a different story or cover the same material that Mr. Meeks covered. The Defendants are stuck with his testimony and what he said at the time he was deposed as your selected 30(b)(6) representative.

To the extent Mr. Meeks did not offer testimony about a matter, then either another 30(b)(6) witness did and you're bound by that testimony or we'll hear about it for the first time at trial. But whatever Mr. Meeks testified about, those topics and, thus, those areas of substance and those specific answers to the questions asked are binding on the Defendant; and you're not going to controvert it.

You're not going to fire the man the day before pretrial and on the very eve of trial and then try to say you are not bound by what he said this summer when he was deposed as your choice as a corporate representative.

Now, Mr. Raley, who is the corporate representative for the Defendants that is going to sit at that counsel table with you throughout the trial? Because I've heard different names. I've heard Mr. Walker, and I've heard somebody else.

MR. RALEY: Sododh Saxena, your Honor. He's the vice-president of Tesco.

THE COURT: Okay.

MR. RALEY: We can provide the spelling.

THE COURT: I can't find a binding rule that says you have to -- you can have a seat -- that the Defendants have to designate -- or any corporate party has to designate their representative and can't change it without notice or without leave of the court. In a lot of trials, a corporate party doesn't really know who their corporate representative that sits at the counsel table is going to be until they get on the eve of trial and they know who is available to be there.

I am concerned about -- I don't think the court can make Mr. Meeks appear before this jury as the representative of the Defendants when his employment relationship has been terminated. But by the same token, the Defendants knowingly terminated that relationship; and they are not going to divorce themselves from Mr. Meeks during this trial with regard to whatever he's testified about or whatever admissions he may have made.

And you're not going to change your corporate representative again without getting leave from me, and your corporate representative is going to be here throughout the entire trial. You're not going to change it in the middle of trial.

MR. RALEY: That's correct, your Honor.

THE COURT: And given these very unusual

circumstances -- the expert witnesses in the case are usually exempt from the Rule, and I'm going to exempt the expert witnesses in the case from the Rule so that they will be in the courtroom and hear Mr. Meeks' testimony when he's called to testify. Given that the Defendants put Mr. Meeks forward as a material source of information, if not the primary source of information for the experts to consider and rely upon, I think they are entitled to hear his live testimony before they testify in this case; and I'm going to order that to take place as well.

All right. Are there questions about this from either Plaintiff or Defendant?

MR. RALEY: One thing your Honor said I just want to make sure that I understand. We will be able to call a corporate rep. The corporate rep will be able to testify on behalf of the company. We'll be bound by the prior testimony of any 30(b)(6) rep on any topic --

THE COURT: And your new corporate rep is not going to get up and say, "What the other corporate rep told you is all wrong. I'm --"

MR. RALEY: Exactly.

THE COURT: "-- starting over. I'm throwing that out."

MR. RALEY: Exactly.

THE COURT: You may fill in the gaps where no one has testified for the corporation, but you are bound by the testimony previously given in the discovery in the development of this case from any designated 30(b)(6) witness who has testified by deposition previously.

MR. RALEY: Thank you, your Honor.

THE COURT: Does Plaintiff have any questions about what I've said?

MR. PAYNE: My understanding is that Mr. Saxena, if called at trial, can neither say anything that's inconsistent with what Mr. Meeks said as the 30(b)(6) nor can he cover the same ground.

THE COURT: He should not be examined, either on direct or cross-examination, as to any area where Mr. Meeks has previously testified.

MR. PAYNE: Thank you.

MR. RALEY: I'm not sure how to accomplish that, your Honor. There were numerous 30(b)(6) topics. In order for us to have testimony before the jury on those topics, it sounds like the court is saying we have to bring them up with Mr. Meeks when he's on the stand or play his deposition.

If we're not able to use our corporate representative to testify consistently with what Mr. Meeks has already testified to, then I don't know how

we can get the information in front of the jury. So, my request is that we could call our corporate rep to testify so long as he is not inconsistent with what Mr. Meeks said.

THE COURT: Well, I don't know how Plaintiff is going to propose to put on their evidence. None of us are doing this for the first time. This is -- all of you are experienced trial lawyers. I think there is at least a possibility that Mr. Meeks is going to testify during the Plaintiffs' case-in-chief and his testimony is already going to be given before you put on your evidence. So, you're going to know what he's testified about; and you're going to know what he hasn't testified about.

To the extent he does not testify in the Plaintiffs' case-in-chief, you will have -- and you elect to call him, then he can certainly testify in your case-in-chief about what he has taken a position on as a 30(b)(6) witness of the Defendants.

MR. RALEY: I understand that, and we will not be repetitive under --

THE COURT: To the extent there is some other 30(b)(6) witness who has represented the Defendants, they are either going to testify live or their testimony is going to be presented -- yeah. I don't know the

gentleman you've designated as the corporate representative. I don't know what area of knowledge he has. I have lots of trials where the corporate representative is simply a bump on a log who warms a chair, never testifies, and usually plays on their smartphone throughout the entire trial. I have other trials where the corporate representative is the primary witness.

I don't know this gentleman that you've identified. I don't know what role you anticipate him playing. What I'm saying is he's not going to divorce your clients from what Mr. Meeks has done or said.

MR. RALEY: I understand --

THE COURT: What Mr. Meeks has not done or said is fair game.

MR. RALEY: I understand that. My concern is this: Given Mr. Payne's question, if Mr. Meeks testified about certain things in his deposition, he is called by Weatherford to the stand, he testifies about certain things, let's suppose they don't go into everything in his deposition --

THE COURT: Then you need to approach me and you need to ask leave to go into those things and explain and let me recognize and agree with you that they haven't been gone into by the Plaintiff. Okay?

MR. RALEY: And then I could do that with my corporate rep with your leave?

THE COURT: We'll cross that bridge when we get to it.

MR. RALEY: Thank you, your Honor.

THE COURT: Mr. Payne?

MR. PAYNE: Thank you.

With respect to Mr. Saxena, Mr. Wilson put forth the argument under *Union Pump* that a corporate rep such as Mr. Saxena cannot testify beyond his personal knowledge. And I would ask the court to follow *Union Pump* and to the extent that Mr. Saxena is called to testify about --

THE COURT: Has Mr. Saxena been deposed in this case?

MR. PAYNE: Not in this case, no, sir. He was deposed --

THE COURT: With regard to the IPRs?

MR. PAYNE: -- in a limited sense on a real-party-in-interest issue. I could give you further background if you would like, but that is not an issue in this case.

In other words, in effect, he has not given testimony about this case really or the issues in this case, infringement, validity, et cetera.

THE COURT: Are you requesting leave to take his deposition before the trial?

MR. PAYNE: I am -- not necessarily. I'm trying to find out what the court's thinking is about the scope of his testimony and whether it is limited, pursuant to Rule 602, to his personal knowledge because Mr. Saxena was not part of Tesco Offshore Services until last spring.

And he did testify in his IPR that he really didn't even know anything about that organization until last fall, about a year ago; so, he really doesn't know anything about Tesco Offshore Services, the entity that will be tried for direct infringement, you know, before maybe the spring, maybe last fall.

THE COURT: Are you talking --

MR. PAYNE: And so --

THE COURT: Are you talking about the topics Mr. Meeks was noticed on that he wasn't responsive on?

MR. PAYNE: There are topics like that. That's correct. But I don't think we're going to get into the topics of, you know, how does a certain Nabors entity relate to a certain Tesco entity. That's all off the table pursuant to the streamlining stipulation.

What I'm really asking the court about is whether Mr. Saxena can go beyond his personal knowledge

of what he knows about, because he started last spring, and go back to 2013, for example, and start testifying based on hearsay about, oh, Tesco Offshore Services did this and that back in 2013.

Pursuant to *Union Pump*, we think that's inappropriate. Pursuant to Rule 602 of the Federal Rules of Evidence, we think that's inappropriate.

Now, we have certain confinement here given the court's instruction about Mr. Meeks. Mr. Saxena is not to cover the same ground or say anything inconsistent. But if he goes into other topics that are beyond his personal knowledge, we would object to that pursuant to 602 and *Union Pump*. And, so, I'm seeking the court's clarification on the scope of Mr. Saxena's knowledge *vis-a-vis* personal knowledge.

MR. RALEY: May I --

THE COURT: Well, I'm going to have to carry that until such time as that occurs and you make that objection in realtime, Mr. Payne. Corporations have to present themselves through human beings, and human beings are not limited ordinarily by their own personal knowledge. They are a spokesperson for the corporation, and they are entitled to give the same testimony the corporation would give if it could appear in human form.

Now, that doesn't mean that a corporate

representative is not subject to cross-examination about what they know and what they personally understand and what somebody else told them and all that good effective cross-examination. But I'm not prepared to give you hard lines on where Mr. --

MR. PAYNE: Saxena.

THE COURT: -- Saxena can go as far as testimony today except to tell you he's not going to go over the same stuff Mr. Meeks testified about. Okay?

MR. PAYNE: Understood, your Honor. Thank you.

THE COURT: All right, counsel. I'm next going to consider Tesco's consolidated motion for summary judgment. That's Document 109. And I'll hear from the moving Defendants on this.

MR. BOWICK: Thank you, your Honor.

MR. RALEY: We have it divided up, your Honor, between topics. I will address the marking issue. Mr. Bowick will address validity and infringement.

THE COURT: That's fine.

MR. RALEY: Which would you like to hear first?

THE COURT: Well, this motion includes quite a bit.

MR. RALEY: Okay.

THE COURT: I just want to hear it all. I'll let you present it in whatever order, between the two of you, you want to.

MR. RALEY: Thank you, your Honor.

THE COURT: Let's get started.

MR. RALEY: Yes, your Honor.

THE COURT: Let's do this. Since you asked the question, let's begin with the arguments with regard to marking.

MR. RALEY: Yes, your Honor.

Weatherford claims in their contentions that they provided notice to Tesco of alleged infringement of the '637 patent by a letter dated September 13th, 2016. We don't know when that letter was received. We have requested from Tesco -- from Weatherford -- we have requested from Weatherford that information as to when they provided notice to Tesco, their green card or whatever. But assuming it was received, I'm sure it would have been around that time.

They did not mark their tool, the Weatherford AutoCLAMP tool, until December of 2016; and then they filed this suit, as your Honor knows, in 2016. When they filed this suit on May 26th of 2017, Weatherford contended that Tesco was infringing apparatus claims and method claims. I'll spare the court the numbers, but

we've got all the numbers of course.

Weatherford later, on July 23rd, 2018, amended its infringement contentions to drop allegations based on apparatus claims and pursued certain specific methods claims, Claims 34 to 37. So, at issue, because they have a tool called the "Weatherford AutoCLAMP" that they contend incorporates and embodies their apparatus claims -- they admit it does not follow the method claims they are asserting in this suit but it does follow and embody the apparatus claims that they originally inserted in the filing of the petition and that they continued to assert until recently when they dropped them -- whether or not they can seek lost profits damages for the time before suit and before any sort of notice was provided, so if they can get lost profit damages before the actual receipt, whenever it was, of this notice letter.

The Federal Circuit has spoken directly to this issue in *Rembrandt versus Samsung*, 853 F.3d 1370, April 17th, 2017, a case that originated in this court. I'm sure your Honor knows it well. In that case Rembrandt not only removed a certain claim from its infringement allegations, it also filed a statutory disclaimer with the Patent and Trademark Office. So, they even did more to eliminate the claim from the lawsuit than just dropping it in the lawsuit.

The court ruled that when a claim is disclaimed at the Patent and Trademark Office, it's as if it never existed at all and, therefore, allowed damages before notice in that situation because -- the issue in that case, there was a licensee that was practicing that claim term with a tool and it was -- there was no notice provided.

The Federal Circuit reversed and vacated that decision, sent it back to this court. They said, "We have repeatedly emphasized that the marking statute serves to protect the public." So, even if a disclaimer relinquishes the rights of the patent owner, we have never held that it relinquishes the rights to the public. "Rembrandt's position, adopted by the district court" -- I'm quoting now -- "effectively provides an end-run around the marking statute and is irreconcilable with the statute's purpose."

And that is the latest Federal Circuit decision we could find on point on this very issue. I know that our opponents with Weatherford have cited earlier cases. To the extent they are inconsistent with this opinion, we submit that this opinion governs this case.

In addition to the Federal Circuit, this court in the *Huawei*, H-U-A-W-E-I, case --

THE COURT: It's pronounced "Huawei."

MR. RALEY: Thank you so much, your Honor.

*Huawei versus T-Mobile* case, also arising from this court, the opinion of Magistrate Payne dated October 15th, 2017, is precisely on point; and your Honor is aware of the paragraph that we've cited.

It is difficult to see the basis for distinction between method and apparatus claims in the marking statute. To further conclude that the application of the statute turns on a patent holder's decision to drop apparatus claims at some point during litigation defies logic. As other district courts have found, apparatus claims were asserted; so, the marking requirement is not excused. T-Mobile's motion for summary judgment that Huawei is not entitled to pre-suit damages should, therefore, be granted.

That Report and Recommendation by Magistrate Payne was adopted by your Honor on November 7th, 2017. So, we not only have Federal Circuit; but we also have an opinion directly out of this court.

For the life of me, I can't understand why our opponents are arguing otherwise; but they are. So, all I can do is bring to the court's attention what the court surely knows, these cases arising out of this court that speak directly to this issue.

Also, they are making -- and by the way, your Honor, counsel surely is well aware of the *Rembrandt* decision because they represented Rembrandt in that Federal Circuit case. So, they are making an argument here that they should know that they lost before the Federal Circuit.

Additionally, your Honor, the *Huawei* case deals with this argument of Weatherford's counsel regarding claim-by-claim analysis. It held -- the recommendation said: Huawei contends that the marking statute does not apply when a party is currently asserting only method claims or, alternatively, that the statute does not limit pre-suit damages because it applies on a claim-by-claim basis. The court has already rejected the latter argument.

And there are citations in the *Huawei* case where this court rejected that claim-by-claim argument; and, of course, that decision was adopted by this court November 7th, 2017. So, again, what we see is Weatherford's counsel making arguments that are directly against precedent in this court and before the Federal Circuit.

I'll be happy to answer any questions by your Honor.

THE COURT: I'm very familiar with the cases

you've cited. I don't have any additional questions.

MR. RALEY: Thank you, your Honor.

THE COURT: Let me hear from the Plaintiff in response.

MR. WILSON: Thank you, your Honor.

So, let me start with, I guess, a couple points. First off, counsel started his argument with a reference to some sort of uncertainty about whether or not they had received Weatherford's notice letter. I just want to point out for the court that that is not an issue that's raised by their summary judgment motion. It kind of sounded like he was raising an issue.

I would point out to the court that at page 13 of the summary judgment motion, which is Docket 109, it says, "Eight of the pusher arms were sold to third parties prior to receipt of Weatherford's September 13th, 2016, notice letter as follows." And it provides a chart there. That seems to be a concession that they received it and that they knew when they received it. I don't see it being raised in a summary judgment motion.

THE COURT: Tell me, counsel: How do you reconcile the facts and circumstances in this case with *Huawei versus T-Mobile*?

MR. WILSON: So, your Honor, there are a couple of those. I assume your Honor is talking about

the latter case, the October 15th. I believe --

THE COURT: Well, I'll just broaden the question. How do you reconcile the facts in this case with either of the Huawei/T-Mobile decisions emanated from this court?

MR. WILSON: So, your Honor, let's take them in order, then. First of all, there is a September 4th, 2017, decision. That was Case Number 2:16cv52 which was also before this court, and that was *Huawei versus T-Mobile*. In that case Huawei asserted -- I'll just quote from the case. It says: Huawei's only opposition to T-Mobile's motion is that because Huawei is only seeking pre-suit damages from the alleged infringement of the method claims of the '339 patent, the marking statute does not apply.

What was going on in that case is Huawei was still asserting apparatus claims but argued in a straightforward manner that because marking applies on a claim-by-claim basis, the method claims are not subject to the marking requirement and we shouldn't -- and Huawei shouldn't be subject to a marking requirement based on its method claim. So, it was saying they're only seeking pre-suit damages on the method claims.

Now, I would say that's directly controlled by Federal Circuit precedent, *American Medical*, for example;

and, so, the court's conclusion there was unremarkable and is not the facts of our case. Apparatus claims are not currently being asserted; so, I think that case is distinguishable.

If we move forward to the second *Huawei versus T-Mobile* case on this issue, this is 2:16cv55, which was decided October 15th, 2017. This case is closer to the facts here, and I will walk the court through the analysis that was provided there.

At page -- well, I'm going to cite --

THE COURT: I've read the case --

MR. WILSON: Okay.

THE COURT: -- carefully. I want you to tell me why it doesn't control here.

MR. WILSON: The reason I think it doesn't control, first of all, is this court's prior decision in *ContentGuard* where it held effectively that timely-dropped apparatus claims do not invoke the marking requirement.

And, so, *ContentGuard* was decided in 2015; and there the court said the court -- and this is in the WestLaw version at *4: The court also finds the facts of this case are readily distinguishable from those cases presented by Defendants which significantly all appear to involve circumstances in which the asserted apparatus

claims were never affirmatively dropped and --

THE COURT: Let me stop you. I asked you to tell me why the 2017 *Huawei* case wasn't controlling here, and I'm hearing about the 2015 *ContentGuard* case. I'd like to know why the 2017 *Huawei* case, the 55 case, doesn't control in this circumstance.

MR. WILSON: And my answer, your Honor, is that *ContentGuard* holds directly -- or to the extent there is overlap in those cases, *ContentGuard* holds the opposite and it's a prior opinion.

THE COURT: *ContentGuard* was very limited circumstances.

MR. WILSON: That's correct, your Honor. However, if the rule were as stated in *Huawei*, the 2017 opinion, the result would have to be different in *ContentGuard* because, for example, although there is this dispute in *ContentGuard* about whether or not a party that dropped apparatus claims, you know, had dropped them timely, the issue then becomes if you can't drop them timely, then necessarily the Plaintiff in that case could not have timely dropped them and the marking requirement would apply.

This court held that the marking requirement didn't apply, that the apparatus claims were timely dropped. *Huawei* comes behind and says --

THE COURT: There was an agreement between the parties in *ContentGuard* that we don't have in *Huawei/T-Mobile*.

MR. WILSON: That's correct, your Honor. I agree. But I still think the court could not have come out the way it did if the rule were as articulated in *Huawei*. The *Huawei* rule is broad and far-reaching and says essentially that you can't drop apparatus claims and not invoke the marking requirement.

Now, with all due respect to the court, your Honor, we think that's incorrect; and I can point out to the court why. The court in *Huawei* said: Huawei is not insulated by *Crown Packaging* which at most only restricts application of the marking statute in instances where a patent holder never asserted apparatus claims.

That is not the holding of *Crown Packaging*. *Crown Packaging* didn't say that. I mean, *Crown Packaging* didn't address the situation of what happens if you raise apparatus claims and then drop them. None of the Federal Circuit cases that are being cited do. Rembrandt, which was first brought up by counsel, is a disclaimer case. It's totally irrelevant.

But the Federal Circuit cases, whether it's *Crown Packaging* or *American Medical* or *Hanson* which was the much prior opinion, they simply do not address the

situation of what happens when an apparatus claim is asserted and then dropped; and the court's analysis in *Huawei* assumes that they do.

But there is additional -- I mean, there is additional authority that makes this point as well. The other case we cite is *General Electric versus Mitsubishi* from the Northern District of Texas which came out exactly as we are asking the court to come out now.

THE COURT: That was Judge Ferguson's case?

MR. WILSON: I don't have the name of the opinion, but I can pull it up if you would like.

THE COURT: That's Judge Ferguson's case.

MR. WILSON: Okay. Then in the WestLaw version at *2 the court says, "Like the *Crown Packaging* court, this court finds that the marking statute is not triggered because the only claim now in suit covers a method, not a product."

It's an unequivocal holding based on *Crown Packaging*.

THE COURT: Doesn't he say in that opinion that "I'll supplement this with further analysis later" and that further analysis is never forthcoming?

MR. WILSON: That's correct, your Honor. I looked for it and couldn't find it.

THE COURT: I don't think it's there.

MR. WILSON: But nevertheless, he does reach a contrary conclusion from this court's *Huawei* opinion.

The *Huawei* opinion also goes on to say: It's difficult to see the basis for a distinction between method and apparatus claims in the marking statute. And counsel just read that passage. However, that's exactly the distinction that the Federal Circuit makes. The Federal Circuit, in *Crown Packaging* and *Hanson,* says it doesn't apply to method claims even though the statute doesn't say anything about a distinction between method and apparatus claims.

So, I think on that point, your Honor, you have my argument. However, there are a couple of other points that I want to make that I -- that counsel did not address on the affirmative side but I would like to address. In the --

THE COURT: Go ahead.

MR. WILSON: So, *American Medical Systems versus American Engineering*, a Federal Circuit case, raises a very interesting point and this is a point that we've made in our motion for summary judgment and I believe we made it in response to theirs as well on this precise issue.

But the issue is the Federal Circuit says in that case -- when it's trying to determine the date on

which the patentee has complied with the marking requirement, it says, "The date that AMS began marking its products is irrelevant for purposes of the statute, because marking alone without distribution provides no notice to the public where unmarked products are continuing to be shipped."

Now, that passage is very interesting for a number of reasons, but the main point of it is Weatherford has never distributed the AutoCLAMP product to the public. The AutoCLAMP is a product that Weatherford uses in its own business. It does not sell it. It does not distribute it. And this is a point that is undisputed.

So, the question is when would Weatherford be barred by Section 287(a) even if it applied to the '637 patent? When would Weatherford's damages be barred? When would that bar start? It would start when Weatherford started distributing unmarked products.

Weatherford has never distributed an unmarked product. Therefore, even if Section 287(a) applies, that bar has not attached to Weatherford. Claims 34 through 36 don't cover the AutoCLAMP, and the AutoCLAMP has not been distributed to the public anyway.

And *Wokas versus Dresser Industries*, which is cited by Weatherford in its briefing -- this is a

Northern District of Indiana case from 1997 -- holds precisely this. It says, "Dresser protests that *American Medical* is inapplicable because it dealt with a situation in which a Plaintiff was attempting to satisfy his burden of proving that he marked, whereas here it is undisputed that Tokheim never marked. That distinction is unimportant. If marking at a given time satisfies Section 287(a), it follows logically that the adverse consequences from failure to mark also arise at that time."

That's on public distribution of the product. If we haven't publicly distributed, then there is no marking requirement under Section 287(a); and Weatherford can't be barred from obtaining pre-suit damages by a failure to mark a product that is not distributed.

And just to take you back to *American Medical Systems* to make that point more deliberately, it says, "Marking alone without distribution provides no notice to the public."

That's a very straightforward point. If Weatherford marked its product, it would provide no notice to the public. Weatherford's marking is irrelevant because it's not distributing the AutoCLAMP.

So, even if Weatherford marked its product, under *American Medical Systems*, it wouldn't count because

Weatherford is not distributing it to the public. Therefore, its failure to mark the AutoCLAMP shouldn't matter for purposes of Section 287(a).

THE COURT: Isn't it true that your position in this case is that depictions of the AutoCLAMP were available on your company's website and that they were copied and contributed to the willful infringement you've alleged by Defendants' pusher arm?

MR. WILSON: That's correct, your Honor.

THE COURT: I mean, it sounds like you're telling me the marking statute doesn't apply because we don't sell this device and we keep it internally and use it, but the other side copied us and willfully infringed us because we put it on the Internet for everybody to see. I mean, at one point you want to say it's hidden. At one point you want to say it's out there for everybody to see. That seems a little inconsistent to me.

MR. WILSON: But I would ask the court: If Weatherford were to stamp its AutoCLAMP with a patent number, what difference would that make?

THE COURT: It would comply with the marking statute.

MR. WILSON: But it -- and again, your Honor, that is exactly what the *Wokas* case says -- I'm sorry -- what *American Medical* devices says does not matter. It

expressly says if you're marking a product but you are not distributing it to the public, it does not count for Section 287(a); and we are squarely within the four corners of *American Medical* devices.

THE COURT: All right. Anything further for me?

MR. WILSON: That's -- well, one final point. Your Honor, we also -- we recognize that the early *Huawei* decision said that there is no -- that marking doesn't apply on a claim-by-claim basis. The second *Huawei* decision follows that logic. We also disagree with that. We would say that marking does apply on a claim-by-claim basis. Thank you, your Honor.

THE COURT: All right. Anything further from Defendant?

MR. RALEY: Yes. Very briefly, your Honor. Thank you.

Weatherford is seeking lost profits for its sales. Weatherford's use and sales of its tool for offshore operators like British Petroleum, Exxon, Shell are sales.

The *American Medical* case dealt with marked products in a warehouse that were not offered for sale. If Weatherford feels that they don't have to mark, why did they start marking in December, 2016?

More importantly, they have cited the *ContentGuard* case which is before *Rembrandt*. This court in *Rembrandt* initially ruled the way Weatherford wants them to rule today. It was reversed by the Federal Circuit. When *Huawei* came around, this court followed *Rembrandt* so --

THE COURT: Let me stop you --

MR. RALEY: Yes, your Honor.

THE COURT: -- for just a minute, Mr. Raley.

Just to avoid any future confusion --

MR. RALEY: Yes, your Honor.

THE COURT: -- in response to your argument about lost profits and the marking statute, the marking statute is a limitation on damages. It does not impact the issue of liability whatsoever. And I want everybody to understand that's the court's view going forward.

MR. RALEY: I understand.

THE COURT: Okay.

MR. RALEY: Thank you, your Honor.

He said *Rembrandt* is irrelevant because it's a disclaimer case. I've just read to you the passage that *Rembrandt* is a case where they disclaimed but they also withdrew claims from its infringement allegations and said that, therefore, they were not required to mark to get earlier lost profits.

The Federal Circuit expressly rejected that. And if the Federal Circuit is to be reversed, your Honor, then they can only be reversed by the Federal Circuit. And that's why when *Huawei* came around, this court followed *Rembrandt*.

Regarding this notice to the public argument, the marking statute doesn't require notice to the public. No case law supports this position that's being proffered by Weatherford's counsel.

They put their tool on rigs and operated it for people outside of Weatherford to see it operating. That's exposure to the public. And they didn't mark their tool and they pled apparatus claims and they pled that their tool embodied those apparatus claims. And, therefore, under the very clear binding case law of the Federal Circuit and this court, they are required to mark to get lost profits damages prior to notice. Thank you, your Honor.

Unless your Honor has other questions for me.

THE COURT: No.

MR. RALEY: Thank you, your Honor.

THE COURT: If I did, I would ask.

MR. RALEY: Yes, your Honor.

THE COURT: Do you have something further?

MR. WILSON: If I may just address the

*Rembrandt* point, your Honor.

THE COURT: Very briefly. We've got a lot of ground to cover.

MR. WILSON: Yes, your Honor. I mean, *Rembrandt* addressed a couple of issues, as this court is well aware; and, so, I hesitate to belabor the point. But it said, "We hold that disclaimer cannot serve to retroactively dissolve the Section 287(a) marking requirement for a patentee to collect pre-notice damages."

And then it said, "We remand to the district court to address in the first instance whether the patent marking statute should attach on a patent-by-patent or claim-by-claim basis."

THE COURT: Right. I'm aware of that.

MR. WILSON: Okay. Thank you, your Honor.

THE COURT: Opposing counsel citing it saying that the Federal Circuit says it doesn't necessarily mean I agree. But I do agree that the facts in this case are very close to the facts in the *Huawei* 55 case and I don't find compelling Federal Circuit authority indicating a different result and, consequently, I'm going to grant the Defendants' motion for summary judgment with regard to the marking statute, thereby limiting Plaintiffs' damages from and after September 13th, 2016, being the

date of notice.

Perhaps, as Plaintiffs have argued, this court's decisions have been overly broad in this area; but until I get specific guidance from the Federal Circuit telling me otherwise, I feel compelled to be consistent with the previous *Huawei* ruling which I think is on point. That's the basis for my decision.

All right. Let's take up the remainder of this consolidated motion for summary judgment.

MR. BOWICK: Thank you, your Honor. We'll address patent infringement next. May I approach the bench, your Honor, to hand you demonstrative charts?

And here is a copy for the court.

THE COURT: All right. We'll take up Tesco's argument that there is no direct infringement --

MR. BOWICK: Correct, your Honor.

THE COURT: -- by Nabors Drilling or Tesco Offshore.

MR. BOWICK: Your Honor, I believe based on the stipulation, the only accused infringer is Tesco Offshore Services limited which we've been calling "TOSL"; and they have withdrawn the indirect infringement under 271(b) and (c). I believe there was an e-mail to the court last week during the pendency of the motions.

So, the basis for the noninfringement, your

Honor, is Tesco's accused pusher arm doesn't memorize the position of anything. This court has construed that to be plain and ordinary meaning.

Now, the Plaintiffs have manufactured a theory of infringement that's just a fiction. I'll explain that in a minute, what that means. They've basically come up with a way that we operate the tool that Tesco does not perform.

Additionally, Weatherford's expert has already said that extending the length of the boom, which is part of this theory they have come up with, is not memorizing the position --

THE COURT: Well, let me stop you for a point of clarification, counsel. Is joint infringement still a live issue in this case based on the parties' stipulations so far as you know and understand?

MR. BOWICK: It is not, your Honor. It's only direct infringement under 271(b) against the sole defendant, which is TOSL, T-O-S-L, Tesco Offshore Services limited.

THE COURT: Do Plaintiffs agree with that?

MR. PAYNE: Actually, Mr. Wilson is arguing this. But there are two entities. Tesco Offshore Services, Inc. became Tesco Offshore Services, LLC, during the lawsuit and, so, those two entities are

accused of direct infringement under 271(a).

The other infringement claims are off the table *vis-a-vis* the other defendants; and all of the indirect infringement claims are off the table. In claim --

THE COURT: You said Tesco Offshore Services, Inc., became Tesco Offshore Services, LLC; and then you said "those two entities." I assume that if "Inc." became "LLC," we're talking about one entity, not two.

MR. PAYNE: There is one surviving entity, LLC.

THE COURT: Okay.

MR. PAYNE: And obviously we're not giving up our claims of direct infringement before that conversion.

THE COURT: Understood.

MR. PAYNE: We need to be clear about that but -- and I think counsel misspoke. 271(b) is not at issue anymore. It's just 271(a), direct infringement against the Tesco Offshore Services entities.

THE COURT: Do you agree with that, counsel?

MR. BOWICK: I agree, your Honor.

And I'm just going to refer to them as "TOSL" because it's the same company. They just converted from a corporation to an LLC. I believe that was in --

THE COURT: All right.

MR. BOWICK: -- December of last year.

THE COURT: Let's go forward with your argument.

MR. BOWICK: Thank you, your Honor.

Additionally, Weatherford's experts agree that driving this arm with a lever and visually watching it and letting go of the lever and stopping it at the desired location is not memorizing.

And they have also agreed that moving the pusher arm until it contacts the pipe and can go no further is not memorizing the position.

Now, Slide Number 2, your Honor, we can disregard. The reason for that is based on the court's ruling on the marking. The original version of the pusher arm, what we call "Version 1" or the non-knuckle, was discontinued in the third quarter of 2015.

So, the court's ruling on 287, on marking and notice, eliminates damages on the original tool. And that tool was replaced. Basically they took the arm of it and put a different one on which you'll see in Exhibit -- in Slide Number 3, your Honor.

THE COURT: All right. And I don't want to belabor this, but I will return to this so that I can be clear on this point. Is there a live allegation in this case that TOSL -- whether it was in the corporate form or

the LLC form -- that TOSL and Nabors jointly infringed the patents?

MR. BOWICK: There was, your Honor; but I --

THE COURT: That's gone, right?

MR. PAYNE: That's gone. I don't even know if that was ever on the table, quite frankly.

But Claim 37 -- they are trying to make out an argument that the previous claim *vis-à-vis* Claim 37 -- Claim 37 has been removed. I think they were trying to argue the Claim 37 theory in effect is a joint infringement theory. So, the court need not consider Claim 37. The court need not consider joint infringement.

THE COURT: Okay. All right.

MR. BOWICK: And, your Honor, just so you understand, they were asserting Claim 37 which had all the steps of 35 and the additional step of clamping the control line to the tubular; and none of the Tesco entities perform that step. That was done by a Schlumberger, a Baker Hughes, a third party.

THE COURT: No joint infringement.

MR. BOWICK: Correct.

THE COURT: I'm clear. Go ahead.

MR. BOWICK: So, in response to our motion, they dropped Claim 37. That's in their response.

THE COURT: Go ahead.

MR. BOWICK: So, your Honor, back to Slide Number 3 there. This is the Version II of the pusher arm. You can see it's got a knuckle. It can bend sort of like your finger. It can move forwards and backwards and can also bend down. Now --

THE COURT: Do Plaintiffs have these same demonstratives? It would be a lot simpler if you would put it on the ELMO so I know everybody in the room is seeing it.

MR. BOWICK: Thank you, your Honor.

THE COURT: Okay.

MR. BOWICK: So, this is the tool that's before the court based on its ruling. This is the only device that's been used by TOSL since the notice in September of 2016. It's the pusher arm knuckle version, or Version II, which has two hydraulic cylinders, one in the base that moves the arm forward and backwards and one in the middle on the knuckle to allow the upper part to bend down or extend upward.

Now, the original theory in this case of infringement was set out in Weatherford's infringement contentions in September of last year. It was confusing because if you look at the underlying portions, they construed -- or they interpreted or asserted that the

determining step and the memorizing step were exactly the same, without any detail of how the pusher arm could in any way memorize a position.

These are just sort of goals. "Facilitates returning to that position in future clamping operations," I don't know what that means.

On 7-23 they amended their infringement contentions based on the court's *Markman* order of July 3rd and they asserted that -- for the first time that this pinning the boom at the appropriate length to a position is the memorizing step. That was in their infringement contentions. The first time we had ever heard of this "pinning the boom," we didn't even know what it was.

Two weeks after that, expert reports came out. Weatherford's expert said that the determining step was performed by selecting the adjustment hole that connects the square tube portion of the roller assembly with the upper arm. And you can see the little roller assembly there. It's the little head (indicating) at the end of the arm. So, that's what their expert says is the determining step.

Weatherford's expert -- this is his expert report, Docket Number 109-6 -- said that the memorizing step is performed by keeping the same adjustment hole

pinned for at least one cycle.

And from our briefing, your Honor, this is doing nothing. They select it, pin it during the determining; and memorizing is doing nothing. It's like buckling your pants and then leaving it buckled. It's doing nothing.

As we point out, the *Kaneka* decision from the Federal Circuit, a method step requires action. You can't have a step of memorizing by doing nothing.

This patent requires memorizing the position of the boom; and according to Mr. Zaleski, Weatherford's expert, it means doing nothing. Buckle your pants. Select a buttonhole. And then you do nothing. It just keeps your pants up all day. That is not an action. That is not performing a step of a method, which is required to infringe a method claim.

So, we got to depose Mr. Zaleski and sort of understand where he is going with this. Weatherford's expert sort of explained what their theory of infringement is. This right here is what I described earlier as a fiction. And their theory of infringement is that they take -- that somehow Tesco takes their pusher arm and retracts that roller assembly all the way down as low as it will go, the little telescoping end; and then they fully extend the arm towards the pipe. And

according to this theory by Mr. Zaleski, it doesn't reach. It doesn't reach out far enough, that the piston and cylinder reaches its full extension and it's not close enough to the pipe so that they can put the clamp on.

So, then comes the determining step according to Weatherford, where a guy gets up on a ladder, extends that roller assembly, sticks a pin in it to lock it in a place where it is close enough for clamping.

And then the memorizing step, just like we talked about before, is do nothing. Just keep that pin in there. Don't change the pin.

Well, this isn't how our device operates. It's never operated this way, and I'll get into that in a minute.

Just to better assist the court understanding how this device operates, this roller assembly, as Tesco calls it, slides within the arm. It's a square tubular. It telescopes within there, and there's four holes that you can select from. These holes, 6 inches on center. So, you can extend it up to 18 inches longer; and this hole, fourth hole, is zero. You extend it out to Number 3, that's 6 inches. Hole Number 2, that's 12 inches. And Hole Number 1, that's 18 inches. Six times three.

Now, you're probably wondering why would they need to extend the roller assembly to make this arm longer. This was addressed in the depositions of Mr. Scrantz and Mr. Meeks. They were asked about this roller assembly. And what they both explained was it had to do with the trajectory of these control lines.

These control lines are sometimes made of stainless steel, and they don't want to put a kink on them. And it has to do with the angle of the control lines coming off -- Oilco calls them sheaves, but they are pulleys because these big rolls of control line are on the rig floor or below deck. They run it up over a pulley to elevate it to get it into high position and through the head of the pusher arm and then against the pipe.

Here is an illustration to sort of show what that's going to look like, your Honor. You can see the sheaves that are connected above the rig floor. They give an elevated position, where the control line spool is spooled up and over to get it in an elevated position above the rig floor. It comes down from the sheave through the head of a pusher arm. This is Figure 2 from the '637 patent-in-suit for illustration purposes.

And the reason you can adjust that length of the arm in the pusher arm is to address that angle. You

don't want to kink this hose. That's what both Mr. Meeks and Mr. Scrantz testified about the operation. And what they are concerned about here is this angle, this trajectory.

And it all depends on -- every rig those sheaves are going to be in a different location. Sometimes they are going to be higher. Sometimes they are going to be lower. Sometimes they are going to be closer to the rig center, the drill pipe center. Sometimes they're going to be further away. So, they can make those 18-inch adjustments to get the angle that the control line running company wants to have on there and not kink the control line.

Now, part of Weatherford's infringement claim is that this extension is part of the determining and the memorizing. Well, every embodiment -- there's three of them, I believe, in the '637 patent -- has a telescoping boom or arm. You can see here that the -- in Figure 1 you have the guide boom or arm 200. It's made up of two pieces. You have the upper 201 and the lower 202 boom. And they telescope. You can make the boom longer and shorter.

The embodiment of Figure 4 has the same thing. It's a telescoping boom that can be extended longer and shorter, similar to the extension that I described

earlier with the pusher arm. Telescoping adjustable length arm or, as they call it, a boom.

Now, when we asked Weatherford's inventor on the issue of infringement does adjusting the length of the boom, making the boom longer -- does that have anything to do -- I also asked the inventor, Troy Hill, the inventor of the '637, does it have anything to do with memorizing the position as claimed? He says no.

The adjustment of the length of the boom or the arm has nothing to do with memorizing the position. That's their case, and their expert says it doesn't. That's not memorizing.

Now, I told you some other testimony about their expert saying what's not memorizing. The first deponent we took in Weatherford's side was on 7-23, the same day they amended their infringement contentions. We didn't understand what they meant by this pinning; so, we asked the witness. What is memorizing the position? Y'all just gave us invalidity contentions. What is this memorizing the position? He said it's driving the arm until you hit the pipe and it can't go any further.

They have dispelled that. Their argument now is, no, that's not what we're saying anymore. But that was -- the same day we got their amended infringement contentions, we asked the first witness we had a chance

to talk to in deposition. He says it's hitting the pipe. They have taken that off. That's okay.

Now, just to assist the court, your Honor -- I know this is complicated -- sort of complicated technology, but I've sort of broken it down graphically for your assistance. Tesco's pusher arm operates with hydraulic cylinders. Those hydraulic cylinders are operated with levers or joysticks that open valves. These joysticks are spring-loaded. This is laid out in our motion.

So, when you push it forward, the arm moves forward. When you let go, that joystick springs back to the upright neutral position; and the arm stops.

So, with the knuckle version, there's two hydraulic cylinders. Therefore, there's two control valves. You can see in those illustrations here, we have the knuckle up; and the arm is going forward and back. In the one below it, the knuckle is down; and the arm is going forward and back.

And you might hear something about the belly pack. This is just a wireless joystick that controls the manual sort of manifold valves which you can control manually but -- to show the court how this device moves by the operator.

There is no "memorize" button. There is no

"recall" button. There is no setting -- let's lock this thing in place, nothing like that. The '637 patent describes such an electrical system in the preferred embodiment. It says that there is a "memorize" button and a "recall" button. There is no such "memorize" or "locking" or "recall." This is purely manual. You drive it forward; you drive it back; you stop it when you get to a stopping point.

THE COURT: Speaking of stopping points, counsel, it's 12:00 noon. How much more argument do you have on this portion of the motion?

MR. BOWICK: Maybe 15 minutes, but we can take a break right now and start back after lunch.

THE COURT: Well, thank you for that option.

MR. BOWICK: Yes, sir.

THE COURT: We're going to recess for lunch, and I'll continue argument on this after we resume. We'll reconvene at 1:00.

Mr. Payne, given the court's ruling on the marking issue, I want you to consult, if possible, with your expert -- your damages expert over the noon hour. My recollection is the report in its current state does not differentiate between the 2016 notice date and any other period of time. In light of my ruling, this damages report is probably going to need to be

supplemented.

I need you to check with your expert and see if that's the case and, more importantly, see, within the time we have to work, what a fair and reasonable amount of time is for that expert to, in compliance with my order and nothing else, supplement and readjust the results of that report.

MR. PAYNE: I'll review his supplemental report, too, over the break. I believe the supplemental report actually --

THE COURT: If you disagree and you think we're ready to go, fine; but I don't want to fail to address the issue of potentially needing to supplement the damages expert's report in light of my ruling on the marking statute.

MR. PAYNE: I'll let you know. Thank you.

THE COURT: We'll take that up immediately after lunch, and then we'll return to the remainder of Defendants' arguments on this infringement issue.

Court stands in recess for lunch.

(Recess, 12:01 p.m. to 1:04 p.m.)

(Open court, all parties present.)

THE COURT: All right. Let's continue where we left off with Defendant's motion for summary judgment. Before we do that, though, however, do you have any

updates for me regarding the issue we discussed just before lunch, Mr. Payne?

MR. PAYNE: Yes, sir. I talked to Mr. Bratic and confirmed that his supplemental report does take into account the marking issue. There are supplemental exhibits. And, so, he did calculate damages post-notice.

There is one other slight issue that I've worked out with counsel, which is they are going to update their financials to show us their latest invoices; and Mr. Bratic will do one more supplemental report that will take into account those additional invoices. As soon as we get those invoices, we'll get them to Mr. Bratic; and then he'll have that supplemental report produced within two or three days, depending on his schedule.

THE COURT: Well, notwithstanding what you and opposing counsel may have worked out, there is no need to overtly supplement the damages expert's report because of the court's ruling on the marking statute.

MR. PAYNE: I don't think so.

THE COURT: Okay. That's what I needed to know. Thank you.

All right. Let's continue with the infringement arguments on the motion for summary judgment by Defendants and see if we can't bring this to a

conclusion.

MR. BOWICK: Thank you, your Honor.

We left off talking about the operation of the accused pusher arm. And Weatherford deposed Mr. Meeks about that operation and, consistent with what I described earlier, that the operator drives the arm with a lever. And he either watches it himself to determine when to stop or he is given a signal from the clamping company -- like a stop signal, like come forward, come on back -- and then he stops it. That's there on page 203.

And the next page, they ask him: What happens if it hits the tubular? What if the pusher arm hits the tubular?

He says: It happens sometimes and you know it because you can hear the hydraulic pump that's delivering the fluid rev up because the fluid is no longer moving.

That's what he's describing right here on page 204, 19 and 20 and 22. That confirms that the arm can hit the pipe if the operator does not stop it short.

Now, Weatherford's expert, Mr. Zaleski, confirmed that an operation of the pusher arm, if you watch it -- the arm as it approaches the tubular and you stop it short, that's not memorizing the position. That's just a manual control.

It's sort of like driving your car into your

garage. You visually get it in there so that the door will close. You just hit the brakes and stop. There is nothing automatic that memorizes where to stop or that actually stops it itself. This is a manual control. The only thing that can stop it is if it hits the pipe, which their expert has said is not memorizing the position.

Slide 14, which I showed you earlier, their expert disagreed with one of their corporate representatives that hitting the pipe is not memorizing the position.

Now, Weatherford's response includes this photograph here on the left that they took during the inspection back on June 22nd. And they said, "Look, this is the arm fully extended; and it's not reaching that far out."

Well, that's just -- that's not accurate. They took a lot of pictures. I don't know which ones they took and didn't. It was their photographer. But I watched the video that they provided that was Docket 112, Exhibit 14 to their response. And at 11:36:21 you can hear Mr. Zaleski ask, "Can you go full retraction on the bottom cylinder?"

And if you look back at our slide, you can see "full retraction" means pulling the piston in moves the arm forward. And the operator that's in a little orange

suit there drove it forward, and at 11:36:47 you can see that the arm extends past where the well center is.

We took our own pictures to sort of illustrate this even better, to show the pipe and the slips in a simulated rig floor. There is a hole there in the floor. And you can see that the pusher arm operates with two different mounting plates. Those plates connect the pusher arm to the -- basically the rotary table, where the well center is, where the pipe goes.

There is a short mounting plate shown on the left, and there is a long mounting plate. It's not in dispute. There's only two different sizes. When they install this thing, they use different plates depending on how much room and which angle the tongs, the big wrenches that connect the pipes, are going to go in.

So, if the pusher arm is 180 degrees from the tong, they can use the short one because they are not going to collide with each other. But if the pusher arm is mounted 90 degrees from the tong -- and this tong is used on rails and driven out -- they use a longer plate so that it can get it back out of the way of the tong when they make connections and break connections with a pipe.

But as you can see on Slide Number 20, using the short and the long plate with a roller assembly fully

retracted, the shortest-length arm, that the roller assembly, the head, reaches out and contacts the pipe unless it is stopped by the operator. There is nothing automatic. There is no memorization of stopping the arm before it hits the pipe, even in the furthest mounting away from the well center, even with the shortest arm possible.

Here is another image to illustrate that where the pipe has been lowered into that hole in the floor. And you can see that at full extension of the arm, that the head extends past the axis of the well. The only way it stops short is by the manual stopping by the operator, which is not a memorizing step, not a determining step. He just drives it, lets go of the lever; and it stops.

If the pipe wasn't there to stop it, as shown in Slide 21, that arm would keep going; and that head would extend past the well center as shown there.

So, the actual operation of this pusher arm, the accused pusher arm -- those last two photographs show that the positioning that Weatherford is asserting, that it doesn't get close enough when the pusher arm is in fully retracted roller assembly, that's not true. It will actually hit the pipe and go past the pipe.

And if it does that, there is no -- the device is not operated by extending the roller assembly and

putting a pin in it. The only reason they extend that at all, if they do it, has to do with the angle of trajectory from the sheaves of the control lines. The operator and the company that installs the control lines makes those determinations.

And the memorizing step that they are asserting, assuming that that was somehow accurate, is to do nothing, which is not performing a step.

So, that's it with claim -- the infringement part for Claim 35 -- I'm sorry -- 34. Now I'm going to move on to Claim 35 which is the dependent claim, your Honor. And this has to do with the court's claim construction because the court -- you will remember, it construed "head" to mean "boom."

THE COURT: It's customary, counsel, to ask the court before you move on, not tell me what you are going to do.

MR. BOWICK: Sorry, your Honor. I apologize.

THE COURT: That's all right.

MR. BOWICK: Do you have any questions with respect to Claim 34?

THE COURT: Let's go on to the dependent claim.

MR. BOWICK: Thank you, your Honor.

Now, 35 depends from 34; and it describes that

the boom is attached to the rig floor by an arm that extends at an angle, as this court has construed it. I'm focusing on the terms "boom" and "arm."

Weatherford has identified -- these are from the expert report of Mr. Zaleski -- that the arm -- the entire length of the pusher arm is the boom, from the head, the roller assembly, all the way down to the base.

On the left they highlighted in red. On the right we drew a rectangle -- red rectangle around it.

The next pages of his report, he's done the same thing. The boom has a big rectangle around it. It's identifying everything from the roller assembly head all the way to the base.

Mr. Zaleski goes further and includes the engineering drawings of the various pieces of the arm and how they are assembled and says the upper and lower pieces, these parts, form the boom.

Well, the problem is these words, these claims, your Honor, have meaning. If the boom is the yellow part of Tesco's pusher arm -- if that's the boom, Claim 35 requires -- 36 requires it, too -- that that boom, the yellow part, be connected to the rig floor by a separate arm -- or an arm. Your Honor, there is no arm. If the boom is the entire yellow piece, where is the arm? It's just not there.

And that concludes our presentation on the summary judgment of noninfringement. This issue sort of comes up a little bit with the 112 issues which we'll talk about a little bit later.

THE COURT: Let me hear a response from the Plaintiff.

MR. WILSON: Thank you, your Honor.

So, let me start by pointing out that Claim 37 was not dropped in response to their motion. Claim 37 was not covered in our infringement expert report. It was dropped before we filed expert reports.

So, as I understand their motion -- and much of what you heard was not from their motion. As I understand their motion, there are two main issues to be addressed. One is the determining step, and the second one is the memorizing step.

Now, Mr. Zaleski provides expert testimony on the determining step; and as I understand their argument -- and I think you heard a lot of that in the presentation that was just given -- it is that the tool cannot possibly stop on its own before it hits the pipe. And we have substantially -- or far more than substantial evidence that, in fact, it can and, in fact, it does.

The testimony that's cited in our brief, the expert testimony from Mr. Zaleski -- which he'll testify

based on his observations at the inspection and demonstration of how the tool operates. That's in the record and he will testify based on his own experience and his observations of the use of the tool that, in fact, it does stop. And we've provided photos, which I'm going to go over in more detail momentarily, from that inspection that show that the tool stops before it would hit the pipe.

Second, Defendant's own witness, Mr. Scrantz, testified that they do at least sometimes stop before they hit the pipe. Mr. Scrantz testified that whether or not they stop -- whether or not the tool is used by going full stroke varies.

He says, "Not consistently stroking both ways." "It varies. It could be or not necessarily could be."

So, his testimony was that yes, sometimes we do. Now, they try to construe that as it never does; but that's not what he said. He said if the tool goes full stroke, the cylinder hits it, stop, then the tool has stopped before it hits the tubing string. So, that testimony alone contradicts their entire summary judgment position on this issue, on the determining step.

Now, Defendants also produced a video, which is covered in our response, in which you can see the

operator pushing the control lever and running the pusher arm toward the pipe -- and this was an actual demonstration video -- until it stops. The operator does not remove his finger from the control knob. The tool stops before it hits the tubing string, and then the video ends.

So, it is clear that the operator wasn't -- there is no one there flagging. There is no one there saying, "Hey. Only go this far, this far, this far, stop." None of that happens. The video confirms Mr. Zaleski's observations and confirms that the tool does not, in fact, hit the pipe before it stops. It stops of its own volition.

But finally, your Honor -- and I'll point this out for the court. This is also covered in our brief, but I'll just blow it up. So, Defendant's damages expert, Ms. Webster, she makes the point -- so, she, in her damages expert report, has a conversation with Mr. Scrantz, who is the manager of Tesco; and in this paragraph she discusses a new noninfringing alternative.

In that new noninfringing alternative they would essentially fix the roller assembly at the top of the tool in place so that it doesn't move. I can't do both of these at the same time, but we can jump back and forth very quickly.

So, essentially her argument is that the roller assembly at the top which has these adjustment holes -- if you just fix that in place, well, all of a sudden there is no adjustment, there is no determining the position of the boom anymore; and, so, there can't be infringement. And that's what she covered.

And now we can go back to her expert report.

But the most important aspect of this testimony is the last few lines here where she says, "Mr. Scrantz confirmed that adjustment of the pins is no longer necessary for the operation of the pusher arm, since the addition of the knuckle provides sufficient adjustment capability for positioning the control line against the tubular."

Now, you just heard counsel for Defendants argue that this is not what they do. But if you look, she cites, in Footnote 92 down here, an interview with Buddy Scrantz. He is the manager of Tesco. He is one of Defendants' 30(b)(6) witnesses, and Mr. Zaleski relies on his testimony because he is the one who says we don't always go full stroke; it varies.

But here he is clearly saying that now that we have this knuckle in the center of the tool, we could do without those adjustment holes; but he clearly says it's for positioning the control line against the tubular.

They just told you that doesn't happen; they don't use those adjustment holes for that. But Mr. Scrantz told Ms. Webster -- and she put it in her expert report -- that that's exactly why they use them. In fact, Mr. Scrantz said "adjustment of the pins is no longer necessary for the operation of the pusher arm." In other words, he deemed it as being a necessary component before they added the knuckle. So, clearly what counsel just argued to you is out of step with their own personnel's view of how they use the tool.

Now, on the second point of memorizing -- and this is perhaps one of the bigger red herrings I've seen -- no one argues -- it's clear from Mr. Zaleski's expert report that he views the step of memorizing as placing the pin into that assembly, into that roller assembly to hold the position. So, he asserts -- and if we can go back to the ELMO.

So, here is a passage from Mr. Zaleski's report; and this is discussing the determining step. And as you can see, he says -- hopefully you can see that. Maybe we can zoom in.

He says -- this is the determining step again -- the length of the pusher arm's boom will be determined by selecting the adjustment hole to pin. He does not say it's pinned in the determining step.

Counsel's entire argument is when you get to memorizing, it's already pinned.

He plainly states there that you're selecting the adjustment hole to pin. In other words, I figure out how far I need this roller assembly to extend in order to adjust the control line against the tubular. Once I've done that, I move to the memorizing step and I pin it. And that's what Mr. Zaleski testified to. That's what his expert report says.

If we turn over to page 140 -- paragraph 140, he says, "The Tesco Lafayette and/or NPE memorizes the position of the boom by keeping the same adjustment hole pinned for at least one cycle."

He goes on to say, "The pin is a mechanical means of memorizing." This is exactly what he says. But there was no confusion about this.

All right. If we can go back to the --

This is Docket Number 122-23. It's an excerpt of Mr. Zaleski's deposition at page 286. You can see where he is asked expressly about this and his explanation. Starting at line 7 he is asked, "In other words, you say -- hold on. You say positioning is moving the pusher arm forward, determining is setting the pin?"

And he says, "No. Determining is setting the position of the sleeve and ensuring that the control line

is in a suitable position for clamping.

"Question: And memorizing, according to page 37 of your report, is keeping the same adjustment hole pinned?

"Answer: By pinning it."

There is no confusion here. The confusion comes entirely from counsel for Defendants. No one argues that if that's his theory, it does not infringe Claim 34. There is no argument to that effect. And if that's his theory, then there is infringement. And that is plainly his theory as expressed in his expert report and as explained clearly here over the next six pages of his deposition as counsel for Defendants argue with him and try to get him to take it back.

Now, these acts, determining the position of the head, moving the roller assembly in the arm, in the boom, and then pinning it are both affirmative action steps. There is no argument that they are not. The only argument is that Mr. Zaleski's opinion was you pin in determining and then you don't have anything left to do in the memorizing step. That's clearly not the opinion. There is no real dispute about this.

Now I want to go back and address something Defendants' counsel said that is just incorrect. So, this is Slide 10 from the Defendants' presentation. And

they make this argument based on Meeks' testimony, the testimony on the right here; and you will see that they cite Docket Number 109-9, Meeks' deposition transcript at Pages 206 to 207.

Now, if the court does as I did and goes and looks for that testimony in Docket Number 109-9, the court will find that testimony is not there. It was not part of their summary judgment briefing. I hope that it was an oversight on their part. But I want to take the court to the actual testimony.

Okay. So -- okay. So, this is -- if we can go backwards, this is Mr. Meeks' deposition transcript; and this is the passage that they cited:

"How do you select what pin to use?

"Depending on where the control lines are coming in from.

"The angle of the sheave?

"Correct."

You can see that testimony there. That's the testimony they put up on the slide. The problem is, as Defendants' counsel know, Mr. Meeks was confused about what portion of the tool was being discussed.

And as you will see in the ensuing pages, that confusion comes to light. He's asked, at the bottom of page 207: So if I'm at one pin and I change, I extend

the length to a second or third pin, don't I have to stroke it farther?

And he says: There's no adjusting to the head on pins.

The only pins are for the rollers. There's no extension here. It's one set length. That's because what he's talking about -- as your Honor will see at the top of Defendants' Slide 9, what he's talking about are these (indicating) pinholes in the roller assembly. He's not talking about these (indicating) pinholes which are Weatherford's infringement theory.

And if you go to the next page, you'll see. He's asked about this very figure on this slide. He says -- he's asked: On the top middle of the picture there is an arrow pointing to a three-fourths-inch thru.

That's right here (indicating). Okay?

He's asked: What do you call that?

I would call that an adjustment hole.

So, he's talking about something entirely different in the testimony that counsel for Defendant cited to you.

And he's asked: Adjustment hole. I'm sorry. I've been calling it a pinhole.

And he says: That's fine.

Then he's asked the question: So, my --

And if we can go back to the -- yeah.

Then he's asked the question here: So, my ultimate question was if I make an adjustment there, that also could cause how much stroke you need to put on the cylinder when you're moving it?

Answer: Yes.

So, he admits that that's what these holes are for. And counsel just told you that he was talking about this (indicating) part of the tool, the roller assembly extension, in his other testimony when it's plain from his deposition testimony that he was not.

Now, I also want to talk about these pictures. We have these pictures here. This is Defendants' Slide 20. We don't know where these pictures came from. They were produced after our expert report.

They were produced after our expert report. They show up in Dr. Rodgers' expert report, but he didn't witness them being created. There is no testimony at all in the record of where these came from or how they were set up or anything. So, your Honor will hear, when we get to our objections to their evidence, our objections to these and more, in a full more argument. But we object to these. They are not legitimate evidence. This was a setup --

THE COURT: We'll get to that later.

MR. WILSON: Okay.

THE COURT: Let's finish up, Mr. Wilson.

MR. WILSON: Okay. The last few points, your Honor. Defendants claim here, at Slide 19, that in the demonstration on the left this was not at full stroke and that we know it wasn't at full stroke because later Mr. Zaleski asked the operator to extend it further, to extend the base cylinder to full extension so that it would go further out.

Now, that's not what happened. And I'll represent to your Honor I was not at the inspection, but my understanding from speaking to those who were is that the photos taken on the left were taken at a different time than the video on the right. It's not clear to me that the video on the right depicts a materially different position for the tool, but -- if we can go back to this presentation -- I want to show your Honor when that picture was taken in sequence.

The picture was taken -- as you can see, going through this sequence of photos, how the tool on the right is going through its range of motion. And there it is. This is the picture that we cite. So, you can see it just went through its full range of motion.

Then you will see in the series of photographs there are multiple views taken from all the way around

the tool. We go all the way around it. The argument that that was not at full extension is, Number 1, contradicted by Mr. Zaleski who was there; and, Number 2, it's inconsistent with the evidence that's right here in the photos. There was no instruction to go full extension after that photo was taken. All these photos were taken, and then the video was taken. So, that's just a misrepresentation of how this evidence occurred.

And finally, your Honor, I want to address the testimony because this issue will arise again in a separate context. This is Mr. Rodgers' expert report. And there is this testimony from Mr. Benoit that supposedly asserts a "hit the pipe" infringement theory.

Number 1, Mr. Benoit is just a fact witness; and he is describing the AutoCLAMP. But, Number 2, he clearly in this testimony, which Mr. Rodgers relies on, never asserts that the AutoCLAMP memorizes a position.

If we walk through his testimony, your Honor will see it here. He's asked the question: Does the Weatherford AutoCLAMP have a memory system to go back to the same position it's been before?

He answers: It will go to the pipe position every time it is stopped by the pipe, and then it will go back in the same position every time.

Question: It's limited by the pipe itself?

Answer: Correct.

Question: Now, we talked earlier this morning about the memory that you say the AutoCLAMP has, correct?

Of course he didn't say that. And now he answers: I said that it goes in the same positions every time, pipe and standby.

And that -- what you call the "memory" is the limitation of the pneumatic piston, correct?

Again, he didn't say that.

In the standby position, he answers, it goes to the same position every time; and that's limited by the cylinders is what I stated.

And then he's asked: Is it limited by the cylinder or by the piston?

Look at the final quote here. After all of this, of counsel trying to characterize him as testifying that it has a memory, it says: Does Weatherford's AutoCLAMP have a memory to go back to the same position like StabMaster?

Answer: No.

So, his testimony is actually the opposite of what they are representing to the court.

And, your Honor, if I may finish up on just a few points. The arm argument for Claim 35, that the pusher arm doesn't have an arm because the boom

encompasses the full length from base all the way up to the roller assembly at the top, Weatherford's expert, Mr. Zaleski, points to the lower portion of that boom as an arm; but it's called -- it's literally called the "lower arm."

Weatherford made exactly the same argument that Defendants' counsel is making during claim construction. Weatherford argued the head in Claim 34, remotely controllable head, as your Honor will recall, couldn't mean "boom"; it had to mean "control line holding assembly" because of the "arm" limitation in Claim 35. Your Honor rejected that argument, and now Defendants have resurrected it as a noninfringement argument. So, it can't possibly be correct.

And that's all I have, your Honor, if you don't have any questions.

THE COURT: No.

Is there any follow-up, Mr. Bowick?

MR. BOWICK: I'll be brief, your Honor.

THE COURT: I hope you will.

MR. BOWICK: First, I want to correct -- I had a typo on that slide --

THE COURT: Just wait until opposing counsel leaves the podium. Then go to the podium, and then begin.

MR. BOWICK: Thank you, your Honor.

THE COURT: All right. Proceed.

MR. BOWICK: Mr. Wilson pointed out an error on one of my slides regarding the Meeks testimony. I had cited it as 109-9. The actual entry is 109-7. That's where the Meeks testimony that he references is included on page 50 and 62.

THE COURT: I will tell everybody I've had more accusations of misrepresentations and untruths in this case than I can remember in any other, and one thing everybody can do to minimize those going forward is to be as accurate and as careful as they can about what they do represent.

We're not going to try this case with each side pointing fingers at the other and telling the jury that they are not telling the truth. We've got different evidence. We've got different theories. We've got different experts. We're going to let this jury hear it all and decide who they believe and who they don't believe and render a verdict accordingly, but we're not going to do it by making accusations about falsehoods and misrepresentations. You know, I'm bothered immensely by what I've already seen this morning that unavoidably there are misrepresentations being made here.

Now, I will just say this: If I get to a

point in this trial where I'm persuaded beyond any reasonable doubt that a lawyer is making a material misrepresentation to me, I will sanction them severely. So, we are not going to have those kind of games and that kind of conduct.

Everybody can make an error and you're going to get the benefit of the doubt in doing that, but we're well beyond where the benefit of the doubt stops in what I've seen this morning and this afternoon. And it's going to come to an end one way or the other. I hope everybody understands what I'm saying.

All right, counsel. Finish up with your rebuttal, and then we'll move on.

MR. BOWICK: Your Honor, I just want to make sure the record was clear. That was a mistake on that slide but the testimony is what it is and it was supposed to be 109-7, not 109-9.

THE COURT: I hear your explanation.

MR. BOWICK: Thank you.

Now, I heard Mr. Wilson say that the pusher arm can't stop on its own before it hits the pipe. He's right. The operator manually has to stop it. It won't stop on its own. He has to let go of the handle. It is a manual control. It's like driving your car. It doesn't stop on its own unless it's one of those fancy

new cars that has collision stuff.

Now, there was reference to this video, this Docket 122, Exhibit 15. That's Weatherford's response. And they suggest that you can see clearly, in the bottom right-hand corner, what the operator -- what the TOSL operator is doing with his hands. I've seen this video a dozen times trying to slow it down frame by frame. I don't believe you can see anything there.

Even if you could, if you look at this device, this is the old pusher arm, the non-knuckle one. It's not going to be an issue before the jury. This is before the notice. There has not been a use or a rental of this tool since the fourth quarter of 2015, well before any damage period. I don't believe that's going to be an issue for this trial.

THE COURT: Well, let me remind you again, counsel. The marking issue relates to only damages. It doesn't relate to liability. If something happened during the period that would be excluded for damages because of a failure to mark, that doesn't mean it's not relevant as to liability. That's why I made the statement earlier.

MR. BOWICK: I understand that, your Honor.

THE COURT: Okay.

MR. BOWICK: I --

THE COURT: You told me this was before the notice period; therefore, it doesn't count. And we're talking about liability here. We're not talking about damages.

MR. BOWICK: Can I ask the court a question? Are we going to allow the jury (sic) to present evidence on a tool that they're not going to be asked to find damages on that might color their view of a tool that operates in a different manner?

THE COURT: I'll take up your motions, and I'll take up the other side's motions. I'm not here to give you advisory opinions or to answer hypothetical questions for you. You're here to persuade me.

MR. BOWICK: Thank you, your Honor.

THE COURT: Let's move forward.

MR. BOWICK: Thank you, your Honor.

All the arguments they've made is all about making what they call the boom longer. Their own expert says making the boom longer has nothing to do with memorizing; that's not the memorizing step.

Now, the testimony they cite to Mr. Scrantz is vague at best. It's a multiple-compound question, and his answer is all over the place. I don't think it shows anything definitive.

Now, they cite to Tesco's damage rebuttal

expert, Dr. Webster, in her expert report where she references Mr. Scrantz. Again, Mr. Scrantz -- what they rely on -- is saying with the new pusher arm, the head hits the pipe. You don't have to do any adjustment.

With the old one, like I said again, that's not going to be something for damages in this case. So, whether or not the old one hits the pipe or doesn't isn't going to be something that the jury is going to be asked to award damages on.

Now, there was reference again to this "determining," what is "determining." Selecting the adjustment hole to pin. Now, I'm not an English major; I'm an engineering nerd. But "pinned," from what I remember, is past tense. That's something that happened before.

It memorizes the position by keeping the adjustment hole pinned. I think that's just basic English grammar. There is no affirmative step in Mr. Zaleski's expert report of putting the pin in as part of the memorizing step.

Now, with the Version II, the knuckle tool, that's not done. That's not necessary. Because as they have already sort of conceded, with the new one they don't have to extend it because it can touch the pipe, as shown in those figures.

Now, they have accused, just like the court just addressed, setting up or manipulating this tool with those photographs to show that it touches the pipe. I heard the word "setup." It's the tool itself.

How do we, know when he showed that sequence of photographs, that that's the full range of motion? I don't know when the photographer took the pictures, but I have watched the video. And I can hear Mr. Zaleski say, "Make it go all the way forward"; and the man in the orange suit complies. And that picture is vastly different from what they represent as the full range of motion.

Now, when we have this trial in December, we intend to bring the accused device here to Marshall for the jury to see. Preferably, we would like to set it up in the courtroom right here (indicating). It's not very big. And we can dispel all this of how this thing operates and whether it has memory once and for all. I think that would be the best --

THE COURT: Are you withdrawing your motion for summary judgment?

MR. BOWICK: I'm not withdrawing it, your Honor. I'm just saying we're not hiding anything here. The tool is the tool.

I am offended that I've been accused, you

know, at least in this part of the argument, of two different things; but we certainly didn't manipulate or alter our device. We just -- our expert asked would it touch the pipe and, if so, could he see pictures. That's what occurs.

So, that's the end of my presentation, your Honor.

THE COURT: All right. With regard to the Defendants' motion for summary judgment of no direct infringement by TOSL because it doesn't perform the steps of determining, memorizing, I think the briefing said aligning and repositioning, the court is persuaded that those issues are replete with questions of fact that have been joined and prohibit the court from granting summary judgment under Rule 56; and I am going to deny the Defendants' motion as to no direct infringement.

With regard to the allegations in the Defendants' consolidated motion for summary judgment concerning no direct infringement by Nabors Drilling, the court denies that as moot in light of the parties' stipulation.

With regard to the portion of the consolidated motion for summary judgment that the Tesco entities do not indirectly infringe, I'm going to deny that as moot in light of the stipulation.

There are remaining portions of this consolidated motion for summary judgment that directly correspond with separate affirmative motions raised by the Plaintiffs. And to make sure that we cover everything discretely and appropriately, we're going to transition to the Plaintiffs' affirmative motions which correspond to the remaining portions of this consolidated motion for summary judgment by Defendants. And between dealing with the Weatherford motions, we should pick up and incorporate and resolve and take care of the remaining portions of the Defendants' consolidated motion for summary judgment. If not, we'll go back and clean up anything that's left over afterward.

But with that in mind, we've got the Weatherford motion for partial summary judgment on marking. That's effectively been dealt with already by the court, and that is denied.

We've got the Weatherford motion on striking testimony from John Walker, Document 108.

We've also got -- we'll come back to that.

We've got Weatherford's motion to strike undisclosed invalidity theories, Document 104. Let's take that up now, and that will also dovetail in with the remaining portion of the Defendants' consolidated motion.

Let me hear from Plaintiffs on their motion to

strike undisclosed invalidity theories.

MR. FIRST: Good morning, your Honor. Chris First on behalf of Weatherford. May it please the court?

THE COURT: Good afternoon. Go ahead.

MR. FIRST: Weatherford asks the court to strike Tesco's undisclosed invalidity contentions. On August 6, 2018, we received Defendants' opening expert reports on invalidity. We were surprised to find that five of the six invalidity theories expressed in that report were brand new and had never been disclosed to us before.

Shortly after, we informed Defendants that we intended to move to strike the expert report. Two days after that and two weeks after Defendants served their invalidity expert report, they served what they called "second amended invalidity contentions," which simply reincorporate the arguments that were made in their expert report.

Defendants have taken three different positions to justify these late amendments. The first is that any change by Weatherford makes any change on their part okay. The court has taken up that argument in the *Pozen v. Par* case, and I'll read just a brief snippet if it's all right with the court.

"To allow *carte blanche* amendment of

invalidity contentions simply because a Plaintiff amended its contentions pursuant to the Claim Construction Order would eviscerate the purpose and function of the patent rules."

So, I think, your Honor, that that argument is off the table now. Clearly that just because Plaintiffs make an infringement contention amendment does not give the Defendant *carte blanche* to make any amendments, no matter how broad, to their invalidity contentions.

In their response they changed course a bit and argued two changes to the infringement contentions justify their amendments to their invalidity contentions. First, they claimed the memorize -- an alleged change to the memorizing limitation justifies their amendments. They claimed that all three new prior art references were justified simply because Weatherford initially argued for restricting memorization to a computer, excluding mechanical memorization.

I think our response clearly shows that that is not accurate, your Honor. These are excerpts from the claim construction hearing, your Honor. You'll see the first, I think, three quotes on this page are Weatherford actively arguing for a construction that includes mechanical memorization.

If you keep going, you will see Defendants

even continue to state their position. "It is our position that this claim, Claim 34, captures the embodiment in which an operator pushes a memorize button."

So, Defendants here are mistaken. It was Defendants that were arguing that a computer and sensors were needed to memorize. From day one in this case Weatherford has taken the position that mechanical memorization meets the claim limitations at issue here.

And, in fact, if you check this bottom quote just at the end, Defendants even acknowledged Weatherford's position. "They" -- Weatherford -- "they are obviously interested in making sure a mechanical means would be included also." So, even at the claim construction hearing Defendants acknowledged that Weatherford's position was that mechanical memorization was included.

Your Honor, they can hardly claim surprise, given that that has been the position since Day 1.

The second limitation they argued was the "remotely controllable head" limitation. Now, on this position Weatherford actually did change its position slightly. However, the argument made by Defendants and the change made by Weatherford was simply to align with Defendants' interpretation of the "remotely controllable

head" limitation, a limitation which they won at the *Markman* hearing. Again, your Honor, it's just not credible that Defendants can claim that this position was unforeseen or otherwise a surprise.

The last argument made in the sur-reply kind of walks away from the "memorizing" limitation that we talked about a few minutes ago; and they cite three different excerpts from Weatherford's -- or depositions, rather, in this case.

The first deposition excerpt, your Honor, is exactly what we talked about earlier. It's Mr. Benoit being asked about how the AutoCLAMP performs. Now, the AutoCLAMP doesn't have a memory; and, in fact, in this case everybody here agrees that the Weatherford AutoCLAMP doesn't practice Claims 34 through 36. So, it's unsurprising that Mr. Benoit testified that there was no memory in the AutoCLAMP.

Again, your Honor, this second deposition excerpt is the same thing. He's testifying about the AutoCLAMP.

The final set of deposition excerpts, your Honor, are questions that were asked directly about the embodiments in the patent. And as Defendants have argued in the context of other motions, there is no detailed embodiment spelled out in the patent. There is written

description in the patent for mechanical memorization. But, again, it's unsurprising that the telescoping boom that's -- that's mentioned in the patent.

And, in fact, if you actually look about halfway through this (indicating), the embodiment in the patent is collapsable for transport. And, in fact, Mr. Hill actually testifies that it is lowered for transportation sake. Again, the collapsable nature of the boom that is disclosed in the patent doesn't have anything to do with memorization; so, there is nothing inconsistent with this argument at all.

Your Honor, I think the more important thing, though, is that none of these three deposition excerpts have anything to do with Weatherford's narrow amendments to its infringement contentions. The rule and the *Pozen v. Par* case requires that the amendments made to Defendants' validity contentions relate back to any changes that Weatherford made; and this allegedly inconsistent deposition testimony, even if it were inconsistent, would not justify a slew of new invalidity positions.

The final argument Defendants make, your Honor, is that there is no prejudice to Weatherford. I respectfully disagree with that. Weatherford was forced to prepare a rebuttal report on these five new invalidity

positions, which account for 80 percent of Defendants' invalidity case, in less than two weeks.

Your Honor, the biggest point here, I think, is that we had no fact discovery on any of that; and that's particularly salient here because Defendants own the Sonnier '664 patent and the MCLRS tool that they added to their invalidity contentions. And, in fact, their position on the MCLRS tool was based on public use.

That is a very fact-intensive inquiry, your Honor. We've, I think, seen four or five pages worth of documents on the MCLRS in this case. They are alleging that it was publicly used. We've had no option to expand or inquire into those facts; and, your Honor, that strikes me as the very definition of unfair prejudice.

And with that, I'll turn it over to Defendants unless your Honor has any questions.

THE COURT: No. I understand your arguments, Mr. First. Thank you.

Let me hear a response from Defendants.

MR. FIRST: Thank you, your Honor.

MR. BOWICK: Thank you, your Honor.

May I approach, your Honor?

THE COURT: You may.

MR. BOWICK: Your Honor, the key dates in this case -- we had a short schedule. My firm wasn't involved

in the *Markman* hearing or anything. We came into this case on June 18th. We got the Claim Construction Order a couple weeks later.

And during the first deposition of a Weatherford employee, during the last week of discovery in this case -- all the depositions were done the last two weeks of July. We got their amended infringement contentions towards the end of the depositions.

So, those questions about memory to Mr. Benoit were: Tell us how we infringe. How do we have memory?

And he said: Hitting the pipe.

And based on that, we added the Sonnier patent as a reference because -- I'll show the court in just a second. All of this was driven based on the court's Claim Construction Order, Slide Number 2.

The head, according to Weatherford in their original infringement position, was just the tip of the arm, not the arm or the boom itself. The court interpreted that as a boom, which caused the conflict with the boom and arm with Claims 34 and 35, which has to do with half of our indefiniteness and written description problems because now the boom and the arm, according to the court's construction and the way Weatherford is applying it, are the same thing. The boom and the arm are one and the same.

So, when you compare Claim 34, your Honor, as a boom, Claim 35 says wherein the boom is connected to the rig floor by an arm. Well, if it's the same thing, boom and arm are the same, then they wouldn't be connected one -- you know, the foot bone is connected to the leg bone. If the boom and arm are the same, it wouldn't say that. It would say the boom is connected to the rig floor or the arm is connected to the rig floor. But the claim is ambiguous because it says the boom is connected to the rig floor by an arm.

THE COURT: You're not saying that the court's claim construction says that a boom and an arm are the same thing.

MR. BOWICK: I'm not, your Honor. I'm saying the court's construed "head" to mean "boom" and then the court did not construe the term "arm." Based on different words and applying the court's construction, the boom and the arm are different apparatus, different structures, two different words. They can't have the same meaning, especially when it's foot bone connected to the leg bone. The boom is connected to the rig floor by an arm. So, that drove a lot of this, is this 34/35 issue with the boom and the arm.

Weatherford asserts that the boom and arm are the same thing, that they mean the same thing, that

Tesco's pusher arms, alleged boom, is also an arm or at least the lower part of the boom is also an arm but not the upper part. I don't really know how you dissect a pusher arm.

THE COURT: So, let me see if I understand your argument, counsel. Are you trying to tell me that these invalidity theories that were amended after claim construction -- you're trying to tell me they are in response to and have a nexus with the infringement amendments urged by the Plaintiff; is that correct? Is that where you're going with this?

MR. BOWICK: Correct, your Honor.

THE COURT: Okay.

MR. BOWICK: And --

THE COURT: Let's see if we can focus on exactly where that nexus, if at all, is. That's what I'm looking for.

MR. BOWICK: I will show you in a picture that we looked at before.

And the infringement contentions -- the original ones September, 2017 -- they said this (indicating) was the head. They put a red circle around it.

After the court's *Markman* order, they said this (indicating) was the head, which the court construed

to mean "boom."

They changed from the head being the tip, the thing that looks like a head, to the head which was construed as a boom being the arm, or what Tesco calls the arm. That's the crux of that first issue with the "boom" claim construction and how they modified it.

They modified that the boom was from just the tip to the entire length excluding the tip, which drives the problem with Claim 35 which requires both a head and a boom.

And the way their expert has asserted infringement is that the entire yellow piece is the boom and it's also the arm, which I believe can't be done. Your Honor denied our motion on that issue, but therein lies the problem with the court's construction and the way they are applying it. It brings in some 112 issues that weren't at issue before.

THE COURT: What else?

MR. BOWICK: Your Honor, with the "memorizing the position of the head," or boom, Weatherford's position at *Markman* was recording the extension. Right out of their brief, "recording the sensed level of extension of the head."

After the court ruled "plain and ordinary meaning," they argued this "mechanical memorization." I

still don't know what that means. I've got a couple engineering degrees, and I'm not sure what a mechanical memory is.

Now, when they said "plain and ordinary meaning" and Mr. Benoit testified -- first witness we deposed -- that hitting the pipe was memorizing the position because it returns to the pipe every time, that's when we asserted for the first time the Sonnier patent.

Now, there was a suggestion that we're asserting public use. What our expert, I believe, said is that the commercial device -- and we showed brochures and photographs -- is a commercial embodiment of the Sonnier patent.

I don't think we have asserted this was a public use as of this date and it was available for public inspection. I think we just said here is a commercial embodiment.

But what Sonnier is relevant with this asserted theory of memorization is the yellow portion there, 230, as referenced there in Column 4, 5 through 9, that the roller guides which hold the control lines are powered by hydraulically operated piston-cylinder assemblies 230. They move towards the pipe and away from the pipe to guide control lines against the pipe for

clamping. You can see the clamp right there at 121.

So, when they asserted this memorization -- I still don't understand what this mechanical memory is. I guess it's driving it close and stopping it. I'm still not exactly sure what they mean by that. But the Sonnier patent, just like their AutoCLAMP and just like the accused pusher arm, are manually controlled. The driver moves a stick. It gets closer; and when he gets close to the stick, it stops. Or he moves the stick until the arm goes forward and hits the pipe.

THE COURT: Now, how are you supposed to persuade me that your late amendments from an invalidity standpoint correspond to the Plaintiffs' claim construction-related infringement amendments when you tell me you don't understand what those infringement theories are?

MR. BOWICK: Okay.

THE COURT: You told me two or three times you don't know what a mechanical memory is but, yet, you're trying to tell me your later-filed invalidity theories have a nexus with and connect and are justified by those post-claim construction amendments on the infringement side by the Plaintiff.

MR. BOWICK: That's a good question, your Honor. Here's how. We go back to the memorization.

Their interpretation that they asserted before this court was "recording." That was what they asserted that the memorizing step was. This patent doesn't have any recording. It's just a manual-operated device just like the accused pusher arm, just like the AutoCLAMP.

So, pre-*Markman* when they are asserting in their *Markman* brief that recording is required, I don't know how you record something without storing it. You have to have a position. You record it. Their interpretation required "sensed." It says "recording the sensed level"; so, that infers there is a sensor there. Neither the accused product nor the Sonnier patent have a sensor, much less record it. They are just manually dumb tools. You just drive it forward; you drive it back.

So, when the court did not construe it according to Weatherford's proposed interpretation, it opened up the prior art to things including, based on their assertion of infringement against our device, to devices that operate the same way, with a manual hydraulic stick control.

If the court had adopted Weatherford's interpretation, I wouldn't have even been worried about invalidity because the accused device doesn't record anything. It's got a hose and a valve and a cylinder that goes forward and backwards. It doesn't sense

anything. The manipulation of the joystick allows fluid to flow one way or the other to move the arm forward and backwards.

So, when the court construed this "plain and ordinary" and they started asserting, well, driving it forward and driving it back is an infringement and that's our infringement theory, then it opened up the spectrum for prior art way broader than what we had before. That's the reason we wanted to add the Sonnier patent.

Along those same lines, there is no mechanical memorization disclosed. The reference that Weatherford relies on is from Column 3, Lines 65 to 67, where it says, as described in here, the boom is memorized electronically. That's what's described in the patent. And then there is a suggestion, a suggestion that you could do it optically and mechanically.

Now, that's a suggestion; it's not a disclosure. And their own expert, Mr. Zaleski, said there is nothing in this patent about memorizing mechanically. It's not described. "There's no disclosure that I can reference with certainty." Those are his words.

And guess what. The embodiments of the '637 patent, they have hydraulic cylinders. They go forward and backwards. They have booms that extend longer and

shorter, telescoping booms. I went over that earlier.

And according to him, that is not memorizing the position. The disclosure -- there is no mechanical memorization of the boom disclosed in this patent, merely the suggestion that you could also do this mechanically or optically but we don't know how.

Now, Weatherford also criticizes Dr. Rodgers because he gives an example. He says, yes, you could do it optically; and here is how you would do it. Here is how you would determine a position with an optical sensor. And what he really goes on to is that a sensor doesn't do the memorizing; a sensor creates feedback, a signal. And that signal has to be processed by something else and compared to a stored, known position, a memorized position, to respond.

But a sensor itself just senses. It doesn't memorize. It just creates a value of something else.

THE COURT: Let me ask you why you keep calling this a suggestion and not a disclosure when it says, "However, the position of the booms could be memorized mechanically or optically." Is that -- why is that not a disclosure? Why is this some mere suggestion that really doesn't count in the way you are presenting it to me?

MR. BOWICK: Because it doesn't disclose to a

person of ordinary skill how to practice this invention. Their own expert can't find it in there.

Weatherford agreed that their device, their AutoCLAMP, does not perform the step of determining and memorizing. Weatherford's device is almost substantially the same -- they accused us of copying it -- as the accused pusher arm. They both have cylinders that move an arm. They both have a control; you can drive it forward and draw it back.

Neither of them have a "memorize" button or a "return to the memorize" button. Neither of them have sensors. It is just a manual move it forward; move it back. There is no stopping point other than hitting the pipe or the user deciding, "Okay. I'm close enough. Let's stop. Let's stop moving."

THE COURT: All right.

MR. BOWICK: That's how both of them work.

I won't go into the boom thing. I think I've talked that one through enough. But their position ultimately is that this boom and arm are the same thing. This is their expert again. According to Mr. Zaleski, the boom and the arm are the same according to this patent. Claim 35 is not consistent with that. They are two separate things.

THE COURT: What else?

MR. BOWICK: That's all I have with respect to that issue, your Honor, other than what's in our briefing.

THE COURT: All right. Mr. First, would you like a very short rebuttal?

MR. FIRST: Yes, your Honor.

THE COURT: All right.

MR. FIRST: Your Honor, something struck me as Mr. Bowick was wrapping up, that Weatherford's AutoCLAMP and the accused device have no "memorize" button. If your Honor will look at page 2 of our reply -- and I implore that you do -- it shows the arguments that were made at the claim construction hearing. It's in the transcript.

I think the positions the parties took at the claim construction hearing are very clear; and the argument that Mr. Bowick just made was exactly the argument they made at the *Markman* hearing, down to the word "memorize" button. They wanted the operator to have to push the "memorize" button on the computer. The court rejected that position, and now you are hearing it argued yet again.

Mr. Bowick also said that they added the Sonnier and MCLRS references as a result of Mr. Benoit's testimony. But Mr. Benoit's allegedly inconsistent

testimony -- although we disagree that it was inconsistent -- is not our invalidity contention amendment -- excuse me, your Honor -- is not our infringement contention amendments. So, I think what you heard there was a concession that it wasn't at all the infringement contention amendments that precipitated that change.

The other thing Mr. Bowick said is that the Sonnier and MCLRS references are just like the AutoCLAMP and the pusher arm. If that's true, then it's impossible that they didn't know that they should have included them initially, given the fact that they own that tool and they own those references.

We've led in a little bit to the written description argument, your Honor. I think that's a pretty easy one. It's an issue of fact. They are citing deposition testimony that they contend should be interpreted one way. I think that's the incorrect interpretation, but I surely don't think they have shown that there is a lack of a material fact there.

And to the point that the patent doesn't disclose specific, detailed embodiments including mechanical memorization, a patent doesn't have to include examples of every possible embodiment. That is black letter law, your Honor; and that is also cited in our

briefing.

And unless your Honor has any questions, that's all I have for you.

THE COURT: All right.

MR. FIRST: Thank you.

THE COURT: Thank you.

MR. BOWICK: Your Honor, real brief?

THE COURT: Very, very brief.

MR. BOWICK: I was misquoted. I didn't say it's exactly the same. I said it operates the same way. It's a manually driven device, referring to the Sonnier. I didn't say it was the same. It operates the same way. It's manual, drive it forward and drive it back.

I wasn't counsel of record at the time of the *Markman*; so, I don't have the benefit of exactly what happened there.

But that's it, your Honor.

THE COURT: Okay. Thank you.

All right. With regard to Weatherford's motion to strike invalidity theories as set forth by Defendants' expert, Dr. John P. Rodgers, there are basically five grounds sought to be addressed in this motion. One is anticipation in view of Sonnier and Tesco's MCLRS device. Ground 2 is obviousness in view of the '931 patent to Webre and the '756 patent, McArthur.

Ground 3 is obviousness in view of Sonnier, the '664 and McArthur, the '756.

Ground 4 is indefiniteness as to the term "head" from the "remotely controllable head" limitation of Claim 34.

And Ground 5 covered by the motion is lack of written description as to the limitation "memorizing the position of the head" in Claim 34.

Having heard the argument of the parties and considered their briefing, the court is going to grant the motion. The court is persuaded that the Plaintiffs have not changed their litigation position post-*Markman* and that the amendments to their infringement position necessitated and properly put forward in light of the court's claim construction ruling does not have a nexus with these additional invalidity theories put forward by the Defendants.

The court does not find any reason why Tesco should not and could not have asserted these earlier. The court has already rejected Tesco's attempts to substitute the term "guide boom" for "arm." And, so, this fourth ground on indefiniteness is untimely; and it is duplicative to what's already been covered.

But I am going to grant the relief requested by the Plaintiff in the motion to strike, Document 104.

All right. That brings us next to Weatherford's *Daubert* motion regarding John Rodgers, which is Document 108, and the corresponding substantive sections of the Defendants' consolidated summary judgement motion that might relate thereto.

Let me hear argument from the Plaintiff on this motion.

MR. FIRST: Thank you, your Honor. Just to let you know, we did file a very, very brief reply yesterday, in case you haven't seen it.

Our *Daubert* motion is premised on four different grounds. The first is that Dr. Rodgers applied the incorrect legal standards to his 112 analysis.

The second is that he contradicted the court's Claim Construction Order by asserting the claims require electrical or computer memorization, not mechanical.

The third is he offers expert opinions on the "hit the pipe" theory that you've heard quite a bit about today that is not asserted by Weatherford.

And the last is that he offers an invalidity conclusion based on a discussion below that never materializes. I think that last point is most likely a typo, your Honor. I'm sure Defendants will speak to that.

I'll focus, your Honor, on the contradiction

of the court's Claim Construction Order because that's what they were able to respond on. I think it's pretty straightforward, your Honor. Dr. Rodgers contradicts the Claim Construction Order by reurging Defendants' positions requiring electronic memorization.

If you look at our reply, I did my best to block quote and pull out the sections of his report that are most relevant. But again and again he says you need sensors, you need to process the information, you need a computer. Again, your Honor, this is exactly the position that we were just talking about and that your Honor rejected at the claim construction hearing.

Your Honor, I'm happy to answer questions on the three grounds that there was no response for. I'm not sure how your Honor would like to handle those.

THE COURT: Well, if it's not responded to, it's not really a joined issue on. If you want to make a comment, Mr. First, I'll allow it.

MR. FIRST: Well, your Honor, the most pressing issue, I think, is Dr. Rodgers' analysis on the Section 112 defenses. For both he applied the wrong legal test. For indefiniteness he applied the "insolubly ambiguous" test which was overturned by the Supreme Court. And the second, he offered an opinion on a grouped -- group of 3 written description requirements,

including the "best mode" defense which was abolished several years ago.

Now, I think what Defendants will probably say on that point is that, well, he's not a lawyer. You know, it's not his fault that he got it wrong. But frankly, your Honor, we're talking about just a few paragraphs in his report. It's very sparse, and there's no way to divide those limitations up.

So, if you take out what Defendants I think will call just the case citations or quoting the case law, there is really nothing left beyond his bare conclusions. So, even if you were to ignore fact that he is misapplying the law, there would be no analysis left; and it should be struck for that reason. Thank you, your Honor.

THE COURT: What's Defendants' response?

MR. BOWICK: Well, I guess we're taking a victory lap because if I understood, your Honor, you already struck our 112 issues; so, that's off the table.

And the court yesterday said that you wanted to hear about this Issue Number 4.

THE COURT: I do.

MR. BOWICK: So, the 112 stuff -- as I understood your last ruling, your Honor, you struck the 112 issues that were raised in the amended invalidity

contentions.

THE COURT: You heard me correctly.

MR. BOWICK: Okay. I just wanted to make sure we aren't reurging it.

Okay. Your Honor, with respect to the "determining the position" and the "memorizing the position," Dr. Rodgers' report -- we outlined a lot of it this morning when we talked about the infringement. We talked about why the accused pusher arm does not perform the memorizing or the determining step.

Now, in his report he analyzed what the preferred embodiment of the '637 patent was, which is a linear transducer and a computer. He analyzed that and describes what that is.

He also analyzed the third option, which was the optical memory; and he gave an example of what that is. At no time did he say, "Ours isn't optical; therefore, we don't infringe." He's laying background as an expert about what these devices are.

He doesn't say, "Ours doesn't infringe because ours doesn't have sensors." If you look at the paragraphs in his expert report, he merely lays out the preferred embodiment of the '637 patent. He gives an example of what an optical memory is and then he analyzes the mechanical memory that Mr. Zaleski asserts that the

accused pusher arm practices and then he cites those photographs that show the accused pusher arm contacting the pipe and extending past the pipe.

And that's basically it. I mean, the report speaks for itself. He doesn't say, "We don't infringe because we don't have sensors." He just analyzes, like a good expert should, the patent and the court's claim construction and the suggestion of what would be an optical memory, what would be an electrical one, and what Mr. Zaleski says is the mechanical memory.

THE COURT: All right.

MR. BOWICK: I'm not going to address the other things because I think those have all been dealt with.

THE COURT: All right. Thank you, counsel.

Well, the four invalidity portions of this motion are out because the underlying invalidity theories I've just struck in regard to Document 104 that we just covered.

Regarding the challenged noninfringement portion that's raised in this *Daubert* motion, I'm going to deny the motion as to paragraph 83 and the second sentence of paragraph 86 and paragraph 150. But I'm going to grant the motion and strike from Dr. Rodgers' reports paragraphs 84 and 85 and the first sentence of

paragraph 86. And that, in conjunction with my earlier ruling on Document 104, should cover everything that's at issue under Document 108.

Now, next we're going to take up the parties' summary judgment motions with regard to the -- is it Webre or Webre (pronouncing) reference? That's Document 105 and Document 109.

But before we do that, we're going to take a very short recess. The court stands in recess.

(Recess, 2:28 p.m. to 2:39 p.m.)

(Open court, all parties present.)

THE COURT: All right. Let's turn to these motions regarding the Webre reference. We've got competing motions effectively here. I'm happy to hear from either side first. We're going to cover everybody's position before we're finished.

MR. BOWICK: Your Honor, since it's the Defendants' burden --

THE COURT: We'll start with Defendant.

MR. BOWICK: Thank you.

May I approach?

THE COURT: You may.

All right. Counsel, proceed.

MR. BOWICK: Thank you, your Honor.

We have competing motions on whether or not

the Webre patent, Michael Webre, Franks International -- whether this is a 102(e) reference as it was filed more than a year before the filing of their patent.

I'll lay up the court's claim construction of these terms, the "head" and the "angle relative." Applying the court's construction, "head" equals "boom" and "angle greater than zero degrees relative to the rig floor."

And we look at -- there is no dispute that the Webre patent is prior art to the '637 patent. That's, I think, in the pretrial order.

So let's start off with the preamble of Claim 34 of the '637, your Honor. The preamble is "a method of aligning a control line with a tubular."

The Webre patent discloses a "control line." That's Number 4 in both the embodiments of Figure 1 and Figure 12.

The "tubular" is the pipe string Number 7. That's the same in both Figure 1 and Figure 12.

And there is "a method of aligning a control line" described; and, as I put up here on the screen, Weatherford's expert agrees that the embodiments of Figures 1 and 12 disclose a method of aligning a control line with a tubular.

Webre further, on its own, describes

"alignment," which Mr. Zaleski has interpreted as moving the control line in a position to be clamped.

So, we have the preamble step of Claim 34, as admitted by Weatherford's expert, disclosed and taught in both Figure 1 and Figure 12 of the Webre reference.

So, the next issue is what is "positioning." The next element is "positioning a control line using a boom." Mr. Zaleski says "positioning" is any movement of the boom towards the tubular causing it to move. That's what -- as a person of ordinary skill, an expert in this case, that's what he understood "positioning" to mean.

The embodiments of Figures 1 and 12 disclose the step of positioning. As you can see from these references to Mr. Zaleski's testimony, Figure 1 positions it with a hydraulic cylinder that telescopes a telescoping boom.

In Figure 12, he uses the word "positions the control line," using the member 25 there and the arms 25b and c.

So, we get to the next element, what is a "boom." That's the court's interpretation of "head." I hope I'm not making you seasick, but I can't seem to get it there.

Figure 1 of the '637 patent says "guide boom or arm," which includes an upper and lower boom. And

using a reference to 220 as a guide boom 220 which is -- Tesco calls it a "roller assembly." I think Weatherford calls it a "head." But basically the boom is the entire thing.

Now, one of the patents -- the only patent cited by the examiner that she looked up when she examined this was the Swoboda patent. It's got the little asterisks there that lets us know that that's one the examiner found. And the Swoboda patent discloses -- this is all about what is a boom -- "an extendible boom." That's a horizontal device that extends forward and backwards.

Another reference, prior art, is the Rogers patent. What is that? It's a telescopic boom. Even Mr. Zaleski agreed that that is a telescopic boom that would be understood by a person of ordinary skill.

Well, Figure 1 of Weatherford similarly describes -- can y'all see this okay?

THE COURT: I can see it.

MR. BOWICK: It's a telescopic boom just like the Swoboda and the Rodgers patent. The hydraulic cylinder pushes it out towards the pipe, and the same hydraulic cylinder pulls it back away from the tubular.

And what did Mr. Zaleski say? He says the boom and arm are interchangeable. They mean the same

thing.

And I asked, "So a boom is an arm, correct?"

And he said with respect to the '637 patent, "They are the same."

And then I confirmed that it was his testimony that in Figure 1 that Line Thruster Number 3 is an arm, which under his interpretation is the same thing as a boom, so establishing that Figure 1 discloses the boom that positions the control line.

We get into Figure 12 of the Webre patent. The Webre patent at Column 3, Line 32 through 34, describes the embodiment of 12 as an alternative control line pusher for the assembly of Number 3, the line thruster of Figure 1.

So, they both have this horizontal sort of ram-like structure. The difference is Figure 1, the ram is moved only horizontally by the hydraulic cylinder where the ram 25 -- what they call "control line pusher" -- is hingedly connected to arms, almost like linkages on like a car suspension kind of, to drive it towards and away from the pipe with the hydraulic cylinder Number 28.

And again Mr. Zaleski states that Items Number 25b and c would be considered arms, which he defined as the same thing as a boom.

Going back again to Figure 1 -- I'm sorry -- Figure 12 of the Webre patent. And I asked Mr. Zaleski does Item Number 220, the guide boom, correspond with Item Number 25e of the Webre patent; and he agreed that those are the same.

So, the guide boom 220 of the '637 corresponds to Item Number 25e; so, therefore, Item 25e and the assembly there would constitute a boom as well.

We move on to the next step, your Honor, "determining a position of the boom, wherein the position of the boom aligns a first portion of the control line with a tubular string."

I won't be repetitive. I think we addressed "aligning" with the preamble language and then an agreement by Mr. Zaleski that the embodiments shown show alignment. So, I asked what is determining. What does a person of ordinary skill -- what is determining? And he said it's positioning when you get close enough to clamp.

Now, what gets interesting here, I asked him about Figure 2 of the preferred embodiment of the '637 patent. The '637, the patent-in-suit, describes this. It says: In a position whereby the control line has been brought to a location adjacent to the tubular string for the installation of a clamp.

Now, this whole case has been about keeping

people safe or out of the red zone, as Weatherford calls it. But their own expert says the preferred embodiment doesn't get you there. It's not close enough. It's not in the determined position. He said it requires some additional manual force to push the control line closer. It is not disclosed in the preferred embodiment.

So, we go back to the Webre patent, your Honor; and you can see that the control line which Webre describes as "Path 10," which is away from the pipe -- Number 10 is a path. And 10 prime, 10 with that little hyphen next to it, engineers call that "10 prime." It moves it from a position away from the tubular to a position in alignment, which is also referred to by Mr. Zaleski as "parallel" or "aligned." And that's the position where it's to be clamped.

As you can see in Figure 12B, you can see the clamp right there (indicating), Number 27, put on after that pusher moves the control line into alignment.

And Mr. Zaleski agreed that both devices of embodiments of Figure 1 and Figure 12 move the position -- move the control line into a position suitable for clamping, which he has stated, as a person of ordinary skill, is a position where it can be clamped to the tubular. That's the "determining a position" according to Mr. Zaleski.

We move on to the memorizing step. And I asked him -- we looked at this before. I won't spend very much time on it -- where is the mechanical memorization? How do we know how to do it? He says it's not described. No reference labels pointing out those types of mechanisms. No disclosure that he can reference with certainty.

Well, one thing we do know is that extending the length of the boom has nothing to do with memorizing the position. That goes to sort of our noninfringement argument. But let's talk about memorizing with the Webre. The Webre patent discloses an automated system. Figure 15 is described as "a general schematic of inter-connected versions of a system that provides automatic sequencing of individual functions of the overall system."

And by putting these pictures, you can see that Item Number 3c from Figure 15 is a hydraulic cylinder from the embodiment of Figure 1. And the way it's described there is these control -- these lines, 52 and 53, are the lines that carry the actuation command signals from a processor, similar to the preferred embodiment disclosed in the '637 patent, your Honor. It's a computerized or electronic memory system.

And again, as I said earlier, the Webre patent

states that the Item Number 3 can be substituted for -- it's an alternative -- for the embodiment in Figure 12.

Now, what are these sequencing controls? The sequencing controls say it moves the control line towards the pipe. Sequencing controls include some kind of program on this processor that controls the hydraulic cylinder to make it move. In the Abstract it talks about it can start the moving of the control line away from the pipe. It says reversing this, it can move it towards the pipe.

If you look at Column 1, Line Number 9, it talks about manual sequencing or automatic sequencing. Now, Dr. Rodgers and I think Mr. Zaleski described what that meant. Manual sequencing is that -- it's manual control, but it won't let you override something if another condition is sensed.

But automatic sequencing is when this event occurs, it triggers an automatic actuation of something else. So, that's how -- the difference between manual sequencing and automatic sequencing. Those are attached -- both of those reports are attached in case your Honor had a question about that.

But throughout the Webre patent, it's describing this automatic sequencing that actuate the power means to move the control lines. You can see that

right there at Column 2, Line 64, the description of Column (sic) 15, and again the description of the figures -- the embodiments of Figure 12 as an alternative form of the control line pusher, usable instead of Assembly Number 3.

The reason that's relevant is Weatherford suggests that this sequencing here in Figure 15 is limited only to the embodiment of Figure 1, that this automatic actuation memory is limited only to Figure 1 but not the embodiment of Figure 12.

Well, the description of Figure 12 states right there that it is an alternative. So, they are both hydraulic cylinders. They are both controlled the same way, whether it is moving the control line towards and away from the pipe in that manner or moving a hydraulic cylinder that moves the pusher assembly with linkage arms.

Now, Webre further describes this memorization through the sequence that I've underlined here; and it shows that this is an automatic procedure. And when you look at this, the way this thing operates, your Honor, there's two positions disclosed. There's 10 and 10 prime on both Figure 1 and Figure 12. So, when it's doing this automatic actuation, it moves the line to two positions, Number 10 -- Control Line 4 in Position Number 10, and it

moves it to Position 10 prime and then back again.

Figure 12A sort of illustrates why these control lines have to be pulled back. It's because this elevator has to come down; and if it wasn't pulled back, it would hit the control line, et cetera.

Now, the last element is positioning using the memorized position or repositioning -- strike that. I forgot something, your Honor.

I've highlighted in red here where Webre is talking about "That event may include last-section position." That is memorizing and storing the last-section position. That's at Column 5, Line Number 38.

And again it's talking about the automatic sequencing. "The control line may be started away from the pipe string." So, in that description right there, it is talking about automatically moving it from 10 prime back to the 10 position.

Now, the last element is the -- of Claim 34 is the "positioning a second portion of the control line using the memorized position," or sort of repositioning, because this device is just repetitive. It goes against and pulls it away, goes towards and pulls it away. The reason it does that is because you add pieces of pipe. This isn't the first oilfield case, I'm sure, in this

courtroom.

And you can see there in Figure 12A, the elevator comes down with the piece of pipe and then it grabs another one and picks it up and stacks it on there and it goes back to the position of Figure 12B.

Now, Claim 7 of Webre describes this process of moving the control line away, connecting the new pipe, and then moving it towards again, and then adding the clamp. This is "Pete and Repeat." This is how drilling does. It's very repetitive, just like this device operates. Add a new piece of pipe, pull it away, and then connect it to the new piece of pipe.

So, your Honor, that's where we are with Claim 34. We believe every element, every step of Claim 34 as this court has interpreted, as testimony of Mr. Zaleski and Dr. Rodgers show and the disclosure of the Webre patent -- each step is clearly disclosed and articulated in the Webre patent.

If you want, I can go to the next element which is dependent Claim 35.

THE COURT: Let's go to 35.

MR. BOWICK: Thank you, your Honor.

Again we're back to the boom and the arm. Well, I've colored the boom here green and the arms red. And Mr. Zaleski has already agreed that -- I just want to

make sure you saw that there. It is color-coded, and you have this angle relative to the rig floor which I've colored red there.

Mr. Zaleski agreed that Figure 1 -- he wouldn't give me arm, but he said it's a leg. It's an appendage of some sort, that the boom is connected to the rig floor by a leg. I'm not sure the difference between an arm and a leg. Does a bear have four legs or two legs and two arms? Depends on if he boxes, I guess.

Figure 12, same thing. He said that the arms 25b and c connect the boom to the rig floor in the same manner as the '637 patent.

So, we get into 35 and 36. And we can get out the protractors, if you will; but I've already done it for your Honor. And you can see that both embodiments -- Figure 1 and Figure 12 -- are approximately 76 degrees, angles to the rig floor, which fall within the court's interpretation of "angle" in both Claims 35 and 36.

Do you have any questions, your Honor?

THE COURT: No. I understand your argument.

Let me hear a response from the Plaintiff. And I'll hear Plaintiffs' affirmative arguments on their competing motion. I guess I should have said it that way.

MR. BAXTER: Thank you, your Honor. Boone

Baxter on behalf of Weatherford.

And as you suggested, I'm going to respond to their argument and then go into my affirmative -- Weatherford's affirmative motion of no anticipation by Webre.

THE COURT: To the extent you can blend those together, I would appreciate it.

MR. BAXTER: I will. I'll be fast.

So, just a few quick points. This is the slide that opposing counsel just used to show that Webre discloses the "determining" step.

Webre discloses clamping. No one disputes that. But the claim language at the top here is "determining a position of the boom, wherein the position of the boom aligns a first portion of the control line with a tubular string." Just the fact that there's clamping is not sufficient. You have to determine the position next to the pipe for clamping.

This is something that I'm not exactly sure why it is part of a motion for invalidity. But it's come up a few times; so, I just want to set the record straight for this. This is through heated argument that Weatherford's AutoCLAMP -- while a fact witness, he is an inventor of the AutoCLAMP -- explained that the AutoCLAMP has telescoping booms that can be collapsed when you put

it on the boat, ship it out to the rig, and transport it to the rig. That has nothing to do with moving the control line to the pipe.

The push arm has an adjustable roller assembly that you can move to determine the position it needs to be when you want the clamp -- the control line next to the pipe. The telescoping transportation arms of the AutoCLAMP are completely irrelevant.

This is their evidence for the "positioning a second portion of the control line using the memorized position" step, Step 4 of Claim 34. They cite Claim 7 of the Webre patent. And just so that the court is aware, there is nothing in here, in Claim 7, that has anything to do with determining or memorization. I'm not going to read through it one at a time, but all this is is the process of moving back and forth.

We agree Webre discloses a process of moving back and forth. This is the claim. Claim 34 requires memorized positions and determining positions. That's my response to their motion.

And can you change to the laptop?

This is Claim 34. I won't belabor the point, but the two really hard-disputed steps are "determining a position of the head" -- and I underlined this because this is what they ignored in the briefing -- "wherein the

position of the head aligns a first portion of the control line with a tubular string." So, you have to determine the position next to the pipe.

Step 3 is you have to memorize that position, not another position, not memorizing a piece of another equipment, but you have to memorize the position of the control line device when it's next to the pipe.

Weatherford asks that you grant partial summary judgment as to the Figures 11/12 embodiment.

Both parties site *NetMoneyIN* in the briefing, and I do want to read this into the record from *NetMoney*. "The hallmark of anticipation is prior invention. The prior art reference, in order to anticipate under 35 USC 102, must not only disclose all the elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'"

And the second cite that we rely on. "Thus, it is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."

And that's exactly what Dr. Rodgers has done with the Figures 11/12 embodiment.

Here are the two embodiments from Dr. Rodgers'

report and in the briefing. This is from Webre. You can see on the left it is a control line thruster. It's Item 3. It's very high up in the derrick, and it moves back and forth.

The second embodiment, which counsel just correctly read from the patent, is an alternative. The patent describes it usable instead of Figure 1 -- is the Figures 11 and 12 embodiment. That is the much lower. It sits on the rig floor, and it has what the patent describes "two standard parallel." Items 25c and b.

These are two separate alternative embodiments, and under *NetMoneyIN* you cannot pick and choose structures from either one to combine to make another embodiment and claim that's anticipation.

I'm not going to read this slide, but I do want to have the cite. These are all the improper combinations where Dr. Rodgers combined structures from these two different embodiments to make his anticipation argument. And this is a couple times in our briefing. This one is Document 122 at 43 through 44.

So, what do Defendants say in response to Dr. Rodgers' impermissible anticipation argument? First, they do not deny that the Figure 11 and 12 embodiment is usable instead of Figures 1 and 2.

They do not deny that Dr. Rodgers combines the

automatic sequencing feature of Figure -- with the Figure 11/12 embodiment, and the automatic sequencing is a feature of Figure 1. They do not deny that Dr. Rodgers relies on the automatic sequencing feature to disclose the determining and memorizing steps.

But they do argue that the Figure 11, which is the automatic sequencing feature, applies to Figures 11/12 -- so they argue that they can combine them -- and that *NetMoneyIN* has no application to this case for three reasons.

Here is the automatic sequencing. This is Figure 15. How do we know it applies only to Figure 1 and not Figures 11/12? Item 3c. That's hydraulic cylinder 3c of Figure 1 is not the power cylinder 28 of Figures 11/12.

And Defendants' three *NetMoneyIN* distinctions all fail. First, they said the Federal Circuit in *NetMoney* held the patent claim at issue only related to one of the two prior art embodiments; so, this embodiment has to be viewed in isolation. That's wrong.

In *NetMoneyIN* the district court was reversed for combining two different embodiments from a prior art reference to create a third undisclosed reference to anticipate the claim. That's exactly what they are doing here by trying to combine two different embodiments to

create a third embodiment that's not disclosed.

Second, they argue that *NetMoneyIN*, the prior art reference had two completely separate embodiments, which each contained different subparts. Counsel just admitted that Figure 1 and Figures 11/12 are two separate embodiments that use one or the other.

Third, they say that the Webre patent specifically teaches at Figure 12 control line assembly can be used as a substitute to Figure 1's assembly. This is the last argument that opposing counsel made. That's the point. If it's a substitute, it can't be combined. These are two distinct embodiments that cannot be combined. If they want to do combinations, they need to make an obviousness argument. They did not do that. This is anticipation.

Our second -- and I'm only going to -- we had four grounds. I'm only going to argue the first two. I'm going to rest on Grounds 3 and 4.

Our second argument of why we should be granted summary judgement of no anticipation is that Defendants do not address the entire claim elements. Again they rely on automatic sequencing to meet the determining and memorization steps. Automatic sequencing does not determine the position of the head, nor does it memorize the position of the head.

In their briefing this was the best case and they just argued it again here, this brief section of Webre called "last pipe position." I do want to read this one sentence -- or two sentences. This is from Webre, Column 5, 33 through 45.

"If outside controls initiate closure of the spider slips and closure is too fast for the control lines to be moved and secured, other preceding events may be used to trigger preparation of the control line for spider slip closing. This may include last-section position." And then they insert, in their brackets, "memorized position."

That's completely argumentative. Memorized position is not there at all, and they -- let's see what "last-section position" means. This is from the patent, not from their brief, the same quote; and in the yellow highlight is what they did not include in their briefing. It says, "When the last-added pipe section is halfway through the spider, the control line may be started away from the pipe string."

"Last pipe section" has to do with the position of the pipe. It has nothing to do with the position of the control line device. That's clear here. There is no determining or memorization disclosed anywhere in Webre.

I'm going to rest on the briefing. This -- opposing counsel argued a lot about what a boom is, what a boom is not. I don't think I can expand any better than what's already been briefed on this point.

But at the end of the day, I do want to note that they have changed from their infringement -- their expert report to their briefing about what is a boom and what is not a boom. And this isn't just a gotcha, haha, you pointed at the wrong figure. The reason why it's important to name the boom right is this next picture.

Once you know the boom, you have to say what the arm is for Claim 35. And when you are forced to identify booms and arms, you get into some really curious positions in Webre. For example, this is Figure 1; and they are claiming the arm of the control line device is the leg of the rig. It's the leg of the derrick.

And, so, it's really important for us to understand what's the boom, what's the arm. This is not a "gotcha" because this argument is unreasonable on its face. The claimed arm cannot be the leg of the derrick.

And that's all I have. Thank you.

THE COURT: All right. Counsel, I think I, from the briefing, understand your arguments.

MR. BOWICK: Can I respond to any of that, your Honor; or are you ready to rule?

THE COURT: I'm satisfied with where the parties are and we've still got a lot of ground to cover and I think you've both been given a fair opportunity to make your arguments.

At the end of the day, counsel, the issue before the court at this juncture is whether method Claims 34 through 37 of the patent-in-suit, the '637, are invalid as anticipated under 102(e) in view of Webre. We have competing expert testimonies here. I'm persuaded there is a genuine and real factual dispute about the scope and content of Webre and Webre in relation to the patent-in-suit such that neither side is entitled to summary judgment at this juncture.

So, to the extent Defendants seek, as a part of their composite motion for summary judgment or combined motion for summary judgment -- consolidated motion for summary judgment, a judgment of anticipation as a matter of law and to the extent that Weatherford as Plaintiff seeks a finding as a matter of law of no anticipation, both motions are denied.

That's Plaintiffs' motion under Docket 105, and that's the portion of Defendants' consolidated motion 109 that addresses this issue. I think there are fact issues live and present under either argument that dictate this should be submitted to the fact-finder as a

part of the trial; so, that's the court's ruling on this motion -- or these competing motions.

Let's return to any remaining issues under the Defendants' consolidated motion for summary judgment that we haven't addressed. Specifically, Defendants' 112 arguments are effectively moot in light of my prior rulings. There is an unaddressed portion of the Defendants' motion dealing with enhanced damages.

MR. BOWICK: Yes, your Honor. That goes to willful infringement. It's pretty bare in our motion. But it basically lays out that for willful infringement you have to rely on the conduct before the lawsuit and there is no evidence pre-lawsuit that we had intent to infringe this patent, that we willfully infringed. It's not going to an exceptional case for all of the types of conduct but just the issue of willful infringement under -- I think it's 284.

THE COURT: All right. What's the Plaintiffs' response?

MR. PAYNE: Your Honor, the statement that there is no evidence of pre-lawsuit conduct that would give rise to willful infringement is improper. We put them on notice -- everyone admits that -- in September of 2016, many months before the lawsuit was filed.

What did they do when they got that demand

letter? The evidence suggests nothing but ignore it. They responded and basically said there is not enough in dispute to bother with this.

There is no evidence that they took any reasonable actions, that they came up with any noninfringement positions, that they came up with any invalidity positions, for example. They just effectively ignored the letter.

We can also go back several years to the admissions in their interrogatory answer about their surfing the Net and finding, you know, what was -- whatever was on there and basing their design on what they found. Of course one of the things on the Internet at the time was our device; so, that gives rise to an inference that they based at least part of their design on our tool.

Of course at the time the flyer that was on the Website at the bottom mentioned that the device may be covered by one or more patents. Did they investigate to see what patents we had at the time? There is no evidence of that.

THE COURT: All right. Let me --

MR. PAYNE: It seems they ignored --

THE COURT: Let me stop you, Mr. Payne.

MR. PAYNE: Thank you.

THE COURT: It's clear in the court's mind that between the notice in 2016 and the lawsuit, there are fact issues about whether or not there was conduct that could or would not give rise to enhanced damages; and I'm going to deny this motion for summary judgment with regard to enhanced damages. This is an issue that needs to go to the jury.

If there is a finding of willfulness, the court will determine later if there is a basis for actual enhancement or not. But there is clearly a factual dispute about what happened between the notice and the lawsuit, and I think that precludes the entry of summary judgment on this issue.

Now, there is a portion of this motion for summary judgment from Defendants that deals with dismissal of other Defendants. I need both sides to address that for me.

I know that there are parties that have restructured during the life of this lawsuit. I know that there are parties that may not be targeted for direct recovery as a part of your streamlining of the case. I don't see anything in your stipulation that says these parties should be dismissed. I don't have a joint motion before me that certain parties should be dismissed. We need to get straight as who is in and who

is out at this juncture.

So, given that it's a part of the Defendants' motion, I want to hear from the Defendants about exactly what they are asking the court to do and why here.

MR. BOWICK: Your Honor, in the motion we were asking that the parties that no longer exist, these corporate entities, including -- Tesco Corporation and Tesco Corporation Canada were dissolved. They don't exist anymore. TOSC and TOSL -- TOSC was converted from a corporation to an LLC. It's the same company. So, we were saying these companies that don't exist anymore should be dismissed from this case because they are not in existence.

THE COURT: And you're not arguing that conduct of entities that now have been dissolved but previously existed is not imputable to their successors who are parties in this case?

MR. BOWICK: I'm not sure, your Honor, because in light of the stipulation, the parties have agreed that based on the discovery TOSL is the company that makes, uses, sells, practices. These other companies are parallel or somewhere in the corporate tree, but they are not related to the accused device.

THE COURT: Well, if there is an agreement between the parties that certain entities no longer exist

and shouldn't be properly included in this case, I'm open to it. But if there is -- if there is a dispute about who is a successor to who and who is liable for the prior conduct of somebody that may have been merged or dissolved or reorganized, that's a different issue. Have you all met and conferred on this?

MR. PAYNE: We've talked about it. I'm willing to try the case to the jury with just one entity; but I want to be clear that for the entire infringement period, you know, the fact that the LLC was formed, you know, during that infringement period doesn't foreclose infringement and damages before they were formed.

I don't think these guys are arguing that, mind you; so, I think the answer is we haven't sufficiently met and conferred to address the court's concern. We can do that quickly, I think.

THE COURT: Well, the court has no problem instructing the jury that over the course of the lawsuit there have been restructuring of various types between parties on the defense side of the case and that that restructuring merger, dissolution, whatever, is not an issue they should consider in determining whether there has been infringement or whether the patent is valid.

But specifically for housekeeping purposes, if both sides agree that X is no longer in existence,

shouldn't be talked about, and can be, if necessary, referred to in the evidence as the predecessor to Y that's now still in the case and everybody agrees on that, we ought to do some cleanup if there is some cleanup to do. But that's the way it appears to me.

MR. RALEY: The goal of the stipulation, your Honor, was to try the case against TOSL. We tried to choose the language as best we could, Mr. Payne and I, to accomplish that. If the stipulation is not enough to accomplish that, I'm sure we'll be able to work out any issue.

THE COURT: Well --

MR. RALEY: But that's where -- I mean, it's not only the parties that no longer exist but these other parties that do exist that they are no longer asserting claims against. They are going after a direct claim against TOSL. So, we're not -- I think we should be able to agree on all of this.

THE COURT: I think there needs to be further efforts to meet and confer between the parties.

MR. RALEY: All right.

THE COURT: To the extent the court should appropriately streamline some of this, I'll take that up at the next pretrial. Let me give you all between now and then to work through these issues. Okay? Hopefully

you can.

MR. RALEY: Yes, your Honor.

THE COURT: The Defendants' motion for summary judgment -- "consolidated motion for summary judgment," it's titled -- also has issues embedded in it with regard to indirect infringement and joint infringement. I think those are no longer in the case, but I want to confirm that with both sides.

MR. PAYNE: Those are moot.

THE COURT: Okay. Then those requests for relief under the Defendants' consolidated motion for summary judgment concerning either indirect infringement or joint infringement are dismissed as moot.

All right. Let me ask this: Are there any other -- with the one exception of the identity of these Defendant entities and whether that needs to be cleaned up, are there any other matters, either under the Defendants' consolidated motion or the separate motions filed by the Plaintiff, that the court hasn't taken up and addressed that the parties are aware of before we get to motions *in limine*?

MR. PAYNE: I think that's all from Plaintiffs.

MR. RALEY: Not aware of any, your Honor. Thank you.

THE COURT: Okay. Just wanted to make that clear on the record.

All right. Then let's move to the disputed motions *in limine*.

MR. RALEY: Your Honor, could my co-counsel be excused very briefly for --

THE COURT: That's fine.

MR. RALEY: -- a personal matter?

THE COURT: That's fine.

MR. RALEY: He'll be right back.

THE COURT: Not to give anybody an unfair advantage and so the court can take equal advantage, we'll just all take a short recess.

MR. RALEY: Thank you, your Honor.

(Recess, 3:24 p.m. to 3:37 p.m.)

(Open court, all parties present.)

THE COURT: All right. Let's turn next to the disputed motions *in limine*. We'll start with the Plaintiffs' motions *in limine*. The first one has to do with 30(b)(6) testimony.

MR. PAYNE: Your Honor, we have some agreements that I would like to announce for the court.

THE COURT: Good. Please do.

MR. PAYNE: With respect to Weatherford's MILs, they have agreed to the following: 1, 8, 9, 10,

11, and 13.

THE COURT: Go through those again, Mr. Payne.

MR. PAYNE: 1, 8, 9, 10, 11, and 13.

THE COURT: All right.

MR. RALEY: With the understanding that it goes both ways, that they will also not do those things.

MR. PAYNE: Sure.

And in addition, your Honor, 2, I think, is moot in light of the court's rulings today on Mr. Walker. So, I don't think we need to address 2.

THE COURT: So, you are withdrawing 2, correct?

MR. PAYNE: Yes. And 14 is withdrawn, too, because I don't think it's really -- they don't have anything on Mr. Bratic; so, I don't think there is going to be a need for an objection. But if there is, you know, we'll see. So, I think we can withdraw 14.

THE COURT: Okay. Any other agreements to announce with regard to Plaintiffs' MILs?

MR. PAYNE: No, sir.

THE COURT: And based on that, Plaintiffs' Motion *in Limine* 1 will be granted by agreement and applied mutually to both parties, with the same result based on the same agreement applying to Plaintiffs' Motion *in Limine* Number 8, Number 9, Number 10,

Number 11, and Number 13. Additionally, Plaintiff withdraws Plaintiffs' Motion *in Limine* Number 2 and Plaintiffs' Motion *in Limine* Number 14.

Is that the agreement from the Plaintiffs' standpoint?

MR. PAYNE: Yes, sir.

THE COURT: Is that the agreement from the Defendants' standpoint?

MR. RALEY: Yes, your Honor -- one second.

Okay. Thank you, your Honor.

THE COURT: All right. That then leaves us, in remaining disputed motions *in limine* from Plaintiff, Number 3 with references to dropped or asserted claims. Now, most of these, counsel, I need very little argument on; but I don't want you to feel that you've not been given an opportunity to be heard.

Does Defendant believe there is some relevance to bringing up dropped or previously asserted but no longer asserted claims before the jury?

MR. RALEY: Only in this sense, your Honor. They are trying to use claims that they are no longer asserting in their lost profits analysis by alleging that certain tools in the marketplace are not noninfringing alternatives. They agree that they do not infringe the asserted claims in this case; they say they infringe

other claims, claims that they dropped in this case.

We are opposed to that because we think that is -- those claims are irrelevant, that the only claims at issue in this case are the asserted claims. And, so, a motion *in limine* on the other side is to oppose their damage expert trying to use dropped, nonasserted claims in his lost profits analysis. But if the court allows them to do that, we need to be able to respond and say, "Hey, those claims were dropped in this case. They are not before this jury."

THE COURT: But, now, the noninfringing alternatives issue is not tied to the asserted claims, is it, counsel?

MR. RALEY: We're not aware of a single case that allows them to do what they are doing, your Honor. Everything that -- and we have cited some cases on this point.

THE COURT: Well, they haven't done it yet. We're just talking about what you anticipate they might do.

MR. RALEY: Their expert does it, your Honor. It was the major point of contention in the deposition of Mr. Bratic. It drives -- what they have tried to do is ratchet their damages by using their nonasserted claims in an analysis of the marketplace. And what's important

is their tool practices these dropped apparatus claims. Other tools arguably do. They have to prove that. It's their burden.

But those claims were dropped, perhaps because they knew that they would be invalidated. I don't know. They've got their own reasons for dropping them. But they've dropped them, and it just seems horribly unfair to me. The law is supposed to make sense, and it doesn't make sense that they can drop claims and then still use the dropped claims to increase their damages. And we've --

THE COURT: How would you respond to an observation that this sounds like a *Daubert* motion clothed in a motion *in limine*? If your argument is their damages expert is unreliable based on this use of information related to dropped claims, why isn't this properly brought before the court as a *Daubert* motion or --

MR. RALEY: I see --

THE COURT: -- rather than a motion *in limine*?

MR. RALEY: I'm sorry. I didn't mean to interrupt, your Honor.

THE COURT: That's all right.

MR. RALEY: I see a lot of people filing *Daubert* motions to strike expert witnesses. I'm not a

big fan of that.

THE COURT: I see a lot of that, too; and I'm not a big fan of it, either. That's why I raised the question.

MR. RALEY: I'm a trial lawyer. So --

THE COURT: I'm not a big fan of motions *in limine* that basically instruct the counsel to follow the Rules of Civil Procedure.

MR. RALEY: Exactly. I agree.

THE COURT: That's often presented to me.

MR. RALEY: Yes, like don't have hearsay in court.

So, we've cited a case in our Motion *in Limine* 6 -- and I hate to jump theirs, but it's an exact cross-reference -- about patent damage analysis, *Uniloc USA versus Microsoft*, Federal Circuit 2011 case. It says that the damage theories must be tied to the facts of the case; otherwise, it's essentially irrelevant.

And the facts of the case is there are certain asserted claims; and, again, it just seems illogical and unfair for them to drop claims for whatever reason they dropped them -- they've got their own explanation for it -- but use those dropped claims to increase their damages.

And, so, I don't like motions to strike

experts. I prefer to just try cases. But I would like the expert's testimony to be consistent with logic and fairness and reason, and there is at least this one case on point that we have cited for your Honor. I'm not aware of a single case that permits them to do what they are trying to do.

THE COURT: Are you familiar with *Presidio Components versus Am. Tech. Ceramics*?

MR. RALEY: I have heard the name. I cannot recite it, your Honor.

THE COURT: Okay. A proper theory of lost profits is not tied to the asserted claims.

I'm going to grant Plaintiffs' Motion *in Limine* Number 3. Mr. Raley, I know you understand that a grant of a motion *in limine* is not an absolute bar or an absolute prohibition. And in the conduct of the trial itself, you certainly have the right to approach the bench and seek leave to go into an area I might have otherwise covered with a motion *in limine*.

And if we get to that point in the damages portion of the trial, I'll consider at the bench any argument you might have as to why I should give you leave; but at this point I'm going to grant Plaintiffs' Motion *in Limine* Number 3.

MR. RALEY: I will endeavor to do so during

our morning session to not interrupt the flow in front of the jury, your Honor.

THE COURT: All right.

MR. RALEY: Thank you.

THE COURT: That brings us next to Plaintiffs' Motion *in Limine* Number 4, criticisms of the PTO. Now, ordinarily that's an easy grant both ways, that we're not going to try this case by denigrating another agency of the United States Government. I understand in this case there may be a desire to talk about a specific examiner with relation to the Webre reference; but in light of my prior rulings, is that still even a live issue?

MR. RALEY: We are not going to denigrate anyone, your Honor. We simply want to say what -- and it's probably already going to have been said by the video -- that mistakes can happen, that human beings are not perfect and, therefore, the jury has a role to do in the patent system. And that's all we were going to say.

To the extent that this *limine* would preclude us from saying that, we are opposed to it; but that's as deep as we want to go. And it will be in no way an insult to the good people at the Patent and Trademark Office.

THE COURT: All right. Well --

MR. BOWICK: Well, your Honor, I would like to

just make sure that we're clear. There is an issue where the examiner stated the reasons for allowance and said that the Webre patent didn't disclose a separate clamp boom as required by the claims, which are not in there. So, we would address that and whether that was an accurate statement or a reason for allowance by the examiner.

THE COURT: I don't see -- Mr. Bowick, I don't see how sections of the prosecution history could be considered. If they are an accurate recitation of what the examiner said or didn't say, I don't know how that's a criticism.

MR. BOWICK: I agree, your Honor. I just wanted to make sure that that wasn't -- didn't fall within this.

THE COURT: Nor do I see that a statement to the jury that none of us are perfect, including the PTO, and they can make mistakes -- that's not a criticism.

MR. RALEY: That's all we want to do.

THE COURT: But just to guard against the possibility of going beyond that in the heat of trial and consistent with my prior practice, I'm going to grant a mutual motion *in limine* that neither side will cast aspersions or make denigrating statements or criticisms about the Patent and Trademark Office or its examiners.

If there is any doubt, approach the bench; but what you both just told me doesn't run afoul of the ruling of the court here. All right?

That brings us to Plaintiffs' Motion *in Limine* Number 5. This has to do with third-party products. Tell me what the dispute is here.

Mr. Baxter, this is the Plaintiffs' motion. Why don't you tell me.

MR. BAXTER: Thank you, your Honor.

Just real briefly, we don't want to go far away from the holding in *Markman versus Westview* that you decide infringement by comparing the product to the properly construed claims.

We are concerned that they will say the fact that we didn't sue a third party is evidence of noninfringement. That's prejudicial; and the only way to really respond to that is us to make the parallel argument, well, the fact that we sued Tesco is, therefore, evidence of infringement. Two wrongs don't make a right. It's confusing. It's against *Markman*. It should -- we ask that it should be granted.

THE COURT: All right. Mr. Raley, why should there be any reference to people who didn't get sued in this case?

MR. RALEY: Well, again this gets to the

noninfringing alternatives issue, your Honor. One of the major competitors in the marketplace is Franks. They have a competing tool. The Franks tool is a big part of the market share for this tool; and they are claiming in this case that Franks is not a noninfringing alternative, again using the issue of the nonasserted claims.

In response to that, we want to be able to say they gave notice letters to all these other people, including us, but didn't give one to Franks.

THE COURT: I'm going to grant this motion *in limine*. I think, based on what you've told me, that invites the jury to compare -- to make a comparison other than the single and only proper comparison, and that is the language of the claims as compared to the accused products.

MR. RALEY: May I ask this, your Honor? My understanding is -- obviously it's their burden of proof, their damages; so, they're going to have to prove that these other tools in the marketplace, such as Franks, which is -- four out of five rigs that Weatherford lost in the Gulf they lost to Franks, according to the note my law partner just handed me.

They're going to have to prove that Franks infringes those nonasserted claims; so, there will be a mini trial, I guess, as to Franks and to these others and

to which we have to respond.

THE COURT: I'm not sure I'm following you.

MR. RALEY: They have a conclusory statement from their expert that there is infringement of these nonasserted claims. My concern is that if there has to be a trial on that issue, then it's really going to make this -- so, all these kind of issues fold amongst themselves as you can see, your Honor.

THE COURT: Well, as with any issue, one side or the other who would otherwise be prohibited can always open the door. And if they open the door to what I've prohibited by this MIL ruling, I'm going to allow you to walk through it. Okay?

MR. RALEY: Thank you, your Honor.

THE COURT: But unless the door is opened, I'm going to preclude a discussion of third-party products that are not accused in the case before this --

MR. RALEY: Obviously we will approach if we think that happens.

THE COURT: Okay.

MR. RALEY: Thank you, your Honor.

THE COURT: As you should. And we will take it up when and if it happens.

All right. That brings us to Plaintiffs' Motion *in Limine* 6.

MR. RALEY: That's very similar to the previous one.

THE COURT: Well, is there any difference here, Mr. Wilson?

MR. WILSON: No, your Honor. This is addressing the same issue that was previously addressed, I think, with respect to Motion *in Limine* Number 3, which is the use of unasserted claims in arguing that there are no noninfringing alternatives.

I think *Rite-Hite* is pretty clear on this. They said the JBL 100 product in that case was governed by another patent that was not asserted in that case and could be used for lost profits analysis. Those were claims that were not asserted. And the court said, yeah, it's totally fine. So, I don't see how this is any different really.

MR. RALEY: The only thing I might add, your Honor, is that the case we've cited, *Oracle versus Google, Inc.*, out of California in 2012 says that damages are supposed to be assessed on a claim-by-claim basis.

Again this gets to the noninfringing alternatives issue -- or nonasserted claims. So, I fear that we are opening a huge Pandora's box here. I'm not aware of a case that allows them to do this, but I believe the very court -- it is very similar to the

previous motion *in limine* the court has ruled on. I just wanted to make sure we got that case cite into the record. It's in our briefing.

THE COURT: All right. Well, given your representations that this is similar to Plaintiffs' MIL Number 5, I'm going to grant it likewise, with the understanding that Plaintiffs open the door, Defendants certainly will get the benefit of that.

All right. Plaintiffs' Motion *in Limine* Number 7. This looks, on its face, to me like a "follow the rules" motion *in limine*, that lay witnesses are not to give expert or opinion testimony. What is there about this that's beyond what the rules already provide?

MR. RALEY: We will not ask for expert testimony, but there is case law that says an inventor can explain his or her invention and what was intended to be covered in the invention and we've cited those cases in our briefing.

The *Voice Techs* case, Federal Circuit in 1999, *Verizon Services*, Federal Circuit case in 2010, which says, quote, the district court properly allowed testimony from witnesses about the patents they invented based on their personal knowledge.

The *Knowles Electronics* case which we cited out of 2000, that a party can elicit testimony about --

quote -- about their inventions, what those inventions do, how they work, and their contributions to the prior art.

So, inventors can provide factual knowledge about their inventions. So, I think we understand what the rules are on that. I just -- the --

THE COURT: I have a concern that comes to mind at this juncture and that is that in examining an inventor about what they invented and what they intended, we could very well be straying into contradictions to the court's Claim Construction Order and we're not going to do that.

MR. RALEY: I do not want to do that.

THE COURT: Mr. Payne, I'll let you be heard on this.

MR. PAYNE: I'm just seeing numerous examples today where they have cited to the court deposition testimony from Mr. Benoit, for example, from Mr. Hill, for example, that is directly within the four corners of this MIL; and, so, I'm very concerned they are going to try to do it at trial.

But if they say they won't do it, that they will follow the rules that you aptly note, then that's good. But the fact that they keep on using these deposition cites in their expert reports and in today's

hearing, you know, concerns me.

THE COURT: Well, whether I grant this MIL or don't, if any party attempts to solicit an opinion or expert testimony from a lay witness, the other side should be on their feet objecting; and I'm going to strictly enforce the prohibition against nonexpert witnesses giving opinion testimony.

And I'm certainly not going to let a lay witness, even if it's the inventor, contradict in any shape, form, or fashion the court's Claim Construction Order. I think this is clearly part and parcel of the existing Rules of Civil Procedure, and I'm going to deny it for that reason only.

That doesn't leave you unarmed. Both of you are armed with those rules if the other side attempts to elicit opinion testimony from fact witnesses. I'll expect the objections to be made if and when that occurs. Actually, I'll expect it not to happen; but if it does, I'll expect the other side to object.

MR. RALEY: Yes, your Honor.

MR. PAYNE: Thank you, your Honor.

THE COURT: Number 7 is denied as stated in the record.

Number 8, Number 9, Number 10, and Number 11 are granted as agreed and are made mutual by the parties'

agreement.

That gets us to Number 12. What's the dispute here, counsel?

MR. RALEY: Yes, sir. I don't even really -- I'm not sure I understand this one. We aren't making a claim of false advertising. I asked a witness in the deposition if the Weatherford AutoCLAMP worked automatically, and he said no.

And I said, "Does it clamp?" And he said, "No." And I said, "Well, then why do you call it the AutoCLAMP?" And I guess they want to strike that testimony. That's just kind of cross-examination about how they named their tool; so, I don't really know what they are doing.

THE COURT: Mr. First, what's the Plaintiffs' concern here?

MR. FIRST: Your Honor, I think their response makes this very clear. A jury should be allowed to weigh the credibility of Weatherford's inventors' decision to name their tool the AutoCLAMP. That doesn't bear on any issue in this case, and it's completely irrelevant.

If the company's credibility as a whole is relevant to this case, then how about Tesco's death penalty sanctions four years ago for fabricating evidence? It's the same type of thing. We're talking

about evidence that doesn't bear on any issue in the case and only goes to essentially mudslinging, your Honor.

MR. RALEY: Your Honor, can I just -- I'm really tired of the victory laps on something that happened before we got involved in the case. I know it was their very best day in the case, but they don't have to keep reminding everybody of their good day.

THE COURT: Let me just say this: I'm aware of Judge Ellison's opinion from 2014, but that has no application in this case.

MR. RALEY: Absolutely.

THE COURT: Somebody who had made a mistake in an earlier case and paid a penalty for it is going to get a fair trial in this case.

MR. FIRST: I agree, your Honor.

THE COURT: Now, woe be it to them if they go down the same path. But that applies to both sides

And same thing for the venue fight that we had. You know, I'm going to enforce the rules of relevance here, mainly because I don't want to confuse this jury.

I'm wondering here, Mr. First, given that the rules prohibit and give you a sound basis to object if an examination by the Defendant calls for irrelevant information, why do you need this order *in limine*? What

is it -- what is it goes beyond a lack of relevance here that would support the grant of this *limine* motion? That's my question.

MR. FIRST: I think the fact that they have essentially conceded here that they want to go into that issue in front of the jury suggests that now is the appropriate time to deal with it rather than disrupting the trial, but obviously it's completely up to your Honor whether it's appropriate to grant the motion *in limine* or have us object at the time.

THE COURT: Well, what is the -- what's the correlation between the inventor's decision to name the tool an AutoCLAMP and allegations of fraudulent marketing?

MR. FIRST: Your Honor --

THE COURT: I mean, is there some correlation there?

MR. FIRST: They are not asserting false advertising in this case. That's essentially what this type of argument would be relevant to. I don't see how this bears on this case at all.

THE COURT: Well, I mean, there's no false or fraudulent marketing in this case on either Plaintiffs' side or as any counterclaim from Defendant, is there?

MR. RALEY: I just asked on cross of one of

their witnesses how they named their tool. That's it. At some point --

THE COURT: And what did the witness say?

MR. RALEY: He said it's not automatic and it doesn't clamp. I just thought that was interesting, but it --

THE COURT: Is that question the sole basis for this MIL? Is there --

MR. RALEY: Yes, your Honor.

THE COURT: -- more here than that?

MR. FIRST: That line of questioning, your Honor.

Defendants have argued that a jury should be allowed to weigh the credibility of Weatherford's inventors' decision to name the tool the AutoCLAMP. That's from their response to this MIL. They intend to go into this.

THE COURT: Maybe I'm missing something here, counsel. But if the inventor says, "I named it the AutoCLAMP because it clamps and it's auto" or doesn't -- whatever he says, how is that prejudicial to the Plaintiff in the case?

MR. FIRST: I understand Defendants want to go into a line of questioning that involves whether or not the AutoCLAMP actually functions automatically. The way

the AutoCLAMP functions, your Honor, is that the tool is automatic and then somebody comes in and actually clamps it.

So, the first part is the automatic functioning of the tool; and then the clamp is the clamping portion of it. But again, your Honor, this doesn't bear on any issue in this case at all.

THE COURT: Well, I'll tell you what I'm going to do. Out of an abundance of caution, so that the court can play its appointed role as a gatekeeper, I will grant Plaintiffs' Motion *in Limine* 12. But if defense counsel approaches and says, "I want to ask the witness this" and I don't see a basis either under 403 or irrelevant information or some other improper reason, I'm going to let him go into it.

MR. FIRST: Understood.

THE COURT: But rather than just have there be no structure in place here, against the prospect that there is more of a dispute here than I can see at this moment, I will grant Plaintiffs' Motion *in Limine* 12.

MR. FIRST: Thank you, your Honor.

MR. RALEY: And may I just say before we move on -- and I'd like to say this on the record because they brought up Tesco death penalty sanctions. Our law firm was the counsel on the other side of Tesco --

THE COURT: I'm aware of that, too.

MR. RALEY: And not that that has anything to do with what we're doing here.

THE COURT: I don't know if that's why Tesco hired you today or not.

MR. RALEY: I think there is a chance of that, your Honor. I would like to think that. But regardless, we represented NOV in that case.

THE COURT: All right. Let's go. Plaintiffs' Motion *in Limine* 13 is granted by agreement and made mutual.

MR. FIRST: I think that was actually --

THE COURT: 14 is --

MR. FIRST: Excuse me, your Honor. I think that was actually Number 12.

MR. RALEY: It was 12.

THE COURT: 12 I just granted.

MR. FIRST: Yes, sir.

THE COURT: Okay. Next, that brings us to 13. 13 was granted by agreement of the parties.

14 has been withdrawn.

And that leaves us with 15. Is 15 still a live *limine* issue here?

MR. PAYNE: They didn't respond to it in their written response. I assume they agree to it, but I --

THE COURT: That's why I asked the question.

MR. RALEY: I'm sorry. Let me -- I apologize. Let me turn to it very quickly.

THE COURT: This is to prohibit by *limine* order an inquiry into privileged subject matter, which I don't know why --

MR. RALEY: This is really hard because they have sealed everything they filed with the court. And every deposition is sealed and everything is privileged; so, I have no idea what they say is privileged because they say everything is privileged. So, I really don't know how to -- what to do with that.

MR. PAYNE: Attorney-client privilege, not confidentiality.

MR. RALEY: I don't --

MR. PAYNE: I'm not sure -- I guess we're not -- this is about don't elicit testimony about --

THE COURT: All right. All right. Wait a minute.

We're going to have one person talk at a time. I don't need a conversation between multiple lawyers at the same time. And that goes for now, and it goes for every other time you're in this courtroom. Everybody.

Now, if you're going to whisper to each other, don't whisper so I can hear you.

Mr. Payne, I'll let you finish your statement.

MR. PAYNE: I think I'm done.

MR. RALEY: Your Honor, we agree to follow the rules.

THE COURT: I can't envision why any lawyer in this case would ask a witness for something that they anticipate would be privileged, but the rules are clear that you should not and must not do that without either leave of the court or agreement of the parties or a waiver of the privilege.

I'm going to enforce the rules as they stand, and I'm going to deny the motion *in limine*. But don't take that as an invitation to push the envelope or go into something that's otherwise privileged because you may be advised by my response that that's not appropriate.

I've already done this. Let me remind both sides again. This court has a standing order on how to seal the record and the transcript. Follow it during this trial. Don't expect me to grant wholesale redactions because you didn't follow my standing order after the fact.

Okay. Are there any other motions *in limine* from Plaintiff that have either not been agreed, withdrawn, or dealt with by the court?

MR. PAYNE: No, sir.

THE COURT: Then let's move to Defendants' motions *in limine*. Are there any agreements here?

MR. RALEY: Sadly, your Honor, no.

THE COURT: All right. Then let's start with the first one.

MR. RALEY: 1 and 2 both go to excluding references to pretrial discovery and venue disputes; and in light of today's ruling, I would incorporate as well any ruling by the court, including the striking of Dr. Rodgers' testimony which the court has ruled on today.

It should not have to be argued that venue disputes and discovery disputes have no place in front of the jury. They are not relevant to any issue. They are not probative. The jury will decide nothing based on venue disputes or discovery disputes; and to the extent there is anything relevant about any of that, it would be barred by 403 as misleading and confusing of the issues.

So, the only reason that we've got it as a motion *in limine* is because they very clearly want to go into it. They have tried several times today to bring it up, and in many depositions in this case they have brought up Mr. Meeks' declaration and this court's ruling on Mr. Meeks' declaration. I anticipate it will be part

of their opening statement because it is their best day. It's obviously prior counsel. Things happened. But the court ruled and the case moved on.

We want to have a case that's tried on the merits of the case and not on this court's prior rulings regarding venue, discovery, or even regarding what experts can testify to or not testify to. You know, I guess I've only done this 34 years; but I've never let anybody -- I've never heard of anybody offering the court's rulings into evidence in front of the jury.

THE COURT: What's the Plaintiffs' response?

MR. PAYNE: I've never heard of a witness being made a central part of the case in so many ways when the witness has previously been found to have been dishonest. This is a unique set of circumstances, at least in my career, and apparently in Mr. Raley's. I understand that. I readily admit it. This is unusual, your Honor. Typically we would agree to most of this, if not all of this.

But as we discussed almost *ad nauseam* today but we're going to have some more argument, we need to find a way that is appropriate to be able to challenge the credibility of Mr. Meeks, whether it's through using his declarations or references to his dishonesty that the court found in striking his first declaration. But we

really need to be able to challenge it, and that's exactly what Rule 608(b) allows the court to give us.

THE COURT: Well --

MR. PAYNE: It says -- I'm sorry, your Honor.

THE COURT: I'm going to grant Defendants' Motion *in Limine* 1 and 2. And as I've said earlier, that's not an absolute prohibition. It's merely to put the court in a position to be a gatekeeper.

And I think both of you have some merit in your respective positions on this. This is not a witch-hunt about Mr. Meeks, and it's not going to become a witch-hunt about Mr. Meeks. But to the extent his prior conduct goes to his credibility and believability, that's always at issue with every witness.

To the extent, within the confines of the rules, there is a pathway for the Plaintiffs to properly present that, I'm going to be open to those arguments. But I'm going to deal with this on a instance-by-instance basis as we go through the trial; and all I'm doing now is putting a structure in place to ensure that I'm the one that decides yes, you can do this or no, you can't.

And I agree.

MR. RALEY: It's really --

THE COURT: I've been out of law school longer than both of you all, and I haven't seen this before.

MR. RALEY: I just want to add one thing for the record so it is very clear. There is not a single witness I am aware of in this case, experts or otherwise, that has relied on Mr. Meeks' declaration about venue or discovery in any of his opinions or testimony in this case. The only thing they relied on is how Mr. Meeks described how the pusher arm worked and didn't work. And, so, I understand your Honor has ruled on it; but I just wanted to make it very clear.

MR. PAYNE: What he said is a red herring. It's not about --

MR. RALEY: Okay.

MR. PAYNE: -- venue or the fact that, you know, documents were not --

THE COURT: All right, gentlemen. We've got this fight before us and I'm going to have to deal with it as we get to it and I can see where both of you are going.

There may be -- depending on how it is presented and the entire context at the time, there may be a basis to allow some of this. There may be a basis to exclude it. I'm going to take it on an issue-by-issue-as-it-comes basis. Defendants' Motions *in Limine* 1 and 2 are granted.

Number 3.

MR. RALEY: Yes. My point on that, your Honor, the jury will be instructed of the clear and convincing burden of proof on our side, on Tesco's side, to prove invalidity. If they want to add and also say there is a presumption of validity, that makes it sound to a lay jury like there are two hurdles we have to clear and not just one hurdle we have to.

And that's why most of the model jury charges do not speak to -- or several that we've cited -- speak to a presumption of validity. They just tell the jury their burden to find invalidity is clear and convincing evidence. So, we just want it to be one hurdle, the legal hurdle that the jury has to deal with, not two hurdles.

THE COURT: Okay. Well, this motion is denied. I routinely tell the jury in my own instructions that properly and lawfully issued United States patents are entitled to a presumption of validity but they can be found to be invalid and that's why there is an elevated burden. It's not two hurdles; it's one. And I think I can make that clear in my instructions.

MR. RALEY: Thank you, your Honor.

THE COURT: Defendants' Motion *in Limine* 3 is denied.

That brings us to 4.

MR. RALEY: I'm a little -- I understand that Weatherford wants to argue copying as part of its background, but Weatherford's AutoCLAMP tool does not practice the asserted claims. And, so, really, you know, copying of the AutoCLAMP or not copying of the AutoCLAMP should be irrelevant.

They have responded and said they do not intend to urge copying in its infringement case or in its obviousness case; so, it really -- it doesn't go to any issue at all before the jury.

THE COURT: What's Plaintiffs' response?

MR. BAXTER: It does go to an issue before the jury. Under *Panduit* we have to show demand. One of the ways that you show demand -- the court has already quoted the *Presidio* case -- is to show the similarity of the product you are claiming lost profits for against the accused products.

And if you look on the screen, you can see the similarity. This goes straight to demand which goes straight to the damages issue. It's completely relevant. And as they have said, we are not using this for infringement. We are not using this for obviousness.

Just a final point. They refer to it in their briefing and again here, calling it the unpatented AutoCLAMP. The AutoCLAMP is patented. It may not

practice the asserted claims, but no one disputes that it practices many other claims of the '637 patent.

MR. RALEY: You've already ruled. This is just another example of them filing a suit, asserting certain claims, then dropping claims, and then using the dropped claims as their damages -- for their damages. And now they are asserting copying of their dropped claims in the lawsuit.

There is the old story about how the camel got into the tent. First the nose and then the head and then the neck, and before long the whole camel is in the tent. And that's what I see them doing in this case. The nonasserted claims keep coming back like Banquo's ghost in *Macbeth*. That's two metaphors in one paragraph, your Honor.

And that's what we're dealing with. If they have dropped the claims, they should be dropped and they shouldn't be such an important part of this case and, yet, they are making them that.

THE COURT: All right. I'm going to deny Defendants' Motion *in Limine* Number 4. It's clear that the Plaintiff does not assert that the AutoCLAMP practices these asserted claims, but that does not preclude the AutoCLAMP from being appropriate evidence about infringement of the patent in a willful or

malicious manner. And I think under the proper reading of the precedent concerning willfulness, it's relevant.

MR. RALEY: Can I just ask, your Honor? We have to have willfully infringed the asserted claims. And if the AutoCLAMP does not practice the asserted claims, then how can copying the AutoCLAMP go to willful infringement of the asserted claims?

THE COURT: Motion *in Limine* 4 is denied.

MR. RALEY: Thank you, your Honor.

THE COURT: It's willful infringement of the patent, not willful infringement of the asserted claims.

All right. Let's go to Defendants' Motion *in Limine* Number 5, extraterritorial sales of the pusher arm. Tell me what the dispute is here.

MR. RALEY: Well, it's not relevant. They can only seek damages for within the United States and its territory. So, relevancy, your Honor, 403.

THE COURT: Is Plaintiff seeking extraterritorial damages, or is it conduct outside the United States that's relevant to issues besides damages that we're talking about here?

MR. BAXTER: We are not seeking any damages for any foreign or extraterritorial -- any foreign sales.

If you can switch over to my monitor.

Just because -- this is a very good animation

that Tesco created that shows the operation of the pusher arm that was sent to a foreign company. It does not lose relevance just because it was sent to a foreign company. We're trying to prevent them from excluding testimony about things like this.

THE COURT: Well, I mean, we're talking to some extent, then, about apples and oranges, Mr. Baxter. This is not -- this is not the time to take up disputed exhibits. I mean, if you're moving that this video be a preadmitted exhibit in the case, I'll hear about that when I take up exhibits.

Now, the fact that this may be relevant to issues in this case and it was sent to a foreign company doesn't in and of itself, without more, persuade me that it ought to be excluded --

MR. BAXTER: Thank you, your Honor.

THE COURT: -- if it's got relevance. But we're not to exhibits yet. We're at motions *in limine*.

MR. BAXTER: I apologize. I just wanted to provide background for the dispute. But I think your Honor understands it.

THE COURT: I mean, beyond something like this video that you put on the screen, are there other instances that the parties are both aware of where Plaintiff believes -- excuse me -- Defendant believes

that Plaintiff is going to improperly go into some area of extraterritoriality?

MR. BAXTER: We tried to make it clear in our briefing. We are going to use documents for what we know were generated here that show the operation of the pusher arm and maybe flyers that show the value that shows customers. And that's what we're talking about. We're not seeking any sales or any damages from foreign activity.

THE COURT: All right. What's your response to that, Mr. Raley?

MR. RALEY: Well, this is a document that they found online. I -- we have not -- we can't really testify about this document. We can't -- you know, I suppose that this is -- as the court says, this is not the time to deal with documents but --

THE COURT: Well, you should have each exchanged objections to the other's proposed exhibits.

MR. RALEY: We have objections to this document, your Honor. That will be handled at the appropriate time.

If this -- here is what I suggest. If this is the only violation of this proposed *limine* that they offer, it seems like it could be dealt with during the exhibit portion.

MR. BAXTER: This is -- this was an example to provide context. We are not seeking damages from foreign sales. This was provided -- produced by Tesco, but they produced it in a stack of documents that they said they sold -- they sent to a foreign company. And, so, we don't want to be limited by discussing technical operation of the pusher arm just because that technical operation document was sent to a foreign company.

MR. RALEY: Based on that representation, we will withdraw this one, your Honor.

THE COURT: All right.

MR. RALEY: Thank you.

THE COURT: Defendants' 5 is withdrawn.

To the extent there are surviving disputes on proposed exhibits that may or may not have been sent to or retrieved from foreign locations, I'll deal with that when we get to exhibits.

Next is Defendants' Motion *in Limine* 6. We're back to dropped claims. What's the dispute here?

MR. WILSON: Your Honor, from the Plaintiffs' perspective, this is the same as our Motion *in Limine* 6 which is -- you know, overlaps with our Motion *in Limine* 3 which the court already granted. So, in keeping, we think the court should deny this motion *in limine*.

MR. RALEY: We have cited case law for the record in our briefing supporting this motion *in limine*, your Honor. I do understand that it is similar to other rulings the court has made.

THE COURT: All right. Defendants' Motion *in Limine* 6 is denied.

All right. Are there other disputed *limine* issues from the Defendants that have not been taken up and ruled on by the court that any party is aware of? Have we missed anything?

Plaintiffs?

MR. PAYNE: No, your Honor. That covers it. Thank you very much.

THE COURT: Defendants, are you aware of anything else?

MR. RALEY: I am not aware, your Honor, of anything else.

THE COURT: Okay. Other than the issue that I'm going to direct both sides, and have directed both sides, to meet and confer on further regarding the identity and propriety of maintaining all the named or previously named Defendants in this case, are there any other matters that relate to pending motions for affirmative relief of a pretrial nature or other pretrial matters prior to undertaking to take up disputes

regarding exhibits that we haven't addressed?

MR. PAYNE: We just learned for the first time today that they want to bring into the courtroom during the trial the accused device, which, of course, is -- the base is 5 feet long, and I think it's 10 feet high. That was not on their exhibit list. I guess I need to consider it. I'm not sure what they intend to do but --

THE COURT: If it's not on the exhibit list, is that an intended demonstrative?

MR. RALEY: Only a demonstrative, your Honor. And it doesn't need to be in the whole time, just enough for the demonstration.

MR. PAYNE: I guess I don't know how they are going to demonstrate it, why they are going to demonstrate it, how it's going to be set up, how it's going to be configured, what other things they are going to use, a pipe or not a pipe. I mean, it raises all kinds of questions. Quite frankly, there's a lot of issues with how they set up their devices, as you've heard today, that I don't think are representative of how they run them on the rig.

So, I don't know what the best solution is, your Honor. Maybe the starting point is for us to talk about it and then submit a joint letter to the court or something to let the court know how it comes out. But I

don't want to have to bring my client's device in here, too, and have two huge devices sitting over there that will already -- you know, it's going to cramp the Plaintiffs obviously.

MR. RALEY: If I could respond briefly, your Honor. I don't know why his device is relevant. It doesn't practice the asserted claims. It has nothing to do with this case. It's a patent infringement case.

We have been accused of fabricating a photograph that shows the pusher arm going over the top of the pipe. It was not fabricated. The photograph has the longest possible base and the shortest possible extension of the boom, and it still goes over the pipe. This proves that their basic fabricated -- I won't say fabricated -- their story about how --

THE COURT: You're the one that's been complaining about the temperature today.

MR. RALEY: Yes.

THE COURT: Don't add to the problem.

MR. RALEY: I will not.

Their story about how we infringe is demonstrably not the way the tool works. It's essential for us to show that to the jury. It's crucial to the defense of the case. We want the jury to see what actually happens with our tool, and that will be proved

up with our witness. We can get into it --

THE COURT: Let me say this.

MR. RALEY: -- in the courtroom or in the street.

THE COURT: Let me say this: The practice that's acceptable in this court is for counsel to address the court and the jury from the podium and -- I'm not talking about right now, Mr. Raley.

MR. RALEY: I'm sorry, your Honor.

THE COURT: I've let you both address me from the tables just to try and speed things up; but when we start this trial, counsel for either party is going to address the court, the jury, the jury panel from the podium.

The general rule is you have the latitude to move an arm's-length from the podium. If you get more than an arm's-length from the podium, you need to ask leave of the court before you do it. I am not going to have lawyers wandering around this courtroom.

I am not going to have tangible exhibits or demonstratives used unless I know about it in advance, how it's going to be used, and I have approved it.

Now, I expect there will be both exhibits and demonstratives shown graphically on the monitors that are in the courtroom and the jury box and on counsel tables.

But if there is something tangible that's going to be demonstrated, I want to know about it; and I do not like surprises. That's one thing I can promise both of you.

You both need to meet and confer about this. And I have no idea who a sponsoring witness would be to demonstrate. I don't know what the purpose -- the relevancy of the demonstration would be. You all need to talk through this. And if there is an agreement, it's still going to be subject to you bringing it to me and letting me approve it. And if there is a dispute, then I will hear the dispute; and I will take it up Tuesday when we complete the pretrial process.

I want two things out of both sides in this case. I want you to dial down the rhetoric about each other. There's been too much of that at too high a level, from both sides. And I want you to show me that you are going to professionally, civilly, and actively meet and confer with each other and communicate in the way that trial lawyers should communicate with each other. And this is an area that calls for additional efforts to meet and confer just like the issue about the named Defendants and how we do or don't streamline who is left in this case.

You all talk about this. You talk about any other tangible exhibits or demonstratives that you might

use. You talk about all the documentary exhibits that are in dispute between you. I don't -- I want to know before you get here next Tuesday what exhibit disputes are left between you, what have been resolved.

And of those that are not resolved, I want to know how you can potentially group those in bunches or buckets so that a common area of guidance from the court can dispose of disputes regarding multiple exhibits. As I've told you, I don't have time to take what probably is hundreds of exhibits and go through them one at a time.

And I want you to let the court know before you show back up here Tuesday where you are on exhibit disputes, what you've narrowed and what you've got left and how you grouped them. And if there are unresolved issues about demonstratives, then we'll -- I'll hear where you are and what you -- where you remain after you had a fuller opportunity to meet and confer civilly and seriously about what one side's intended use or demonstration might be.

I'm not going to have a flatbed trailer with a huge piece of equipment parked outside the front of this courthouse that every venire member is going to have to walk by unless I know about it and approve it.

I'm not going to have this -- I tried a false claim act case over guardrails, and we had a 16-foot

section of a guardrail in this courtroom. I'm not opposed to, in the proper circumstance, of bringing tangible demonstratives or exhibits into the courtroom; but I want to know about it. And I want you to meet and confer about it; and if there are disputes, I'll hear about it and give you guidance before anything is done.

I'll just say this once. You won't like it if I feel like I've been surprised with something you should have discussed with each other and then brought to me before it shows up, especially if it shows up for the first time in front of the jury. Okay?

Demonstratives, we'll take up Tuesday of this nature. I want you to meet and confer about it. I want to know about the status of the exhibit disputes before next Tuesday's second pretrial hearing.

MR. PAYNE: When would you like a revised set of objections, grouped objections, to the trial exhibits?

THE COURT: Not later than 5:00 Monday.

MR. RALEY: We'll do it sooner because we'll be on flights probably so --

THE COURT: Sooner is better.

MR. RALEY: Yes, your Honor.

THE COURT: All right. Is there anything else we need to take up before -- in light of what I've just told you -- we recess for the day?

MR. PAYNE: No, sir.

MR. RALEY: Thank you, your Honor.

THE COURT: All right. That completes today's pretrial hearing. I'll see you back next Tuesday.

We stand in recess.

(Proceedings concluded, 4:30 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, NOVEMBER 9, 2018, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/
CHRISTINA L. BICKHAM, RMR, CRR