REDACTED BY ORDER OF THE COURT

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF TEXAS

3              MARSHALL DIVISION

4  WEATHERFORD TECHNOLOGY          )(

5  HOLDINGS, LLC, AND              )( CIVIL ACTION NO.

6  WEATHERFORD U.S., L.P.,         )( 2:17-CV-456-JRG

7       PLAINTIFFS                 )( MARSHALL, TEXAS

8  VS.                             )(

9  TESCO OFFSHORE SERVICES, INC., )( DECEMBER 5, 2018

10 TESCO OFFSHORE SERVICES LLC,    )( 8:27 A.M.

11      DEFENDANTS                 )(

12              <u>TRIAL TRANSCRIPT</u>

13      <u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

14        <u>UNITED STATES CHIEF DISTRICT JUDGE</u>

15 APPEARANCES:

16 FOR THE PLAINTIFFS:    Mr. Leslie V. Payne
                          Mr. J. Boone Baxter
17                        Mr. Christopher M. First
                          Heim Payne & Chorush, LLP
18                        Heritage Plaza
                          1111 Bagby Street
19                        Suite 2100
                          Houston, Texas 77002
20
   COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
21                        Official Court Reporter
                          United States District Court
22                        Eastern District of Texas
                          Marshall Division
23                        100 E. Houston
                          Marshall, Texas 75670
24                        (903) 923-7464

25 (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)

```
 1   FOR THE PLAINTIFFS:       Mr. Douglas R. Wilson
                               Heim Payne & Chorush, LLP
 2                             9442 Capital of Texas Hwy North
                               Plaza One
 3                             Suite 500
                               Austin, Texas 78759
 4
     FOR THE DEFENDANTS:       Mr. John W. Raley, III
 5                             Mr. Robert M. Bowick
                               Raley & Bowick, LLP
 6                             1800 Augusta
                               Suite 300
 7                             Houston, Texas 77057

 8                      P R O C E E D I N G S

 9

10        (Jury out.)

11        COURT SECURITY OFFICER:  All rise.

12        THE COURT:  Be seated, please.

13        Counsel, before I bring the jury in, yesterday, I

14   ordered from the bench that the parties submit revised final

15   jury instructions and verdict forms or proposed final jury

16   instructions and verdict forms.  I may not have been as

17   clear as I should have been.  My intention was that that be

18   a joint submission.

19        Overnight, Defendants filed their separate

20   submission.  Plaintiffs have not yet filed theirs.  I'm

21   going to direct that Plaintiffs take the Defendants' version

22   as submitted separately and build it into their submission

23   so that any conflicting proposals are side-by-side in a

24   single document.  And I'm going to extend the Defendants'

25   time to file that from noon until 3:00 o'clock.
```

1          MR. FIRST:  Thank you, Your Honor.

2          THE COURT:  And that's probably a result of my not

3   being as precise as I intended to, but it's much easier for

4   the Court to deal with competing proposals when Plaintiffs

5   are in italicized and Defendants are bolded, and they follow

6   one right after the other, and then where there are sections

7   where there's no disagreement, that we have ordinary type,

8   and then I can go easily from area to area where there's a

9   lack of agreement and look at the competing proposals in one

10  document.

11          So that's what I was looking for.  I may not have

12  been as precise in my instruction as I intended, but I think

13  we can cure it by you simply -- Plaintiffs simply taking

14  what Defendants have submitted and folding it into your

15  submission on that kind of a basis, and I'll extend your

16  time so that you can do that.

17          MR. PAYNE:  Mr. Baxter is working on it right now,

18  so we'll get that message to him.  3:00 o'clock, you said,

19  right?

20          THE COURT:  3:00 o'clock, yes.

21          MR. BOWICK:  And, Your Honor, I'll have a Word

22  version submitted to them so they can manipulate --

23          THE COURT:  Yes, that will be helpful.  Thank you,

24  Mr. Bowick.

25          All right.  Plaintiffs, it's my understanding you

1    have one more witness to call in your case-in-chief?

2         MR. PAYNE:  Yes, sir.

3         THE COURT:  All right.  Defendants indicated

4    yesterday they had two expert witnesses to call, and they

5    were considering whether their corporate representative

6    would testify.  Have you reached a decision in that regard,

7    Mr. Raley?

8         MR. RALEY:  Yes.  And we informed counsel shortly

9    after yesterday's trial, we will not call Mr. Subodh to the

10   stand.  So we have our two experts, Your Honor.  First,

11   Dr. Rodgers and then Ms. Webster.  We will have a very brief

12   reading from a deposition that was not opposed, and we

13   shared the clips with them.

14        THE COURT:  Yes.  The discussion is about live

15   witnesses only.

16        MR. RALEY:  Yes, Your Honor.

17        THE COURT:  I assume there may be a short depo clip

18   from one or the other sides in and amongst these.  I was

19   just mainly asking about live witnesses.

20        MR. RALEY:  Yes, Your Honor.

21        THE COURT:  Okay.  Anything else, counsel, before

22   we bring in the jury?

23        We do need to read into the record the exhibits

24   from yesterday's portion of the trial.  Let's do that.

25        MR. PAYNE:  Your Honor, there's one other thing,

1   please --

2          THE COURT:  Yes.

3          MR. PAYNE:  -- which I raised with your clerks.

4   That is, we're going over financial information this morning

5   with damages experts -- sorry -- our damages expert this

6   morning, I assume their damages expert this afternoon.

7          We don't want to seal the courtroom, but there is

8   going to be some sensitive, you know, revenue numbers,

9   profit and loss numbers, things like that.  We would like --

10  both parties would like to not seal the courtroom and

11  simply, within a matter of a couple of days, inform the

12  Court of what portions of the transcript we would like to

13  seal.  I know that's not consistent with your general

14  policy.

15         THE COURT:  I have a standing order on this matter.

16         MR. PAYNE:  Yes.  Yes, sir.  We're asking for an

17  exception, both parties are, Your Honor, to do away with the

18  rigmarole of sealing the courtroom.

19         And we can get that in, for that sealing,

20  identification of a couple of pages to you very -- very

21  quickly, if you would grant leave --

22         THE COURT:  What's the rationale, Mr. Payne?

23  What's the justification?

24         MR. PAYNE:  That we don't want transcripts to be

25  publicly available to competitors that have profit and loss

1    information in there, revenue information in there.

2        THE COURT:  I understand why you don't want the

3    information to be public.  My question is, why do you want

4    to do it without sealing the courtroom and then submitting

5    redactions as opposed to sealing the courtroom when the

6    testimony is offered originally?

7        MR. PAYNE:  Because it's okay for the people in

8    this courtroom that we've seen to hear this information, and

9    we don't want to go through the disruption of sealing the

10   courtroom, but we don't want the general public to have that

11   information.

12       THE COURT:  Of course, you understand, under my

13   standing order, those persons subject to the protective

14   order are not required to exit the courtroom when it's

15   sealed.  I don't see many people in the courtroom that may

16   not be under the protective order in this case.

17       MR. PAYNE:  I -- I --

18       THE COURT:  Now, you know better than I do.

19       MR. PAYNE:  Yeah.  And I -- and it's in-house

20   counsel, I think, really.

21       THE COURT:  Okay.  What's Defendants' posture on

22   this issue?

23       MR. BOWICK:  Your Honor, we have no objection.  We

24   concur with that.

25       THE COURT:  Well, I will say this:  If I'm -- if

1    I'm considering granting your request, I want to limit it to

2    only the expert witnesses who testify the remaining portion

3    of the trial.  I don't want to open this up to possible

4    redactions for everybody else that's already testified in

5    the case.

6         MR. PAYNE:  That's right.  Just the two --

7         THE COURT:  You're only talking about which

8    witnesses, Mr. Payne?

9         MR. PAYNE:  Mr. Bratic and Ms. Webster.

10        THE COURT:  Okay.  Well, then I'll -- based on the

11   joint request of the parties and holding you to your

12   commitment that your suggested redactions will be targeted,

13   limited, and almost immediately submitted, then I'll waive

14   the application of the Court's standing order for those two

15   expert witnesses only.  Outside of that, the standing order

16   of the Court remains in force.

17        MR. PAYNE:  Thank you, Your Honor.  We appreciate

18   the indulgence.

19        THE COURT:  All right.  Anything else before we

20   bring in the jury?

21        MR. BOWICK:  Your Honor, reading the exhibits.

22        MR. PAYNE:  Sorry.

23        THE COURT:  Let's do that.

24        Let's proceed to read the exhibits from the list of

25   pre-admitted exhibits used in yesterday's portion of the

1  trial.

2          Go ahead, Mr. Payne, for Plaintiffs.

3          MR. PAYNE:  Yes, sir.  Thank you.

4          Yesterday at trial, Plaintiffs offered the

5  following exhibits, all PX numbers:  3, 4, 13, 14, 19, 20,

6  21, 28, 29, 31, 35, 39, 56 -- which I'll come back to, Your

7  Honor -- 60, 62, 63, 64, 65, 66, 67, 78, 79, 126, 148, 149,

8  181.01 through .148, and 217, which I'd also like to

9  address.

10          217 and 56 are the declarations of Mr. Meeks, which

11  were pre-admitted and which various portions of were shown

12  to the jury.  And so we would offer those into the record,

13  as well.  That's it.

14          MR. RALEY:  I believe --

15          THE COURT:  And when you say you would offer those,

16  you're talking about only the portions of those declarations

17  that were shown to the jury, not the entire declaration?

18          MR. PAYNE:  I would prefer for the whole

19  declarations to -- to be into the record, absolutely.  I

20  mean, it's not the policy to only put into the record, you

21  know, the segments that a witness testifies about.

22          THE COURT:  Well, those declarations were

23  pre-admitted subject to the existing limine orders, which

24  permitted the Court in its gatekeeping function to determine

25  during the course of the trial which portions, if any, would

1   be shown to the jury.  During the trial, the Court permitted

2   the jury to be shown two particular paragraphs, and those

3   were the only portions of those declarations that were shown

4   to the jury.

5        Consistent with my previous approach, I'm not going

6   to allow the entire declarations to be exhibits which the

7   jury could then ask for, and I would send them during their

8   declarations, them only having seen those two paragraphs

9   from those declarations.

10        So with regard to that particular exhibit, I'll

11   pre-admit as a part of the record the exhibit to be

12   redacted, except for the two paragraphs that were shown to

13   the jury.  Otherwise, we will have defeated the entire

14   purpose of letting the Court be a gatekeeper and determine

15   in its discretion what was appropriate under a 403 balancing

16   test for the jury to see and what was inappropriate for the

17   jury to see.  So I'm only going to permit the redacted --

18   the redacted documents reflecting and having unredacted

19   within them those two particular paragraphs to be a part of

20   the record.

21        MR. PAYNE:  One clarification -- I'm sorry.

22        MR. RALEY:  May the record note my exception and

23   objection and reincorporation of arguments during pre-trial

24   on this point?

25        THE COURT:  I gather, Mr. Raley, you don't want the

1    entire declarations put into the record?

2         MR. RALEY:  I don't --

3         THE COURT:  You don't want anything in the record?

4         MR. RALEY:  Any of it put in.

5         THE COURT:  I understand.

6         MR. RALEY:  For the reasons previous expressed.

7         THE COURT:  I think the record is replete with your

8    position.

9         MR. RALEY:  Thank you, Your Honor.

10        MR. PAYNE:  Can we -- with respect to redactions, I

11   assume it's okay to include the style and the first

12   paragraph that introduces --

13        THE COURT:  The style -- they style and the -- the

14   style and the title of the document, and then as far as

15   where the text begins, only those two paragraphs, including

16   the signature.  Whatever was shown to the jury should

17   only -- be the only thing shown below the style and heading.

18        MR. PAYNE:  Okay.

19        MR. RALEY:  The style is the wrong parties, though.

20        THE COURT:  The style has the other Defendants on

21   it?

22        MR. RALEY:  Yes.  So I would object to that for

23   additional reasons.

24        THE COURT:  All right.  Then redact -- put the --

25   put the existing style on there.  Redact the Defendants that

1  have been subsequently dismissed.  Have the title and then

2  have the portions of the text, including the signature, be

3  the only thing else shown.  That will be what's

4  pre-admitted.  I mean, that's what will be admitted and a

5  part of the record.

6           MR. PAYNE:  Thank you.

7           THE COURT:  All right.  Are there items from the

8  list of pre-admitted exhibits used by Defendants to read

9  into the record --

10           MR. BOWICK:  Yes, Your Honor.

11           THE COURT:  -- relating to yesterday's portion of

12  the trial?  Go ahead, Mr. Bowick.

13           MR. BOWICK:  Thank you, Your Honor.

14           On December 4th, 2018, the Defendants used

15  Plaintiff Exhibits 1, 12, 31, 56, 75, and 217.  And I'll

16  note that consistent with the Court's ruling, 56 and 217 are

17  the redacted forms.

18           And Defendants' Exhibits 1, 7, and 11.

19           THE COURT:  All right.  Except for the declarations

20  by Mr. Meeks, which we've addressed, does either side have

21  objections to the respective offerings from the other side

22  related to what was used before the jury yesterday from the

23  list of pre-admitted exhibits?

24           MR. PAYNE:  I don't know because I didn't get a

25  list before this conference.  No objection to 1 --

1          THE COURT:  Well, this is information that should

2    have been exchanged before we got here this morning.

3          What happened, Mr. Bowick?

4          MR. BOWICK:  Your Honor, my legal assistant had a

5    problem this morning.  She was taking care of this.  She's

6    not here yet, but that's the problem.  I didn't realize it

7    until I got here, and she was not.

8          THE COURT:  Well, let's make sure it doesn't

9    reoccur.

10          MR. BOWICK:  Thank you, Your Honor.  It will not.

11          MR. PAYNE:  Did he say DX-1, 7, and 11?

12          THE COURT:  Let's do this.  You and Mr. Bowick meet

13    and confer quietly together.  Tell me when you've satisfied

14    yourselves or if you have an objection lodged.  The time

15    this takes, I'll charge against the Defendants' part of the

16    case.

17          (Pause.)

18          MR. PAYNE:  No objection, Your Honor.

19          THE COURT:  All right.  Is there anything else

20    before I bring in the jury?

21          Anything from Plaintiffs?

22          MR. PAYNE:  Can I hand up the binders?

23          THE COURT:  You can hand out the binders as I bring

24    the jury in.

25          Anything from Defendants?

1          MR. RALEY:  No, Your Honor.

2          THE COURT:  Let's bring in the jury, please,

3    Mr. Johnston.

4          COURT SECURITY OFFICER:  All rise for the jury.

5          (Jury in.)

6          THE COURT:  Welcome back, ladies and gentlemen.

7    Please be seated.

8          All right.  Plaintiffs, call your next witness.

9          MR. PAYNE:  Mr. Walt Bratic.

10          THE COURT:  All right.  Mr. Bratic, if you'll come

11   forward and be sworn by our courtroom deputy.

12          THE WITNESS:  Yes, Your Honor.

13          (Witness sworn.)

14          THE COURT:  Please come around, have a seat on the

15   witness stand.

16          MR. PAYNE:  Your Honor, may I approach with the

17   binders?

18          THE COURT:  You may.

19          All right.  Mr. Payne, you may proceed with your

20   direct examination when you're ready.

21          WALT BRATIC, PLAINTIFFS' WITNESS, SWORN

22                  DIRECT EXAMINATION

23   BY MR. PAYNE:

24   Q.  Mr. Bratic, good morning.

25   A.  Good morning.

1  Q.  Could you please introduce yourself to the jury?

2  A.  Sure.  My name is Walt Bratic.  My last name is spelled

3  B-r-a-t-i-c.

4  Q.  And where do you reside, sir?

5  A.  I live in Houston, Texas.

6  Q.  Where do you work?

7  A.  I work for a Texas-based accounting and consulting firm

8  called Whitley Penn.

9  Q.  What kind of work do you do at Whitley Penn?

10  A.  I provide economic, financial, accounting, and

11  statistical consulting services for a variety of clients.

12  Q.  What is your position there?

13  A.  I'm the managing director.

14  Q.  And why are you here today?

15  A.  I was retained on behalf of Weatherford to determine the

16  amount of damages Weatherford has suffered, assuming that

17  Tesco has infringed the '637 patent.

18  Q.  Did you prepare some slides today for purposes of your

19  testimony?

20  A.  I did.

21  Q.  And does Slide 2 reflect an accurate rendition of your

22  qualifications and education?

23  A.  Yes.

24  Q.  Can you briefly summarize your education for the jury?

25  A.  Yes.  I have two formal college degrees.  I have a

1   Bachelor's degree from the University of Pennsylvania, which

2   is in Philadelphia, Pennsylvania.  I also have an MBA, a

3   Master of Business Administration degree from The Wharton

4   School of Business which is also at the University of

5   Pennsylvania.

6   Q.  And is The Wharton School of Business nationally

7   recognized?

8   A.  It is.  It's also the oldest business school in the

9   United States.

10  Q.  Can you explain to the jury whether you're a Certified

11  Public Accountant?

12  A.  Yes, I am a Certified Public Accountant.  I've been

13  licensed by the state of Texas since 1981.

14  Q.  What specifically does it take to become a CPA?

15  A.  Well, you have to have a -- have taken a number of

16  accounting hours.  So you have to submit a list of your

17  accounting courses to qualify to sit for the exam.

18  Currently, I believe there are four sections of the exam.

19  When I took it, there were five.

20        You have to pass all parts of the exam.  Then once

21  you've passed the exam, you have to sit -- excuse me, not

22  sit -- you have to work under the supervision of a licensed

23  CPA for two years.  Then you get your license certification.

24        But then every year, I have to go to class and

25  submit 40 hours of training, accounting training, in order

1   to maintain my license.

2   Q.   Are you a Certified Licensing Professional?

3   A.   I am.

4   Q.   What does that mean?

5   A.   Well, a Certified Licensing Professional is a

6   designation given -- a certification given by the Licensing

7   Executive Society of the United States and Canada.   And

8   that's an organization of people in -- who deal in licensing

9   of intellectual property rights.

10          And I qualified for it by giving them a lengthy

11  list of projects I've worked on involving licensing of

12  intellectual property rights, and then every three years, I

13  have to submit training that I've taken to maintain that

14  license.

15  Q.   What are intellectual property rights?

16  A.   Well, intellectual property rights would be, for

17  example, patents, trade secrets, copyrights, trademarks,

18  trade dress.   Those are all what are commonly called

19  intellectual property rights.

20  Q.   As a Certified Licensing Professional, have you actually

21  negotiated real-world patent licenses?

22  A.   I have, going all the way back to 1980.

23  Q.   How many?

24  A.   I'd say somewhere around 250 and 300 to date.

25  Q.   And how long have you worked in the field of patent

1   licensing and patent damages matters?

2   A.  Well, I began my work in patent licensing back in 1980

3   when I was chief financial officer of a company that

4   designed oilfield equipment.

5   Q.  Have you taught courses in intellectual property and

6   patent licensing?

7   A.  Yes, I have, routinely.

8   Q.  And can you describe some of those courses for the jury,

9   please.

10  A.  Yes.  For example, I've been teaching two classes at the

11  University of Houston Law School every year going back to

12  now 14 years.  I'll be teaching my next class in April of

13  2019.

14          And in that course, I teach students -- talk to law

15  students about intellectual property damages and how they

16  compare and contrast, depending on the type of intellectual

17  property we're dealing with.

18          I've also been on the steering committee for the

19  intellectual property -- Advanced Intellectual Property

20  Conference at University of Texas in Austin for a number of

21  years.

22          And I've spoken on intellectual property licensing

23  and damages at intellectual property conferences all over

24  the world, North America, South America, Africa, Asia as

25  examples.

1   Q.   How much speeches have you given over the course of your

2   career?

3   A.   Oh, 150, 200.

4   Q.   And are you on and have you been on any boards

5   concerning publications on intellectual property matters?

6   A.   Yes.  Over the last 15 years, I've served on the

7   editorial board of three intellectual property publications.

8   And my role in the editorial board is to take turns -- we

9   have to take turns screening articles that are being

10  submitted for the publication and review them and comment on

11  them and make suggestions to tweak them for the readership.

12  Q.   Have you been appointed by any judges as an expert or an

13  examiner?

14  A.   Yes.  I've been appointed by state court judges in Texas

15  as a court-appointed examiner and expert in various

16  lawsuits.

17  Q.   And what is an examiner?

18  A.   Well, an examiner would be where a court has specific

19  questions.  For example, there's been evidence in a case,

20  but there are holes in the evidence.  And so I basically go

21  out and fill out the -- the gaps of information for the

22  benefit of the Court.

23  Q.   About how many times have you been retained to work on

24  matters like this to give opinions on patent damages?

25  A.   Over the course of my career, several hundred times.

1    Q.  And has that been mostly for the plaintiff or the

2    defendant or a mixture?

3    A.  It's been a mixture over -- over my career.

4    Q.  How would you break it down?

5    A.  Well, on balance, over -- if you spread it out over

6    30 years, it's been pretty even balanced.  But over the last

7    three, four years, it's been more than 50 percent in favor

8    of representing patent owners.

9    Q.  Thank you.

10          MR. PAYNE:  Your Honor, we tender Mr. Bratic as an

11   expert in the field of patent damages.

12          THE COURT:  Is there objection?

13          MR. RALEY:  No objection, Your Honor.

14          THE COURT:  Without objection, the Court will

15   recognize the witness as an expert in the designated field.

16          Continue, Counsel.

17          MR. PAYNE:  Thank you.

18   Q.  (By Mr. Payne) Mr. Bratic, can you explain some of the

19   work you've done in this case?

20   A.  Yes.  Well, there are various documents that were

21   produced in this case that I've reviewed over time, for

22   example, various legal pleadings that I reviewed.  I've

23   reviewed the patent.  I'm not a technical expert, but I

24   reviewed the patent and the asserted claims.

25          I interviewed Ted Zaleski, the technical expert for

1    Weatherford, who testified yesterday.  I also interviewed

2    Mr. Porter.  And I might point out I've interviewed them,

3    Mr. Zaleski and Mr. Porter, several times in conjunction

4    with my work in this case.

5    Q.  Why did you interview them?

6    A.  Well, Mr. Zaleski is a technical expert.  I'm not.  And

7    various opinions I have are -- I relied on his expertise and

8    his input in forming my opinions, as I'll explain later.

9            As far as Mr. Porter, he's worked in the offshore

10   oil and gas industry service sector for 30-some years.  And

11   I -- one, I needed to ask him about Weatherford's business

12   operations, the industry, who the competitors are in

13   Deepwater Gulf of Mexico, and I also had to interview him

14   about various Tesco business records.

15   Q.  What other type of information did you consider?

16   A.  Well, there were a number of business records that have

17   been produced both by Weatherford and Tesco, such as tenders

18   that the jury has heard about, various invoices that both

19   Weatherford and Tesco have produced in this case regarding

20   TRS completion services, and I did some independent industry

21   research.  And then I filed three expert reports in this

22   case.  I was -- and I was deposed in this case.

23   Q.  And did you prepare a slide summarizing your opinions?

24   A.  I did.

25   Q.  Can you explain to the jury the concept of a patent from

1  a financial or economic perspective, please?

2  A.   Yes.   Well, a patent is a property right.   It's no

3  different than land.   For example, you have land, you have

4  the right to own it, so you have a right to use it, you have

5  a right to exploit it, you have a right to keep people from

6  coming on your land, but if you give them permission to come

7  on your land, you have a right to be compensated to allow

8  somebody to come on and use your land.

9  Q.   What are the types of damages that are potentially in

10 play here?

11 A.   Well, in the realm of patent damages, there are lost

12 profits, and then there are reasonable royalties.   Those are

13 the types of remedies, as I understand it, in -- in patent

14 damages.

15 Q.   What are lost profits?

16 A.   So lost profits would be the profits in this case that

17 Weatherford would have generated had Tesco not sold the

18 infringing TRS completion services.

19       In other words, if you assume that Tesco is an

20 infringer, which is an assumption I've had to make for my

21 analysis, and then if you assume that Tesco is an infringer

22 and then if you assume, because they're an infringer, they

23 weren't allowed to sell the infringing TRS completion

24 services, the question is, who would have provided those

25 services in the absence of Tesco selling the infringing

1   services they did?

2          So in that situation, you look to lost profits and

3   would Weatherford have been in a position to have provided

4   Tesco's customers the services that are deemed infringing

5   services?

6   Q.  And do you assume infringement and validity for those

7   purposes?

8   A.  I have to assume that for the purposes of patent

9   damages.  That's a requirement.

10  Q.  What -- what do you mean a requirement?

11  A.  Well, there's a well-known case that I'll explain

12  shortly called the Georgia-Pacific case.  And in that

13  case -- it was a patent case, Georgia-Pacific versus U.S.

14  Plywood, 40-something years ago.  And the Court set out

15  parameters and required that in considering the patent

16  damages, the damages experts are supposed to assume that the

17  subject patents are valid and have been infringed.

18  Q.  What is the other type of potential damages?

19  A.  Well, the other type of damages are reasonable

20  royalties, and that is, for example, the payment of rent for

21  the use of one's intellectual property.

22         So it'd be like if a farmer owns oil -- has oil and

23  gas on his -- his or her land and the oil company wants to

24  come and take that oil and gas off the -- remove it, well,

25  if the farmer gives permission, the oil company comes on the

1   property, they remove and extract the oil and gas, and they

2   have to pay rent in the form of what's called royalties.

3           The payment of rent for the use of intellectual

4   property rights in patent damages are also called royalties.

5   Q.  Did you reach opinions about damages?

6   A.  I did.  I did reach an opinion about damages in this

7   case.

8   Q.  And with respect to Scenario A that is shown on this

9   slide, can you please briefly explain your opinion to the

10  jury?

11  A.  Yes.  So I have three opinions here -- three scenarios

12  I've prepared regarding patent damages.

13          Scenario A is a scenario in which only lost profits

REDACTED BY ORDER OF THE COURT

14  apply.  And that's ███████████ for lost profits.  There are

15  no reasonable royalties.  In this scenario, Scenario A, I

16  assume that there are no non-infringing substitutes -- in

17  other words, nobody else could have provided Tesco's

18  infringing services other than Weatherford because -- as

19  Dr. Zaleski explained to me and testified yesterday, nobody

20  else could either had products that provided similar

21  benefits to the patented technology or they actually

22  infringe the patent, like, for example, Frank's.

23          And, therefore, the only company that could have

24  provided these TRS completion services, in the absence of

REDACTED BY ORDER OF THE COURT

25  Tesco doing so, would be Weatherford.  Therefore, I have ███

REDACTED BY ORDER OF THE COURT

1    ████████    in lost profits.  No reasonable royalties under

REDACTED BY ORDER OF THE COURT

2    Scenario A.  And total damages are ████████.

3    Q.  Is Scenario A, in your opinion, the most appropriate

4    form of damages?

5    A.  It is.

6    Q.  Why?

7    A.  Well, Scenario A is the most appropriate form of damages

8    because, as Mr. Zaleski explained to me, that there are no

9    non-infringing alternatives available for the '637 patent.

10   So you either have -- you either own the '637 patent, get to

11   practice it, or you have to take a license.  Otherwise, you

12   can't provide TRS completion services using a control line

13   device.

14   Q.  Can you briefly explain Scenario B on this slide?

15   A.  Yes.  So Scenario B is what I would call a hybrid

16   scenario.  And what I mean by a hybrid is you'll see I have

REDACTED BY ORDER OF THE COURT

17   ████████  for lost profits, ████████  for reasonable

18   royalties, and I have total damages in this scenario of ██

REDACTED BY ORDER OF THE COURT

19   ██.

20        And the reason this is a hybrid is because in this

21   Scenario B, I assume that Frank's is a competitor that has a

22   non-infringing alternative.  In other words, I've assumed a

23   way, Mr. Zaleski's conclusion, that Frank's infringes the

24   '637 patent.  And I've assumed, therefore, that Frank's

25   would have been able to lawfully compete.  And since Frank's

1    is one of the major competitors in the Deepwater Gulf of

2    Mexico, I concluded that in this scenario, Frank's and

3    Weatherford would have shared in Tesco's sales if sale -- if

4    Tesco were not allowed to sell the TRS completion services

5    it did during the damages period.

6    Q.  Can you summarize, finally, Scenario C?

7    A.  Yes.  Scenario C is -- Scenario C is the opposite of

8    Scenario A.  Scenario C assumes that there are no lost

9    profits -- in other words, that Weatherford hasn't satisfied

10   the requirement to show that it would have made the sales

11   that -- all or some of the sales that Tesco actually made

12   during the damages period.  And, therefore, the only damages

13   available under Scenario C would be reasonable royalty

     REDACTED BY ORDER OF THE COURT

14   damages, and that's ▮▮▮▮▮▮▮▮.  So the total damages here

15   are also ▮▮▮▮▮▮▮▮.

16   Q.  Since you believe A is the most appropriate, why did you

17   prepare these alternative models on B and C?

18   A.  Well, because I don't know what the jury will determine

19   are the facts in this case, and I wanted to give them a menu

20   of choices, depending on what facts they find are the

21   appropriate facts as they relate to damages.

22   Q.  In your testimony today, which scenario are you going to

23   address first?

24   A.  Scenario A.

25           THE COURT:  Mr. Bratic, please try to speak up a

1   little bit.

2           THE WITNESS:  Oh, I'm sorry.

3           THE COURT:  Go ahead.

4           THE WITNESS:  Allergies.  Yes, thank you.

5   Q.  (By Mr. Payne)  And what factors did you use in

6   considering Scenario A?

7   A.  Well, I considered factors that -- referred to as the

8   Panduit factors, and there are four of them.

9   Q.  And what are the Panduit factors?

10  A.  There are four Panduit factors, one called demand for

11  the patented product, one dealing with the issue of absence

12  of non-infringing alternatives, one dealing with

13  manufacturing and marketing capacity, and the last one deals

14  with the ability to calculate damages.  And these all came

15  from a well-known patent lawsuit a number of years ago

16  called Panduit Brothers -- I'm sorry, Panduit Corporation v.

17  Stahlin Brothers, involving issues of lost profits.  And the

18  Court set out four factors to determine lost profits.

19  Q.  With respect to Panduit Factor No. 1, what type of

20  information and evidence did you consider?

21  A.  Well, I looked at tenders that were submitted by Tesco

22  and Weatherford.  I looked at invoices in this case.

23  Q.  Why did you look at tenders and invoices?

24  A.  Well, tenders would indicate what kind of equipment that

25  customers -- offshore operators in the Deepwater Gulf of

1   Mexico are requiring in terms of equipment configuration

2   that they want their vendor or suppliers to make sure they

3   have.

4   Q.  Did you look at Tesco's sales and Weatherford's sales?

5   A.  I did.

6   Q.  Can I ask you to look at your exhibit binder there,

7   please, and I'll direct your attention to PX-181.

8   A.  Yes.

9   Q.  And 182?

10  A.  181, okay.

11  Q.  And did you consider both of those exhibits in

12  connection with your opinions?

13  A.  I did.

14  Q.  And is 181 the Tesco invoices?

15  A.  It is.

16  Q.  And does that go through 181.1 to 181.148?

17  A.  It does.

18  Q.  And is 182 the Weatherford invoices?

19  A.  Yes.

20  Q.  And does that go through .1 to .130?

21  A.  Did you say .1?

22  Q.  .1 to .130?

23  A.  I have 182.01.

24  Q.  Yes, sir.   .01 through .130?

25  A.  That's correct.

1   Q.   So you considered about 148 Tesco invoices?

2   A.   I'm sorry?

3   Q.   You considered about 148 Tesco invoices?

4   A.   Yes.

5   Q.   And about 130, roughly, Weatherford invoices?

6   A.   Yes.

7   Q.   And does Tesco dispute your analysis on Prong 1, the

8   demand prong of the Panduit factors?

9   A.   No.

10   Q.   Did you rely on Mr. Zaleski with respect to Panduit

11   Factor No. 1?

12   A.   In part, yes.

13   Q.   Why did you rely on Mr. Zaleski?

14   A.   Well, because he explained to me the nature of how these

15   various components work together in providing TRS completion

16   services.  For example, he explained that although there are

17   separate components that are used, they all work together as

18   an integral functional unit to provide those TRS completion

19   services.  And he also explained you can't mix and match

20   them.  In other words, Weatherford's equipment is designed

21   to work Weatherford's equipment.  It's not designed to work

22   with Frank's or Tesco's equipment, and the same for the

23   other competitors, as well.

24        So when you provide these services, it's as a

25   package.

1  Q.  Why did you underline the phrase "functional unit" on

2  this slide?

3  A.  Well, because it was my understanding from my interviews

4  with Mr. Zaleski that TRS completion services, in -- which

5  include the control line devices, operate as a functional

6  unit.  And that was important for lost profits because only

7  the control line device is accused of infringing the '637

8  patent, but there's these other components that work with

9  and are integrated to work with the control line device to

10 provide that package TRS completion services.

11 Q.  In your opinion, is the concept of a functional unit a

12 critical aspect of the damages analysis?

13 A.  It is certainly for lost profits.

14 Q.  Why is that?

15 A.  Well, because the -- when Tesco and Weatherford, and

16 even Frank's, go out and provided these services, they're

17 providing all of these services at the same time.  In other

18 words, when Weatherford comes on a rig, they're providing

19 the -- the tongs, everything, the tongs, control line

20 devices, all the other services together.  You're -- you're

21 not -- you don't have other service vendors from other

22 competitors coming in there and providing their personnel at

23 the same time because it creates a lot of -- basically

24 chaos.

25 Q.  And for the jury's benefit, could you please explain

1  what the Rite-Hite case said about functional unit?

2  A.  Right.  So the Rite-Hite case was a patent damages case

3  involving lost profits, and it talked about that -- I'm

4  giving you my layman's understanding of how I applied it --

5  that -- they talk about a completely functional unit.  So

6  you're -- the patentee is entitled to claim or seek and

7  obtain lost profits if it can show that the patented

8  component, which here is a control line device, worked with

9  non-patented elements, such as tongs, spiders, and so forth,

10  as a complete functional unit.

11       And if so, then you can seek lost profits on all

12  those completion services, not just on the revenues

13  associated with the control line device.

14  And have you been in the courtroom when Mr. Zaleski

15  testified?

16  A.  I have.

17  Q.  Did he testify about a functional unit?

18  A.  He did.

19  Q.  What did he say?

20  A.  Well, he said that all these components work together as

21  a complete functional unit.  And what I mean these

22  components, the control line devices, tongs, spiders, and so

23  forth.

24  Q.  Were you here in this courtroom when Mr. Porter, the

25  corporate representative for Weatherford, testified?

1   A.   I was.

2   Q.   What did he say?

3   A.   He basically said the same thing.

4   Q.   Were you here yesterday when Mr. Meeks was called to

5   testify?

6   A.   I was.

7   Q.   What did he say about functional unit?

8   A.   Well, he said they're also a package service.

9   Q.   Have you seen any evidence in this case that there's not

10   a functional unit?

11   A.   No.

12   Q.   With respect to the tenders --

13   A.   Yes.

14   Q.   -- that you reviewed --

15   A.   Yes.

16   Q.   -- you also -- you specifically reviewed Weatherford and

17   Tesco tenders?

18   A.   I did.

19   Q.   And is PX-192 a Tesco tender?

20   A.   It is.

21   Q.   What's shown here with respect to PX-192?

22   A.   So this was a tender submitted from BHP Billiton to

23   Tesco, and it indicates what kind of equipment was required

24   for this job in the Deepwater Gulf of Mexico.

25   Q.   Let me stop you there --

```
 1   A.  Yes.
 2   Q.  -- please.
 3           Does it say requirement?
 4   A.  Yes, it does.
 5   Q.  Did it say specifically equipment requirement?
 6   A.  It does.  I've circled it.
 7   Q.  What does the word requirement mean to you?
 8   A.  What it means to me is it's a requirement.
 9           In other words, if you can't provide that equipment
10   of which the operator is saying is required, it means you
11   won't meet the technical specifications of -- for this job.
12   Q.  Have you seen any evidence in this case that there is
13   not a requirement for deepwater completions in the Gulf of
14   Mexico with respect to control line manipulation devices?
15   A.  No.
16   Q.  Has all the evidence shown that there is a requirement?
17   A.  Of the evidence --
18           MR. RALEY:  I'm sorry.  That's leading, Your Honor.
19           THE COURT:  Sustained.
20   Q.  (By Mr. Payne) Can you tell me whether all the evidence
21   has shown that there is such a requirement?
22   A.  Yes.  I've reviewed many tenders.  I've reviewed
23   invoices and the like.  And I've certainly interviewed
24   Mr. Porter and Zaleski --
25   Q.  And what --
```

1    A.   -- and I heard courtroom testimony on this subject.

2    Q.   Excuse me.

3         What is the significance of this requirement to

4    have a control line device in the Deepwater Gulf of Mexico

5    for completions?

6    A.   Well, the significance of it is, if you can't provide a

7    control line device, then you're not going to meet the

8    technical specifications for the job, so you won't be

9    considered for that job.  You, meaning you as a company.

10   Q.   And specifically with respect to PX-192 on the screen --

11   A.   Yes.

12   Q.   -- what do the requirements show in the left column and

13   the right column, please?

14   A.   Well, what I've highlighted here is the requirement here

15   specifically identified:  An AutoCLAMP control line

16   manipulating arm with accessories.  And, of course, the

17   description from Tesco was that they had a control line

18   Pusher Arm that satisfied that piece of equipment

19   requirement.

20   Q.   Can you clear the screen, please?

21   A.   Yes.  I'm trying to find the magic place.

22   Q.   And what is PX-196, sir?

23   A.   This is an amendment to a Shell Oil and Tesco contract.

24   Q.   And what does this contract amendment say about whether

25   a control line device is required?

1  A.  It says here to assume that all completion activities

2  require pusher arms and slips.

3  Q.  And what does that mean in the context of this

4  agreement?

5  A.  It means it's a requirement.  It means you can't -- if

6  you don't have it, then you can't provide the service.

7  Q.  What's the significance of the requirement in the

8  context of this Shell/Tesco agreement?

9  A.  As I said, the -- the significance is if it's required

10  and you can't provide it, that specific equipment, then you

11  won't satisfy the requirements of the contract.

12  Q.  And did you discuss control line manipulation devices

13  with anyone at Weatherford?

14  A.  I did.

15  Q.  And who did you talk to specifically?

16  A.  Mr. Porter.

17  Q.  Why did you talk to Mr. Porter?

18  A.  Well, Mr. Porter is in charge of the offshore completion

19  services business at Weatherford, and I wanted to understand

20  from him how the offshore -- Deepwater Offshore U.S. Gulf of

21  Mexico completion services business operates and how the

22  competitors operate in that requirement and how companies or

23  operators who buy these services, what they need in terms of

24  equipment and what they require.

25  Q.  And were you here when Mr. Porter testified on the first

1  day of trial?

2  A.  I was.

3  Q.  Do you remember what he said about whether there is a

4  requirement in the Deepwater Gulf of Mexico for completion

5  services with respect to control line manipulation devices?

6  A.  I do.

7  Q.  What did he say?

8  A.  Well, what he said was that you cannot provide TRS

9  completion services in the offshore -- U.S. Offshore Gulf of

10 Mexico if you do not have a control line device.  That's a

11 requirement.

12 Q.  And did you also consider the total sales revenues for

13 both Tesco and Weatherford with respect to their Deepwater

14 Gulf of Mexico completions' operations?

15 A.  I did.

16 Q.  Can you summarize those for the jury, please.

17 A.  Right.  So I looked at the same time period going back

18 to September 2016 through October 31st, 2018, during the

19 damages period in this case.  And I determined that Tesco

   REDACTED BY ORDER OF THE COURT

20 generated about ███████████████████ in TRS completion

21 services during this time period, and during that same time

   REDACTED BY ORDER OF THE COURT

22 period, Tesco generated ███████████ in revenues.

   REDACTED BY ORDER OF THE COURT

23 Q.  Let me -- you said Tesco, ███████████?

24 A.  No.  I'm sorry.  I meant Weatherford.

25 Q.  Could you go back over that, please, to make sure the

1  jury understands?

2  A.  Sure.  During the same time period, which is the damages

3  period, beginning September 13th, 2016, through October

4  31st, 2018 about a month ago, Tesco generated TRS completion

REDACTED BY ORDER OF THE COURT

5  services revenues of ███████████.  During the same time

REDACTED BY ORDER OF THE COURT

6  period, Weatherford generated sales of ███████████.

7  Q.  And how do those revenues bear, if at all, on the issue

8  of demand under Panduit Factor 1?

9  A.  Well, they're -- to me, they're evidence of demand for

10  the patented product because these are services that involve

11  provisioning of control line device services.

12  Q.  So what is your conclusion on the demand factor?

13  A.  Well, my conclusion is that -- regarding

14  Panduit Factor 1 is that there is demand for the patented

15  product.  And that prong of the Panduit four-factor test has

16  been satisfied.

17  Q.  And remind us what Panduit Factor 2 is, please.

18  A.  So Panduit Factor 2 deals with the subject of the

19  absence of alternatives.

20       In other words, are there non-infringing

21  alternatives that would have been available in the

22  marketplace to customers if Tesco hadn't sold its infringing

23  TRS completion services?

24  Q.  With respect to Panduit Factor 2, did you consider

25  Mr. Zaleski's opinions?

1   A.  I did.

2   Q.  Did you interview him?

3   A.  I did.

4   Q.  Did you hear his testimony yesterday?

5   A.  I did.

6   Q.  And how did you rely on Mr. Zaleski?

7   A.  Well, I relied on his opinions that based on his

8   investigation, that there were no available non-infringing

9   alternatives.

10  Q.  And how does that impact your analysis?

11  A.  Well, it means -- under Scenario A, it means that all of

12  Tesco's infringing sales would have gone to Weatherford

13  because they were the only other company that could have

14  provided TRS completion services involving the use of a

15  control line device.

16  Q.  And why did you, specifically in subbullet 2 there,

17  reference Frank's products as -- as likely infringing?

18  A.  Well, because Frank's is one of the major competitors in

19  the Deepwater Offshore Gulf of Mexico.  It's Frank's,

20  Weatherford, and Tesco.

21          And so one of the questions I had for Mr. Zaleski

22  was whether or not Frank's infringed the '637 patent

23  because, if Frank's infringes the '637 patent, then Frank's

24  would not have been a substitute if Tesco couldn't suggest

25  its infringing products, therefore, all of Tesco's sales

1  would have gone to Weatherford; none would have gone to

2  Frank's.

3  Q.  Did you hear Mr. Zaleski's testimony yesterday about

4  whether Frank's is infringing certain claims of the '637

5  patent?

6  A.  I did.

7  Q.  What did he say?

8  A.  He said there were specific claims, including Claim 1,

9  that were infringed by Frank's Cobra product.

10  Q.  And remind the jury what Factor 3 is, please.

11  A.  Factor 3 has to do with manufacturing and marketing

12  capacity.

13       In other words, that means that seeking lost

14  profits, would Weatherford have been -- had sufficient

15  resources, equipment and so forth, in order to take on those

16  additional sales that Tesco actually took if those Tesco

17  sales had shifted over to Weatherford.

18       Do you have an opinion about Weatherford -- whether

19  Weatherford had the manufacturing and marketing capacity to

20  satisfy those sales.

21  A.  I do.

22  Q.  And what is your opinion?

23  A.  My opinion is that based on my investigation,

24  Weatherford had sufficient manufacturing and marketing

25  capacity to take on the additional infringing sales that

1    Tesco actually made.

2    Q.  On what information and evidence did you rely on to

3    reach that opinion?

4    A.  Several things, one of which, of course, is my

5    interviews with Mr. Porter; and, two, my review of an

6    inventory list prepared by Weatherford that they had built

7    37 clamps -- not clamps, excuse me, 37 AutoCLAMPs during the

8    last --

9    Q.  Is --

10   A.  -- couple of years.

11   Q.  Excuse me.  Is the inventory PX-210?

12   A.  I believe so.  Let me confirm that.  Yes.

13   Q.  Thank you.  And did you see Mr. Porter's testimony about

14   the ability to meet demand?

15   A.  Yes.

16   Q.  And how did he testify?

17   A.  Well, he testified that they had plenty of capacity.  In

18   fact, he pointed out that there was a downturn in the

19   industry in 2014 in the Offshore Gulf of Mexico because oil

20   prices dropped significantly in 2014, so they had a lot of

21   excess equipment, starting in 2014 -- they, being

22   Weatherford, had a lot of spare equipment.  Not just control

23   line devices, but other equipment that works with the

24   control line devices, that functional unit we talked about.

25   Q.  And remind us what Panduit Factor 4 is.

1    A.  Well, that is just the ability to calculate lost

2    profits.  Do you have the ability to calculate lost profits

3    once you've satisfied the other three tests?

4    Q.  Did you use a specific -- specific formula to calculate

5    the amount of lost profits under the GP -- excuse me, under

6    the Panduit factors?

7    A.  I did.

8    Q.  And what is that formula?

9    A.  Well, so the formula is taking -- determining what

10   Weatherford's lost sales would have been and then

11   multiplying it by Weatherford's incremental profit margin,

12   and that would tell you the total amount of lost profits

13   that Weatherford suffered under Scenario A.

14   Q.  And with respect to the box on the left, Weatherford's

15   lost sales, what are those?

16   A.  Well, in this case, what I use is -- I use Tesco's lost

17   sales -- Tesco's actual sales during the damages period, the

REDACTED BY ORDER OF THE COURT

18   ███████████████   we talked about earlier.  Those -- I assume

19   that Weatherford would have sold those services at Tesco's

20   prices, not Weatherford's prices.

21   Q.  And is PX-181 the Tesco sales invoices?

22   A.  Yeah.  This is an example of one invoice from, I

23   believe, BP.

24   Q.  And is this PX-181.35?

25   A.  Yes.

1  Q.  Can you explain to the jury the significance of that

2  particular Tesco invoice?

3  A.  Well, this is just one invoice from Tesco during the

4  damages period involving Tesco's TRS completion services.

5  And this particular invoice was for three -- almost

6  $366,000.00.

7  Q.  And what pricing did you assume in your analysis of lost

8  profits?

9  A.  I assumed that Weatherford would have provided these

10  services -- these TRS completion services under Scenario A

11  at Tesco's prices, not Weatherford's prices.  Tesco's prices

REDACTED BY ORDER OF THE COURT

12  are about ▮▮▮▮▮▮▮▮▮▮ on average during this time

13  period than were Weatherford's prices.

REDACTED BY ORDER OF THE COURT

14  Q.  Does that mean your ▮▮▮▮▮▮▮ profit opinion is

15  conservative?

16  A.  Yes.

17          MR. RALEY:  That's leading, Your Honor.

18          THE COURT:  Sustained.  Restate it in a non-leading

19  form.

20          MR. PAYNE:  Yes, sir.  Yes.

21  Q.  (By Mr. Payne)  Can you describe whether that impacts

REDACTED BY ORDER OF THE COURT

22  your ▮▮▮▮▮▮▮ number?

23  A.  It does, because if I had used Weatherford's pricing

24  during this time period for TRS services, instead of

25  Weatherford's pricing -- instead of TR -- Tesco's pricing,

REDACTED BY ORDER OF THE COURT

1   then the ████████████ in lost profits would have been

2   higher.

3   Q.  And with respect to the Tesco invoices for deepwater

4   completions operations in the Gulf, did you prepare a few

5   slides that summarize all of those invoices?

6   A.  I did.

7   Q.  And are those the slides we're seeing now on the screen?

8   A.  Yes.  I believe there are three summary slides I

9   prepared.

10  Q.  And can you make out the totals on Slide 20 there?

11  A.  Yes, if we can blow it up a little.  But that's about

REDACTED BY ORDER OF THE COURT

12  almost ███████████ in TRS completion services provided by

13  Tesco, going back to 2013 to the date of first infringement.

14  Q.  And what are the number of days there?

15  A.  The number of days are a little over 3,000 days.

16       MR. PAYNE:  Could you blow that up, Mr. Boles?

17  Q.  (By Mr. Payne)  What is the jury seeing there with

18  respect to the 3,102 number?

19  A.  Those are the number of billed rig days.  In other

20  words, that's the number of days in which services were

21  being provided by Tesco, going all the way back to September

22  of 2013 through October 31st, 2018.

23  Q.  And can you summarize Tesco's deepwater completion

24  sales?

25  A.  Yes.  So this number here, we've discussed before.

REDACTED BY ORDER OF THE COURT

1   I mentioned ███████ approximately, but the actual

2   number is ████████. That's the amount of Tesco

3   completion sales involving use of the Pusher Arm, for the

4   damages period beginning in September 13, 2016, through

5   about a month ago, October 31st, 2018.

6   Q.  And under Scenario A, what sales of Tesco did you assume

7   Weatherford would have made but for the infringement?

8   A.  I assumed that Weatherford would have generated, under

REDACTED BY ORDER OF THE COURT

9   Scenario A, approximately ███████ in revenues, using

10  Tesco's actual TRS completion services revenues during the

11  damages period.

12  Q.  With respect to your formula that we see here, can you

13  explain what you've done on Box 1?

14  A.  Right.  So what I've done is I've gone back to the

15  formula we looked at, and I put in the lost sales portion of

REDACTED BY ORDER OF THE COURT

16  the formula, the ███████ in Tesco actual completion

17  revenues during the damages period as being Weatherford's

18  lost sales.

19  Q.  What's the next step in the formula?

20  A.  The next step is to determine what the incremental

21  profits were during this time period.

22  Q.  What are incremental profits?

23  A.  So incremental profits are the additional profits that a

24  company like Weatherford would make on top of the actual

25  business or revenues it actually generated because,

1  remember, Weatherford was providing TRS completion services

2  during the damages period.  But if you're assuming in

3  scenario A that they would have taken on the additional

4  sales that Tesco generated, you now have incremental sales.

5  In other words, they're generating more sales.

6        And the question is:  How much more profit would

7  they have generated in their completion business than they

8  actually did during that time period?  So incremental

9  revenues and profits look at what additional amount of

10  profits you would generate if you overlay Tesco's infringing

11  sales and now shifted -- shifted them over to Weatherford.

12  Q.  Did you consider Weatherford's actual profits in its

13  business?

14  A.  I did.

15  Q.  And are those reflected in PX-188.1?

16  A.  They are.

17  Q.  Could you look in your exhibit binder, please, and

18  confirm that?

19  A.  188.1.  Yes.

20  Q.  And can you explain for the jury what PX-188.1 is,

21  please?

22  A.  So these are various -- this is a profit and loss

23  statement for Weatherford's Offshore Gulf of Mexico

24  operations which are run out of Lafayette, Louisiana.  And

25  these go back for a period of years, and it just shows the

1    revenues, the -- for that business unit, the -- all the

2    expenses, the variable and fixed expenses, and then what

3    they call field operating profit, which is the profit for

4    that field division after all expenses are taken into

5    consideration.

6    Q.  What's the date range?

7    A.  I'm sorry?

8    Q.  The date range?

9    A.  Well, this goes back from as early as 20 -- fiscal year

10   2013 on the far left, through -- year-to-date through the

11   third quarter of, I believe, 2018, which is October 31st

12   2018.

13   Q.  Are these profit and loss statements limited to

14   Weatherford's TRS completion business?

15   A.  No.  It also includes the casing services run out of the

16   Weatherford Lafayette facility.

17   Q.  So all of the TRS services?

18   A.  All of TRS completion services, both TRS completion

19   services and casing.

20   Q.  And why do you have a red box in the middle of this

21   first page of 188.1?

22   A.  Because this shows the -- the profit margin for that --

23   for that unit, that business unit run out of Lafayette.

24          MR. PAYNE:  Mr. Boles, can you blow that up a

25   little bit there?  Thank you.

1    (By Mr. Payne) And what does the reference on the left to

2    FOP mean?

3    A.   That means field operating profit.  So that means the

4    field operating profit, meaning the profits associated with

5    that business unit run out of Lafayette as opposed to the

6    company overall.

7    Q.   Is FOP profit and incremental profit the same?

8    A.   No.

9    Q.   Why not?

10   A.   Well, because FOP is the profit after considering

11   certain fixed expenses that are in -- or in line items you

12   have, for example, depreciation here and you have facilities

13   cost.  Those two are fixed costs.  They would have been

14   incurred whether Weatherford picked up any additional Tesco

15   infringing sales or not.  And so you have to take that into

16   consideration and make an adjustment for that.

17   Q.   Did you, in fact, make any adjustments with respect to

18   facilities and appreciation?

19   A.   I did.

20   Q.   How did you do that?

21   A.   Well, I removed them from -- I added -- these expenses

22   were already deducted in getting a field operating profit,

23   so I had to go back to field operating profit in order to

24   make an adjustment for incremental profits.

25   Q.   And what is the reference in the second bullet to

1  reduced Weatherford's profit margin to account for Tesco's

2  lowers prices?

REDACTED BY ORDER OF THE COURT

3  A.  Right.  So as I mentioned earlier, the ████████ are

4  the -- Tesco's infringing sales, TRS completion services.

5  Those sales were -- were -- Weatherford, during that time

6  period, would have generated higher sales because,

7  historically, Weatherford prices its products more than

8  Tesco.

9        So I had to recognize that -- since I'm making an

10  adjustment and now using only Tesco's invoice -- invoices

11  and Tesco's prices, I needed to adjust Weatherford's profit

12  margin down to figure out what Weatherford's profit margin

13  would have been as applied to Tesco's lower prices.

14        So, in other words, I lowered Weatherford's profit

REDACTED BY ORDER OF THE COURT

15  margin by an additional ████████, reflecting the fact that

16  I'm using Tesco's pricing.

17  Q.  And back to your Scenario A formula, what did you find

18  ultimately with respect to Weatherford's incremental profit

19  margin?

20  A.  So I applied the -- I determined that the incremental

21  profit margin for Weatherford during the damages period

REDACTED BY ORDER OF THE COURT

22  going back to September 2016 was approximately ████████.

23        So when I multiplied that by the ████████ in

24  lost sales, that would give me that ████████ in lost

25  profits that we talked about at the beginning when we talked

1    about Scenario A.

2    Q.  Can you summarize your Scenario A analysis for the jury,

3    please?

4    A.  Yes.  So my analysis of Scenario A indicates that based

5    on my analysis, I believe that the four Panduit factors were

6    satisfied, and, therefore, Weatherford would be entitled to

7    lost profits.  And the amount of lost profits under Scenario

REDACTED BY ORDER OF THE COURT

8    A that Weatherford is entitled to would be ▉▉▉▉▉▉▉.

9    Q.  And why are we going to look at Scenario B?

10   A.  Well, these are alternatives because I don't know what

11   the trier of facts is going to ultimately determine to be

12   the facts of the case.  So I've just prepared two

13   alternative calculations, although it's my opinion that

14   Scenario A is the appropriate measure of damages based on

15   Mr. Zaleski's testimony.

16   Q.  Would you speak up a little bit?

17   A.  Sure.  I'm sorry.

18   Q.  It's okay.

19   A.  Allergies.

20   Q.  And remind us what Scenario B is.

21   A.  Right.  So Scenario B is this hybrid scenario I

REDACTED BY ORDER OF THE COURT

22   mentioned where there's a combination of lost profits of ▉▉

REDACTED BY ORDER OF THE COURT

23   ▉▉▉▉▉ and reasonable royalties of ▉▉▉▉▉▉, totaling

24   ▉▉▉▉▉.

25           And the reason there are lost profits in Scenario B

1  is because we assume in Scenario B that Frank's is a

2  legitimate competitor, that they have a non-infringing

3  alternative, something Mr. Zaleski concluded they didn't

4  have, but in this scenario, I'm assuming Frank's can compete

5  with its Cobra product and that Cobra product does not

6  infringe the '637 patent.

7  Q.  But, again, what did Mr. Zaleski testify to with respect

8  to Frank's vis-à-vis infringement?

9  A.  He believed, based on his investigation, that Frank's

10  did infringe the '637 patent.

11  Q.  Okay.  And what would that mean with respect to

12  Scenarios A and B?

13  A.  Well, that means Scenario B wouldn't apply.  Only

14  Scenario A would apply.

15  Q.  And under Scenario B, how did you take -- how did you

16  specifically take Frank's into consideration?

17  A.  So I had to look at information regarding market share

18  in the Deepwater Gulf -- U.S. Deepwater Gulf of Mexico.  And

19  I had to look at Tesco, Frank's, and Weatherford's market

20  share during the damages period in order to figure out how

21  much -- how many lost sales of Tesco's infringing sales

22  would have gone to Weatherford and how many would have gone

23  to Frank's in Scenario B.

24  Q.  What is shown in the pie chart in this slide?

25  A.  Well, the pie chart shows that I have to account for all

1    infringing sales.  So if a portion of Tesco's infringing

2    sales are now, just in Scenario B, considered for lost

3    profits, not a hundred percent of them, but some portion

4    because Frank's is getting some of those, then the balance,

5    though, Tesco still has to pay royalties on the remaining

6    infringing sales that are not covered by Weatherford's

7    lost -- lost sales and lost profits.

8    Q.  And what does this pie show with respect to how it

9    breaks down between the market shares for -- market share

10   for Weatherford versus the market share for Frank's?

11   A.  Well, this doesn't show that detail.  This is just

12   showing that I'm splitting up the lost profits and the

13   reasonable royalties to account for 100 percent of all of

REDACTED BY ORDER OF THE COURT

14   Tesco's ███████████████████ of infringing sales.

15   Q.  And did you use a formula for Scenario B in calculating

16   damages?

17   A.  Yes.

18   Q.  Can you walk the jury through these boxes?

19   A.  Sure.  So the box on the left, this is, again, trying to

20   figure out lost profits -- the lost profits component,

21   assuming Scenario B, that Frank's can compete for the Tesco

22   infringing sales, and then I have the other component, which

23   is Weatherford's reasonable royalties that I have to account

24   for.

25          So when you add those two up, that will give you

REDACTED BY ORDER OF THE COURT

1   the total damages in Scenario B of ███████████ .

2   Q.  And under Scenario B, how did you figure out how much of

3   Tesco's sales would be Weatherford's market share and how

4   much would be Frank's market share?

5   A.  Well, I looked at data that Weatherford tracked

6   regarding the Deepwater Gulf of Mexico -- the U.S. Deepwater

7   Gulf of Mexico and which service providers were providing

8   TRS completion services on how many rigs during various

9   points in time.

10  Q.  Can I ask you to look in your trial exhibit binder --

11  A.  Sure.

12  Q.  -- at PX-44 and PX-189 and identify those documents,

13  please, for the jury?

14  A.  Did you say 44?

15  Q.  Yes, sir.

16  A.  Okay.  I have them in front of me.

17  Q.  And did those particular PX exhibits bear on

18  Weatherford's market share?

19  A.  They do.

20  Q.  How so?

21  A.  Well, this is data that was tracked by Weatherford

22  regarding specific rigs in the Deepwater Gulf of Mexico at

23  various points in time and which companies are providing TRS

24  completion services.

25  Q.  And what data do we see on the slide here with respect

1  to PX-44?

2  A.  Well, PX-44, we just see various market share

3  calculations going back to 2015 through --

4          THE COURT:  Mr. Bratic, you're going to need to

5  speak in the microphone.

6          THE WITNESS:  Sorry, Your Honor.

7          THE COURT:  I hear you, but you're speaking toward

8  me and not the jury.

9          THE WITNESS:  I'm sorry.  Let me pull it over.

10  Excuse me.  Let me get some water.

11  Q.  (By Mr. Payne) You can look at the screen if you want

12  to.

13  A.  Right.  So what I'm looking at in PX-44 are specific

14  market share calculations as summarized and as shown on the

15  screen in Slide 30.  So these are just showing market share

16  data from the first quarter of 2015 through the second

17  quarter of 2017.

18  Q.  And why are OES and Besco listed here in PX-44?

19  A.  Well, they're listed because the top part -- this part

20  is for the entire Gulf of Mexico, the shelf, the shallow

21  in-shore of the Gulf of Mexico drilling activities, as well

22  as the Deepwater Gulf of Mexico.

23          The lower portion is where you can see that OES and

24  Besco are not highlighted because they are not in the

25  Deepwater Gulf of Mexico providing TRS completion services.

1   And since Frank's -- excuse me, Frank's, Weatherford, and

2   Tesco all provide -- were the only companies providing TRS

3   deepwater completion services during the damages period,

4   they're the ones you have to focus on to figure out what the

5   appropriate market share is for lost profits and reasonable

6   royalties, taking into consideration Frank's as a

7   competitor.

8   Q.  In addition to PX-44, did you also consider Mr. Porter's

9   testimony with respect to the 2018 market share data?

10  A.  Yes.  He provided me updated information through the

11  third quarter of 2018 regarding Tesco, Weatherford, and

12  Frank's in the Deepwater Gulf of Mexico.

13  Q.  And, specifically, what information did he testify

14  about?

15  A.  Well, for example, he identified what happened over

16  time, beginning in the first quarter, and the second and

17  third quarter of 2018 in terms of how many rigs Weatherford,

18  Frank's, and Tesco had.  And so I had to take that into

19  consideration.

20  Q.  And what are the calculations that are shown here?

21  A.  This is taking -- for example, if you look at the top

22  part, this is looking at Frank's, Weatherford, and Tesco

23  accounting for 100 percent of the market share in the

24  Deepwater Gulf of Mexico, as an example looking at 2016.

25          What I've done below is I've taken Weatherford --

1  Tesco out of the picture and reallocated Tesco's market

2  share to Frank's and Weatherford.  And that's how I'm able

3  then to figure out what portion in Scenario B of Tesco's

REDACTED BY ORDER OF THE COURT

4  infringing ███████████ in sales would go to Weatherford

5  based on time period, because market shares changed and how

6  many would go to Frank's.

7  Q.  And remind the jury why you removed Tesco under Scenario

8  B.

9  A.  Well, because Tesco was still assumed to be an

10  infringer, and so I have to then figure out, well, Tesco is

11  an infringer and couldn't lawfully have sold TRS completion

12  services.  I then have to figure who would have gotten its

13  sales.  In scenario B, I assume that Frank's would have

14  gotten some of its sales, and, of course, Weatherford would

15  have gotten some of the sales, too, because they're the only

16  three competitors in the Deepwater Gulf of Mexico providing

17  TRS completion services.

18  Q.  After removing Tesco, what are the specific market share

19  percentages that you found?

20  A.  Well, they ranged from a high of 50.9 percent in 2017 to

21  a low of 24.3 percent in 2018.  And I use those

22  percentages -- market share calculations in my lost profits

23  calculations for Scenario B.

24  Q.  And are those percentages for Weatherford?

25  A.  Yes, the highlighted red at the bottom are

1   Weatherford's.  The ones right above it are Frank's.

2   Q.  And can you go over those specific percentages?

3   A.  Sure.  So for 2016, the average -- Weatherford's average

4   market share in the Deepwater Gulf of Mexico would have been

5   43.8 percent.

6           In 2017, it would have been 50.9 percent.

7           And for 2018 through October 31st, it was 24.3

8   percent.

9   Q.  And under Scenario B that we're discussing, can you

10  explain to the jury how you calculated Weatherford's lost

11  profits?

12  A.  Yes.  So I began with the same number of infringing

13  sales during the damages period, the ▮▮▮▮▮▮▮▮.  I  REDACTED BY ORDER OF THE COURT

14  applied Weatherford's overall market share -- its weighted

15  average market share during the damages period from

16  September 2016 through October 2018.  And that was 41.2

17  percent.  That was looking at the three numbers on the

18  previous slide we just talked about and averaging them

19  during the damage period.  The effective market share during

20  that time period was 41.2 percent.

21          So when you multiply 41.2 percent of Weatherford's

22  market share times Tesco's infringing sales, you get

23  Weatherford's lost profits under Scenario B of ▮▮▮▮▮▮.  REDACTED BY ORDER OF THE COURT

24  Then when you apply Weatherford's incremental profit margin

25  during this damages period, it's ▮▮▮▮▮▮, you get  REDACTED BY ORDER OF THE COURT

1  Weatherford's lost profits under Scenario B of just under

REDACTED BY ORDER OF THE COURT

2  ███████████ .

3  Q.  And under Scenario B, in addition to Weatherford's lost

4  profits, do you also need to calculate a reasonable royalty?

5  A.  Yes.

6  Q.  Why?

7  A.  Well, because you have to account for 100 percent of

8  infringing sales by -- we saw that -- if you can go to the

9  previous slide, please.

10      We saw that Weatherford only had under Scenario B

11  41 percent average market share.  That means roughly 60

12  percent market share went to Frank's.  But that means --

REDACTED BY ORDER OF THE COURT

13  that means there's 60 percent of the infringing ███████████

14  sales that Weatherford is not picking up in lost profits,

15  and it's entitled to compensation in the form of a

16  reasonable royalty for that remaining 60 percent of those

17  infringing sales.

18  Q.  And how does this formula account for those remaining 60

19  percent of infringing sales?

20  A.  Well, we then turn to figuring out what Weatherford's

21  reasonable royalties were under Scenario B to calculate

22  total damages because we've already accounted for only lost

23  profits.

24  Q.  And so can you, again, with respect to Boxes 1 and 2,

25  talk about the 40 percent and 60 percent?

A.   Right.  So the 40 percent is accounted for here in

the -- Weatherford's lost profits.  But there's 60 percent

of infringing sales that have to be taken into consideration

here in this second box on reasonable royalties.

Q.  And with respect to the second box, what is a reasonable

royalty?

A.  Well, reasonable royalty is basically rent that's paid

for use for somebody's patent.  It's much like the example I

gave of the farmer and the oil and gas company.  If you come

on the property to take oil and gas off, you have to pay

rents.  If you want to use somebody's patents, the patent --

patent owner is entitled to, under the patent statute shown

here, no less than a reasonable royalty.

Q.  And as a damages expert, do you consider certain factors

with respect to a reasonable royalty?

A.  Yes.

Q.  What are those factors?

A.  Those factors are called the Georgia-Pacific factors.

Q.  And how many Georgia-Pacific factors did you look at?

A.  Well, there's 15 of them.  And if you look here on the

chart, I have all 15 of them.  And they come from a very

well-known patent case involving reasonable royalties in a

patent case called Georgia-Pacific versus U.S. Plywood.

Q.  And with respect to Factor 15 on the right here --

A.  Yes.

1   Q.   -- can you explain to the jury how that factor bears on

2   a reasonable royalty analysis?

3   A.   Yes.   The Georgia-Pacific court -- because the parties

4   were -- there was no license.   The parties were in court

5   just like Weatherford and Tesco are in court today.   And

6   because they didn't agree on a license, the Court created a

7   scenario or a situation in which the Court assumed that

8   there would have been a hypothetical negotiation between

9   Georgia-Pacific and U.S. Plywood to determine a reasonable

10   royalty.   And the outcome of that hypothetical negotiation

11   would have been a hypothetical license.

12          So the Court said there were 14 factors to be

13   considered to then roll into that hypothetical negotiation

14   to reach a reasonable royalty paid under a hypothetical

15   license.

16   Q.   Why did you -- excuse me.   Why did you group the 15

17   factors into four different buckets?

18   A.   Well, because a number of them have similar

19   characteristics or similar traits, similar themes, and so

20   it's easier for discussion purposes to group them together.

21   Q.   And what are the key factors in the hypothetical

22   negotiation for a royalty?

23   A.   Yeah.   So the -- the conditions of the hypothetical

24   negotiation shown in this slide is that the hypothetical

25   negotiation occurs about the time of first infringement,

1   which in this case goes back to June 2013.  So that's when

2   Weatherford and Tesco would have sat down to have a

3   hypothetical negotiation for a hypothetical license.

4        The parties -- both parties are supposed to assume

5   that the '637 patent is valid and infringed.  The

6   negotiation is an open book.  And what I mean by that is

7   there are no secrets.  Everybody knows what the other party

8   has in terms of information.  That's very different than a

9   real world where lots of time you don't share all the

10  information you have.  But here, under Georgia-Pacific,

11  everything's known to all the parties.

12       And you also can consider what's called the book of

13  wisdom, which is there's information that may have occurred

14  after the date of infringement that could inform the

15  parties' negotiations.

16       At the end of the hypothetical negotiation, the

17  parties agree on a reasonable royalty rate, and Tesco gets a

18  license to the '637 patent.

19  Q.  And with respect to the first bucket, licensing

20  characteristics, what factors are in that bucket?

21  A.  Well, as an example, you -- you would look to whether or

22  not Weatherford has ever licensed the '637 patent, and if

23  so, under what terms and conditions.  You'd see if there

24  were any comparable licenses to the -- involving comparable

25  technology to the '637 patent that have been either licensed

```
 1  by Tesco or were there any industry licenses that might
 2  involve comparable technology.
 3  Q.  In your opinion, are there any licensing agreements in
 4  this case and evidence that bear on the royalty rate?
 5  A.  In my opinion, no.
 6  And with respect to the second bucket labeled Commercial
 7  Success, which factors do we have there?
 8  A.  Well, those deal with, for example, looking at the
 9  profitability and commercial success of the products made
10  under the invention, the benefits of practicing the patent
11  and things of that nature.
12  Q.  And did Weatherford and Tesco generate profits that bear
13  on this bucket?
14  A.  They did.
15  Q.  And what information did you consider with respect to
16  Tesco's sales in this bucket?
17  A.  Well, I looked at the period of infringement for Tesco,
18  and over the period of infringement, Tesco generated sales
19  of around [REDACTED BY ORDER OF THE COURT].  Tesco generated completion services
20  for its Pusher Arm service on a day basis because they sell
21  these services based on time.  They generate about [REDACTED BY ORDER OF THE COURT]
22  per rig per day in revenues.
23  Q.  And does this go specifically to Georgia-Pacific Factor
24  No. 6?
25  A.  Yes.  This impacts Georgia-Pacific No. 6.
```

1   Q.  What is No. 6?

2   A.  Well, No. 6 deals with convoyed sales.  It's

3   non-patented made in conjunction with the use of the

4   patented invention.

5   Q.  And how are convoyed sales relevant to your analysis on

6   a royalty?

7   A.  Well, much like we talked about the functional unit

8   concept for the other components for the TRS completion

9   services for lost profits, those other components, other

10  than the control line device, would be considered convoyed

11  items under Georgia-Pacific Factor 6 because they're sold in

12  conjunction with or as a result of CRS -- the TRS completion

13  services involving control line devices.

14  Q.  And specifically with respect to your conclusions of

REDACTED BY ORDER OF THE COURT

15  ▮▮▮▮▮  per rig per day for Tesco, how does that impact your

16  analysis?

17  A.  Well, it just shows that those revenues -- that they've

18  generated substantial revenues on a per-day basis based on

19  how they provided those services, and that's how they

20  generated the revenues, by providing daily services of TRS

21  completion services.

22  Q.  Did you also consider Weatherford's daily rig

23  information?

24  A.  I did.

25  Q.  And what was that?

```
 1   A.  Well, I looked at the same time period of infringement,

 2   and I determined that Weatherford generated per rig per day
              REDACTED BY ORDER OF THE COURT
 3   revenues of ████████, a little higher than Tesco's revenues

 4   per rig per day.

 5           And then I considered Weatherford's incremental
              REDACTED BY ORDER OF THE COURT
 6   profit margin of ████████████ during this time period, and

 7   that told me that on a day basis -- on a per rig per day

 8   basis, Weatherford generated incremental profits of about
REDACTED BY ORDER OF THE COURT
 9   ██████ thousand a day.

10   Q.  And how does that relate to Georgia-Pacific Factor

11   No. 8?

12   A.  Well, this talks about the profitability of the products

13   and commercial success of the products, so these products

14   were commercially successful, that millions -- both

15   companies sold millions of dollars' worth of TRS completion

16   services involving use of control line devices, and both

17   companies generated profits when they provided those

18   services.

19   Q.  And with respect to that information, did you consider

20   PX-182, the -- the various invoices in PX-182?

21   A.  Yes.

22   Q.  And did you --

23   A.  Yes.

24   Q.  -- did you also consider PX-187.1 and 188.1?

25   A.  I'm sorry.  187.1?
```

1   Q.   Yes.

2   A.   And?

3   Q.   188.1?

4   A.   Yes, I did.

5   Q.   And what is 187.1?

6   A.   187.1 is AutoCLAMP revenues summarized by invoice.

7   Q.   And 188.1?

8   A.   188.1 is that -- is the field operating profit document

9   we talked about earlier for the Weatherford Lafayette

10  operations.

11  Q.   And with respect to Georgia-Pacific Factors 9 and 10,

12  did you consider the benefits of the '637 patent?

13  A.   I did.

14  Q.   On whom did you rely for those benefits?

15  A.   Mr. Zaleski.

16  Q.   Why?

17  A.   Well, because he's a technical expert, and I certainly

18  wasn't qualified to determine what the benefits associated

19  with practicing the '637 patent and the asserted claims of

20  the '637 patent, so I had to turn to Mr. Zaleski for that

21  input.

22  Q.   And did he discuss with you the benefits of the asserted

23  Claims 34, 35, and 36?

24  A.   He did.

25  Q.   And how did that impact your analysis?

1  A.  Well, it impacts my analysis because it indicates to me

2  that there are different benefits associated with practicing

3  the asserted claims of the '637 patent as shown here on this

4  slide.

5  Q.  And did you hear him testify about those specific

6  benefits for Claims 34, 35, and 36?

7  A.  Yes.

8  Q.  What are the benefits?

9  A.  Well, the benefits are it improves the efficiency of the

10  pipe lower -- pipe lowering process and improves the

11  workers' safety, makes for a much safer work environment in

12  that red zone, and it provides -- prevents damaging control

13  lines and company tubulars.

14         He also, of course, explained to me there were no

15  available acceptable non-infringing alternatives to the '637

16  patent if you wanted to get these benefits.

17  Q.  And did you consider the contribution of the '637 patent

18  to Tesco's infringing services?

19  A.  I did.

20  Q.  Did you rely on Mr. Zaleski for that information?

21  A.  I did.

22  Q.  How so?

23  A.  Well, he's the one that provided me indication and

24  apportionment of the technological contribution of the

25  control line device to the TRS completion services, which he

1  said operated as a functional unit.

2          And so, as shown on this slide, he indicated that

3  20 percent of the -- of the TRS completion services, 20

4  percent of the value is attributed to the control line

5  handling equipment.

6  Q.  And is that 20 percent figure for the control line

7  equipment important to your analysis?

8  A.  It is.

9  Q.  Why?

10  A.  Well, because -- because I figured out what the profits

11  were associated with practicing the patents, but I also

12  needed to know how much of the revenue and profits were

13  attributed only to the patented technology as opposed to all

14  these other components, such as the elevators, spiders, and

15  the tongs, because they're not covered by the patent.

16  Q.  And what calculation did you make specifically with

17  respect to Mr. Zaleski's 20 percent apportionment?

18  A.  Well, as shown here, I determined what the incremental

19  profits per day that Weatherford generated were, which is

REDACTED BY ORDER OF THE COURT

20  █████████        per rig day, and then I only took 20 percent --

21  Mr. Zaleski's 20 percent apportionment and multiplied that

REDACTED BY ORDER OF THE COURT

22  against the  █████████   and that told me that the profits

REDACTED BY ORDER OF THE COURT

23  relating only to the '637 patent were  █████████   per day.

24  Q.  And what's the next bucket you considered?

25  A.  The next bucket deals with the relationship between the

1  parties.  In other words, the patent owner, Weatherford,

2  versus Tesco, what is the relationship with them under

3  Georgia-Pacific, whether they're competitors or not, whether

4  one is an inventor and the other one is the promoter?

5  Q.  Has Weatherford ever licensed the '637 patent to a

6  direct competitor?

7  A.  No.

8  Q.  How does that bear on your analysis?

9  A.  Well, it's just an indication to me that Weatherford

10 does not willingly license competitors, certainly with

11 respect to the '637 patent.

12 Q.  Why wouldn't it willingly license competitors like

13 Tesco?

14 A.  Well, as this -- as I understand from Mr. Zaleski, this

15 is important technology, and it gives him a competitive

16 advantage, and it's a required technology in the Deepwater

17 Gulf of Mexico.

18       So if you have patented technology that you have

19 that others don't have and customers require that

20 technology, it gives you a competitive advantage you don't

21 want to willingly give up.

22 Q.  And with respect to the last bucket, what factors did

23 you consider?

24 A.  Well, the last two -- the last two Georgia-Pacific

25 factors deal with the opinion of experts.  For example, I

1  relied on Mr. Zaleski for various opinions and inputs into

2  my analysis.  And then the -- the last 15 factors, of

3  course, the hypothetical negotiation, which rolls up all 14

4  factors into that negotiation.

5  Q.  And does that mean we've covered each factor?

6  A.  Yes.

7  Q.  And -- and would the GP factors that we've discussed be

8  considered by the parties at the time of the hypothetical

9  negotiation in 2013?

10 A.  Yes.  Excuse me.  Yes.

11 Q.  How so?

12 A.  Well, the parties would have taken that information into

13 consideration in forming their negotiations and the outcome

14 of that negotiation.

15 Q.  And what are the key factors the parties would consider

16 in your opinion with respect to that hypothetical

17 negotiation?

18 A.  Well, certainly Weatherford would have emphasized the

19 fact that the patent -- the '637 is valid and has been

20 infringed by Tesco, but also that the patented technology is

21 -- is novel and provides functionality and benefits.

22         Another key point Weatherford would have emphasized

23 is that there are no available acceptable non-infringing

24 alternatives, and certainly Weatherford would have pointed

25 out they're direct competitors, so, therefore, Weatherford

1   giving Tesco a license would enable Tesco to take away work

2   from Weatherford.

3   Q.  And in your opinion, did one of the parties in the

4   hypothetical negotiation have more bargaining power than the

5   other?

6   A.  Right.  Well, I also -- yes.  I also have a slide I

7   prepared about Tesco's bargaining position and what they

8   would have raised as key points, but at the end of the day,

9   I believe that Weatherford would have had greater leverage

10  in a hypothetical negotiation.

11  Q.  Why would Weatherford have greater leverage in your

12  opinion?

13  A.  Well, primarily because, according to Mr. Zaleski, there

14  were no alternatives available to Tesco in order to still

15  provide a control line device to customers in the Deepwater

16  Gulf of Mexico, and so, therefore, that would have shifted

17  the bargaining leverage in favor of Weatherford.

18  Q.  And what about Tesco's bargaining position?

19  A.  Well, Tesco would have certainly emphasized that it

20  contributed its own technology for completion services.  It

21  would have emphasized that it was an established company in

22  the Deepwater Gulf of Mexico providing completion services,

23  and that there were other factors that influence customers,

24  such as price and quality of service.

25  Q.  And did you use a specific formula then for a reasonable

1  royalty?

2  A.  Yes.  I -- I had to determine what the royalty rate was

3  and then what the royalty base was.  And once you multiply

4  those two out, you'll get the amount of reasonable

5  royalties.

6  Q.  And based on you're an -- analysis, what did you

7  conclude was the reasonable royalty?

8  A.  Well, I concluded the reasonable royalty was -- as you

REDACTED BY ORDER OF THE COURT

9  see here down below, it's circled -- ███████ per rig per

10  day.  That's after, of course, taking the ███████,

11  Weatherford's incremental profit, multiplying it by

12  Mr. Zaleski's 20 percent apportionment for the value of the

REDACTED BY ORDER OF THE COURT

13  patented technology, and that gave me that ███████ per rig

14  per day as the royalty.

15  Q.  And what are the other numbers we see on this slide?

16  A.  Well, they're just the daily sales -- completion --

17  Weatherford's completion sales per day per rig, and then the

18  incremental profit margin we talked about earlier.

19  Q.  Why did you use the metric per rig per day in your

20  analysis?

21  A.  Because that's how companies such as Weatherford and

22  Tesco provide their services.  They charge it out over time.

23  And when you look at the invoices, the invoices cover a

24  specific number of days that these TRS completion services

25  are provided.

1  Q.  And in your royalty analysis, under Scenario B, what is

2  the next step in the formula?

3  A.  Well, once I determined what the day rate was, the

REDACTED BY ORDER OF THE COURT

4  royalty per day of ███████, then the next thing was to

5  determine how many days would be subject to a reasonable

6  royalty in Scenario B.

7  Q.  And did you consider all the days in Scenario B?

8  A.  No, I -- I already had -- I had to factor out the lost

9  profits days because, remember, Scenario B has a component

10  for lost profits.  So if I used all the days that TRS

11  completion services were billed, then I would be overstating

12  the royalty damages.  So I had to back out the number of

13  lost profits days and only focus on the remaining days.

14  Q.  And remind us how that broke down and the 40 percent/60

15  percent?

16  A.  Well, that would be, for example, 60 percent of the days

17  would be accounted for in reasonable royalty days, and 40

18  percent of the days would have been account -- allocated

19  in -- already accounted for in the Scenario B lost profits

20  days.

21  Q.  And for those 60 percent of the days, how many days did

22  you calculate?

23  A.  978 days during the damages period.

24  Q.  And what does that mean specifically?

25  A.  Well, that means there are 978 billed days that were not

1   included in lost profits that are subject to reasonable

2   royalties.

3   Q.  And how does that impact your formula for royalty under

4   Scenario B?

5   A.  Well, then I took the 978 days, put it here, and plugged

    REDACTED BY ORDER OF THE COURT

6   it into the formula, multiplied that times the ▮▮▮▮▮ per

7   rig day royalty, and that gave me reasonable royalties under

    REDACTED BY ORDER OF THE COURT

8   Scenario B of a little over ▮▮▮▮▮.

9   Q.  And do you have to add that number to another number in

10  Scenario B?

11  A.  Yes.

12  Q.  And can you walk us through that addition?

13  A.  Sure.  So you -- we've just talked about the

    REDACTED BY ORDER OF THE COURT

14  ▮▮▮▮▮ in reasonable royalties under Scenario B.  We

15  add -- have to add back the lost profits for Weatherford in

    REDACTED BY ORDER OF THE COURT

16  Scenario B of ▮▮▮▮▮.  And when you add

17  those two numbers together, that's going to give you total

    REDACTED BY ORDER OF THE COURT

18  damages under Scenario B of just over ▮▮▮▮▮.

19  Q.  And with respect to Scenario C, can you remind the jury

20  what your analysis is?

21  A.  Well, Scenario C is a scenario where there are no lost

22  profits.  That's why it's N/A under Scenario C.  It just

23  says that Weatherford hasn't satisfied or met its burden to

24  show that it's entitled to any lost profits, and, therefore,

25  it is entitled to no less than a reasonable royalty.  And

1  the reasonable royalties would be

REDACTED BY ORDER OF THE COURT

2  [REDACTED] under Scenario C.

3  Q.  And what formula did you use for Scenario C?

4  A.  I used the same formula we talked about reasonable

5  royalties under Scenario B, but -- and I used the same

REDACTED BY ORDER OF THE COURT

6  royalty rate per day of [REDACTED].  But, now, rather than

7  using the 978 days, which were the partial days that were

8  only subject to reasonable royalties in Scenario B, I used

9  all the billed rig days from September 2016 through October

10  31st, 2018.

11  Q.  And how do you compare the 60 percent of the days under

12  Scenario B to the number of days here?

13  A.  Well, here it's a hundred percent of the rig days.

14  Q.  And how did you calculate the hundred percent of the rig

15  days?

16  A.  Oh, by looking at the number of -- of billed days during

17  the damages period, and that gives me 1,665 days.

18  Q.  And explain why this is higher than the 978 days for

19  Scenario B.

20  A.  Right.  Because in Scenario B, we had -- for reasonable

21  royalties, we had 978 days.  Here, we have 1,665 days

22  because the difference between the 978 days and the 1 --

23  1,665 days in this scenario was due to the lost profits days

24  that were calculated in Scenario B.

25          So here, there are no lost profits.  So all of the

1   billed days during this damages period are subject to a

2   reasonable royalty.

3   Q.  And how does the 1,665 days of infringement relate to

4   your formula?

    REDACTED BY ORDER OF THE COURT

5   A.  Well, so you multiply the ████████ per rig day as a

6   royalty times the 1,665 billed days during this time period,

    REDACTED BY ORDER OF THE COURT

7   and that equals reasonable royalties of 2. -- just over ████

8   ████████ under Scenario C.

9   Q.  And, again, what time period is that?

10  A.  This is from September 13, 2016, through October 31st,

11  2018.

12  Q.  Did you calculate any damages after October 31, 2018,

13  under any of these scenarios?

14  A.  No.

15  Q.  Why not?

16  A.  I didn't have any additional sales information from

17  Tesco beyond October 31st, 2018.

18  Q.  So can you please summarize your opinions under the

19  different scenarios?

20  A.  Well, yes.  So my opinions are that under Scenario A,

21  which I believe is the most appropriate scenario, the total

    REDACTED BY ORDER OF THE COURT

22  damages are ████████████.

23          But Scenario B, which includes a hybrid of lost

24  profits and reasonable royalties, the damages are

    REDACTED BY ORDER OF THE COURT

25  ████████████.

1          And then Scenario C, which is strictly reasonable

REDACTED BY ORDER OF THE COURT

2     royalties, the royalties are ███████ .

3          MR. PAYNE:  Pass the witness.

4          THE COURT:  All right.  Ladies and gentlemen,

5     before the Defendants cross-examine the witness, we're

6     going to take a short recess.

7          You may simply close your notebooks and leave them

8     in your chairs.  Use this opportunity to stretch your legs,

9     get a drink of water.  We'll be back shortly.  Follow all

10    the instructions, including not to discuss the case among

11    yourselves.

12          The jury is excused for recess.

13          COURT SECURITY OFFICER:  All rise.

14          (Jury out.)

15          COURT SECURITY OFFICER:  All rise.

16          THE COURT:  Be seated, please.

17          Are you prepared to go forward with your

18    cross-examination, Mr. Raley?

19          MR. RALEY:  I am, Your Honor.  And I will be using

20    the ELMO a couple of times.

21          THE COURT:  Just let Ms. Lockhart know, and she'll

22    switch it over for you.

23          MR. RALEY:  Thank you very much.

24          THE COURT:  Let's bring in the jury, Mr. Johnston.

25          COURT SECURITY OFFICER:  All rise.

1          (Jury in.)

2          THE COURT:  Please be seated.

3          We'll proceed with the Defendants'

4    cross-examination of the witness, Mr. Bratic, at this time.

5          Mr. Raley, you may proceed.

6          MR. RALEY:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8    BY MR. RALEY:

9    Q.  Mr. Bratic, you -- you base much of your damage

10   calculations on the complete, whole completion job, not just

11   the Pusher Arm itself, correct?

12   A.  Yes.

13   Q.  And you quoted the -- the Rite-Hite case, which requires

14   such analysis for being -- for items that are not a part of

15   the -- the patent infringement case to be a -- I believe

16   I've quoted you correctly -- complete functional unit, not

17   sold together as a business advantage, correct?

18   A.  Correct.

19   Q.  All right, sir.  Now, you understand that these two --

20   well, let's talk about the different tools that are

21   involved.  They include elevators, correct?

22   A.  Yes.

23   Q.  Elevator links?

24   A.  I believe so.

25   Q.  Load compensators?

```
 1   A.   Yes.

 2   Q.   Tongs?

 3   A.   Yes.

 4   Q.   Spiders?

 5   A.   Yes.

 6   Q.   Control stands?

 7   A.   I'm not sure about that one, but --

 8   Q.   Interlocks?

 9   A.   I've heard that.

10   Q.   Single joint elevators?

11   A.   Elevators, yes.

12   Q.   Torque turn sensors?

13   A.   I'm sorry?

14   Q.   Torque turn sensors?

15   A.   Yes.

16   Q.   Skids?

17   A.   Yes.

18   Q.   Stabber?

19   A.   Yes.

20   Q.   You're not aware of any patent infringement claim on any

21   of these individual items, are you, sir?

22   A.   No.

23   Q.   And finally, the Pusher Arm, which your report estimated

24   to be 2.7 percent of the overall job, correct?

25   A.   Correct.
```

```
 1   Q.  Okay.  So this Pusher Arm, which is 2.7 percent of the

 2   overall job, and what we're in court about today, you're

 3   claiming that other 97.3 percent of the other tools, which

 4   are not a part of the patent infringement claims in this

 5   case, as part of the damages, correct?

 6   A.  Certainly.

 7   Q.  Yes, sir.

 8        Now, you understand that the Pusher Arm is not

 9   connected with any kind of cable or cord or anything to such

10   things as the -- the elevators or the, you know, torque or

11   the skids or the stabber?

12   A.  That's my understanding.

13   Q.  It's -- you plug it in -- it's kind of like a blender --

14   and you use it?

15   A.  I'm not sure what you mean by plug it in.

16   Q.  Okay.  It's not hooked up in any kind of computer way or

17   electronic way or anything else as part of -- with these

18   other tools to your understanding?

19        MR. PAYNE:  Beyond -- beyond my direct, number one.

20   Number two, that misstates the evidence.

21        MR. RALEY:  Okay.  It's responsive -- I'm sorry.

22        THE COURT:  Go ahead.  What's your response?

23        MR. RALEY:  I'll wait until you're -- all right.

24   He was asked about whether it was a complete functional

25   unit, and he said that he talked to Mr. Zaleski about it,
```

1  so -- but I will withdraw the question, Your Honor, and --

2  and try to clarify.

3          THE COURT:  I'll overrule the objection.  If you

4  want to withdraw it and move on, or if you want to restate

5  it, I'll leave that with you.

6          Mr. Bratic, please try to speak into the

7  microphone.

8          THE WITNESS:  Sure.

9          THE COURT:  Mr. Raley has a good strong voice, and

10  your soft answers sometimes get lost.

11          THE WITNESS:  I understand.

12          THE COURT:  So please speak into the microphone.

13          THE WITNESS:  I'll just pull it up.

14          THE COURT:  All right.  Let's proceed.

15          MR. RALEY:  All right, sir.  Thank you.

16  Q.  (By Mr. Raley) All right.  Do you understand that

17  neither Weatherford nor Tesco sells control lines?

18  A.  Yes.

19  Q.  And neither sell or install clamps?

20  A.  Yes.

21  Q.  That is your understanding.  You're agreeing with my

22  answer -- with my question?

23  A.  I'm agreeing with your answer --

24  Q.  Thank --

25  A.  I'm agreeing with your question.

1   Q.  Thank you.

2        And Weatherford and Tesco and Frank's and others

3   are hired to run pipe, tubular running services; is that

4   correct?

5   A.  Yes.

6    Other third parties actually do the clamping.  They provide

7   the control lines.  They -- they provide the -- the clamps,

8   and they actually do the clamping; is that correct?

9   A.  That's my understanding.

10  Q.  Do you understand that those parties could include

11  Schlumberger or Baker Hughes?

12  A.  I certainly know about Schlumberger.  I'm not sure about

13  Baker Hughes.

14  Q.  Sure.  All right.  And you have no understanding, do

15  you, sir, that the Pusher Arm is connected by an electronic

16  cable or hydraulic or pneumatic or any other sort of

17  connection device to elevators or tongs or -- or the other

18  items that we list?

19  A.  That's my understanding.

20  Q.  All right, sir.  Let me, if I may, sir, ask you a couple

21  of questions from your second supplemental report.

22        MR. RALEY:  And I will be using the ELMO,

23  Ms. Lockhart.

24        With the Court's permission?

25        THE COURT:  Proceed with the ELMO.

```
 1            MR. RALEY:  Thank you, Your Honor.

 2            THE COURT:  There's no need to have the comment to

 3   the jury about where the questions are coming from.  If

 4   you'd avoid the sidebar comments, I'd appreciate it.

 5            MR. RALEY:  Yes, Your Honor.

 6            THE COURT:  Just ask the questions from wherever

 7   they come from.

 8            MR. RALEY:  Absolutely.

 9            THE COURT:  Okay.

10            MR. RALEY:  My apologies.

11   Q.  (By Mr. Raley)  All right.  You wrote the second

12   supplemental --

13   A.  I'm sorry?

14   Q.  That's all right.

15   A.  Let me just grab some water.

16   Q.  Water.  Just let me know when you're ready.

17   A.  All right.  Thank you.

18   Q.  Yes, sir.  You wrote a second supplemental expert report

19   on November 30th, 2018; is that correct?

20   A.  Yes.

21   Q.  All right.  On Page -- let me do this.  Is that your

22   report, sir?

23   A.  It's the cover page.

24   Q.  Yes.  On Page 4 of your report, you say:  Additionally,

25   I have updated my analysis to exclude four duplicate Tesco
```

1   invoices that were previously included in my analysis.    I

2   have removed the following Tesco invoices from my -- and

3   then it goes to the next page -- analysis, 132384, 132390,

4   132395 -- those are the ones I'm going to ask you about.

5   Did I read the numbers correctly?

6   A.  I don't think you read the fourth one.

7   Q.  I'm -- there is the fourth one, but I'm -- I'm going to

8   ask you about the first three in just a second.

9   A.  Okay.

10  Q.  All right, sir?

11  A.  Okay.

12  Q.  Yes, sir.  You say that you deleted those from your

13  analysis?

14  A.  Yes.

15  Q.  Okay.  And yet on Page 1 of the Tesco estimated sales of

16  Pusher Arm services charged to Shell Corporation, those are

17  the same first three numbers that I mentioned; isn't that

18  true, sir?

19  A.  Do you have a copy?

20  Q.  Sure.  We can obtain one for you.

21          THE COURT:  Counsel, approach the bench.

22          MR. RALEY:  Yes, Your Honor.

23          (Bench conference.)

24          THE COURT:  Mr. Raley, this looks to me like it's a

25  Daubert motion in the middle of trial.  You're attacking the

1    veracity or accuracy of his report.

2          MR. RALEY:  It's not a Daubert motion.  It's just

3    cross-examination.

4          THE COURT:  Well, the time for motions to strike a

5    portion of an expert's report or to find that the

6    methodology is unreliable, that's all during pre-trial.

7    I'll -- I'll let you go a little further, but I'm concerned

8    that this is an attempt to Daubert the report when you chose

9    not to do it during the pre-trial under the Court's docket

10   control order.

11         MR. RALEY:  I'm -- I'm cross-examining, Your Honor,

12   that --

13         THE COURT:  All right.

14         MR. RALEY:  -- I think that I can still do -- do

15   that.  The report came in November 30th.

16         THE COURT:  Well, we'll -- we'll -- we'll leave it

17   at that and see where it goes.

18         MR. RALEY:  Yes, Your Honor.

19         THE COURT:  One other thing.

20         MR. RALEY:  Yes, Your Honor.

21         THE COURT:  You have a natural tendency to talk to

22   yourself at the podium.  And every time you get an answer,

23   you say, yes, sir, or thank you very much.  I know that's a

24   habit.  But to the extent you can limit your comments to the

25   questions and then respond with another question once you

1  get an answer and avoid that extraneous communication, I

2  think that would be proper.

3       MR. RALEY:  I will try.  I'm not even aware that

4  I'm doing it.  I'll try to be conscious of it.

5       THE COURT:  I know that.  I just want to raise --

6  raise it with your attention.

7       MR. RALEY:  Yes, sir.

8       THE COURT:  All right.  Let's proceed.

9       (Bench conference concluded.)

10      THE COURT:  Let's proceed.

11      MR. RALEY:  May I approach with --

12      THE COURT:  You may approach the witness.

13      THE WITNESS:  Thank you.

14  Q.  (By Mr. Raley)  Mr. Bratic, now that you have the

15  document, I'd like to go back and show you the pages I

16  referenced earlier so you can find it.  It's Page 4 of 8.

17      MR. PAYNE:  Your Honor, can counsel tell me where

18  he is in the report, please?

19      MR. RALEY:  Yes.  Page 4 of 8 in the report.

20      MR. PAYNE:  The exhibit?

21      MR. RALEY:  Oh, I'm -- I'm sorry.  In the overall

22  exhibit, counsel, it's -- well, it's in the section that's

23  the fourth -- third overall page -- Analysis of Supplemental

24  Documents.  It's Item No. IV -- Roman Numeral IV, Paragraph

25  10 -- or Section 10.

1          THE COURT:  All right.

2          MR. RALEY:  May I be permitted --

3          THE COURT:  You gentlemen meet in the middle, take

4    your respective copies, and make sure you're both on the

5    same place.

6          MR. RALEY:  Thank you, Your Honor.

7          THE COURT:  Then we'll continue.

8          MR. RALEY:  May I proceed, Your Honor?

9          THE COURT:  Let's proceed.

10   Q.  (By Mr. Raley)  All right.  Mr. Bratic, again, for the

11   record, the numerals I'm talking about are on the top of

12   Page 5 of 8 of your report in Section No. 10 that you say

13   you deleted from your analysis, 132384, 132390, and 132395.

14   Did I read those correctly?

15   A.  Yes, you did.

16   Q.  Good.

17         MR. RALEY:  Sorry, Your Honor.

18   Q.  (By Mr. Raley)  If you could turn, please, to -- I'll

19   tell you exactly how many pages to turn, so one, two --

20   they're two-sided pages.  It's a -- it's a document that is

21   entitled Tesco's Estimated Sales of Pusher Arm Services

22   Charged to Shell Corporation.  Do you see that document,

23   sir?

24   A.  I do.

25   Q.  The top three numbers of the document are the numbers

1  that I read previously; is that true?

2  A.  Yes.

3  Q.  Those are the numbers that you said you deleted from

4  your report, correct?

5  A.  Yes.

6  Q.  Okay.  And at the bottom of the page -- this is the same

7  page where you've estimated that the overall percentage of

8  the Pusher Arm in the -- in the -- in the total completion

9  job is 2.7 percent?

10  A.  2.6.

11  Q.  2.6 percent, I apologize.

12  A.  Excuse me, yes.  Yes.

13  Q.  Thank you.

14        One more page.  If you could turn, please,

15  Mr. Bratic, a couple of pages farther to a document entitled

16  Weatherford Technology Holdings, a Summary of Tesco's

17  Invoices With Pusher Arm Services.

18  A.  Yes.

19  Q.  Do you see that, sir?

20  A.  Yes.  Sorry, what exhibit is that?  Could you --

21  Q.  The exhibit number?

22  A.  Yes.

23  Q.  The overall exhibit number is -- well, your report is

24  not an exhibit, I'm sorry.

25  A.  No, no, I meant supplemental -- "operating" in the

1  corner?

2          Oh, yes, sir.  Second supplemental, Exhibit 9.2.

3          Are you ready?  Are you ready?

4  A.  Just bear with me one second.

5  Q.  Yes, sir.  I'll wait until you're ready.

6  A.  Oh, I'm sorry.  Go ahead.

7  Q.  Yes.  On this document, as well, are the same three

8  numbers we read earlier, which you said you had deleted from

9  your report, and yet they are in your report, correct?

10 A.  Yes.

11 Q.  Is it your understanding that Weatherford Technology

12 Holdings, Inc., is the owner of the patent in question, the

13 '637 patent?

14 A.  That's my recollection.

15 Q.  Now, the owner of the patent, Weatherford Technology

16 Holdings, Inc., does not make anything or sell anything or

17 lease anything, correct?

18 A.  That's my -- excuse me.  That's my understanding.

19 Q.  So as -- as such, they could sue for a reasonable

20 royalty but not sue for lost profits because they don't make

21 anything, sell anything, or lease anything, correct?

22 A.  That would be my understanding.

23 Q.  There has been reference to cost-sharing arrangements

24 during this trial.  Have you heard them when you were

25 listening?

1   A.  Mr. -- I -- I heard Mr. Porter discussing them.

2   Q.  Yes, sir.

3        Plaintiffs' Exhibit 7 is a cost-sharing agreement

4   between Weatherford/Lamb and several companies, including

5   Weatherford U.S., L.P.  You see Weatherford U.S., L.P.?

6   A.  Yes.

7   Q.  Is it your understanding that Weatherford U.S., L.P.,

8   are the ones who make the Weatherford AutoCLAMP and lease

9   it?

10  A.  Yes.

11  Q.  This cost-sharing agreement, in Article 7, says that the

12  license that is given from the owner of the patent to the

13  person who makes the -- the AutoCLAMP is a non-exclusive

14  license.

15       Do you see that, sir?

16  A.  I -- I see that in Article 7.1.

17  Q.  Now, you understand that an exclusive license is

18  necessary to have the power to sue, correct?

19           THE COURT:  Counsel, approach the bench.

20           (Bench conference.)

21           THE COURT:  Mr. Raley, this is a damages expert.

22  This is well beyond the scope of his report, as well as

23  you're asking for legal conclusions.  You're asking him to

24  tell this jury what supports a right to sue in court and

25  what doesn't.

1          This witness is not in a position to have knowledge

2   of any of the things you've asked him in this regard, and

3   they're well beyond the scope of his report, and I'm not

4   going to allow you to take a damages expert and make a legal

5   expert out of him or a technical expert.

6          MR. RALEY:  May I respond, Your Honor?

7          THE COURT:  Yes.

8          MR. RALEY:  The whole point is that he has started

9   his damage calculation for lost profits long before

10  Weatherford U.S., L.P., had an exclusive license, which was

11  one day before the suit.  And he understands this.  This was

12  discussed in his deposition, and the --

13         THE COURT:  Lower your voice.

14         MR. RALEY:  -- and the lost profits are part of his

15  report.  And this was -- this is not a surprise to anybody.

16  This is all a part of our cross examination.

17         THE COURT:  I don't care if it's a surprise or not.

18  It -- he -- and I don't care if he was deposed on it.  It's

19  beyond the scope of his report.  It's beyond the scope of

20  the direct.  And you're calling for legal conclusions from

21  him.  And I just can't let three distinct areas of

22  impropriety go by without raising it.

REDACTED BY ORDER OF THE COURT

23         MR. RALEY:  They've put ███████ of damages on

24  the board, and a lot of that is lost profits that precede

25  the right to sue for those profits.

1          THE COURT:  I'm not saying you can't make an issue

2    out of it, but you're going to have to make an issue out of

3    somebody besides a damages expert, who's not knowledgeable

4    about the right to sue or not having the right to sue.  This

5    is not the witness for that.  I don't know who it is, but

6    it's not a damages expert whose report is limited to

7    reliance on the technical expert and his damages

8    calculations.

9          MR. BOWICK:  On day one, on direct examination, the

10   Plaintiff asked Mr. Porter if they had an exclusive license

11   in 2005, and he answered in the affirmative, which is

12   untrue.

13         MR. RALEY:  And the problem is his damages --

14         MR. PAYNE:  May I respond?

15         THE COURT:  Just a minute.

16         MR. PAYNE:  Thank you.

17         MR. RALEY:  I'll back --

18         THE COURT:  That's Mr. Porter.

19         MR. RALEY:  I'll back off the legal question, but,

20   Your Honor, I have to be able to cross-examine on lost

21   profits.  That's our whole defense.

22         THE COURT:  You can testify on lost profits as to

23   what he's testified on direct and what's in his report and

24   the calculations and so forth, but the assumptions that he

25   relied and the -- the propriety of the Plaintiff to bring

1  the lawsuit they've brought are areas well beyond the

2  knowledge and scope of this witness.

3          MR. RALEY:  I'm not doing that.  I'm saying --

4          THE COURT:  That seems it me exactly what you're

5  doing.

6          MR. RALEY:  What I'm trying to do, however

7  inartfully, is show that his lost profits and damages starts

8  way too early.  And that's part of his report, and that's

9  part of his deposition, and it's part of his direct

10 examination, and all I'm trying to do is cross-examine on

11 that very point.  Nothing else.  I'll --

12         THE COURT:  I'm not -- I'm not trying to keep you

13 from trying to prove that the Plaintiffs don't have a right

14 to seek damages during the period they're asserting --

15         MR. RALEY:  That's what I'm trying to do.

16         THE COURT:  -- but this is a damages expert.

17         MR. RALEY:  Yes.

18         THE COURT:  And he's limited to the -- to the

19 material in his report.  You cannot -- you cannot ask him to

20 go beyond his report and his area of expertise to the extent

21 you are.

22         MR. RALEY:  I -- I will --

23         THE COURT:  And none of this --

24         MR. RALEY:  I'll back off the law, Your Honor.  But

25 just so the Court understands my point --

1          THE COURT:  You'll back off whatever I tell you to

2    back off of.

3          MR. RALEY:  I'll do whatever you say.  Exception is

4    noted for the record.  I'm just trying to say he starts his

5    lost profits way too early, and to do that, they didn't --

6    they didn't have an exclusive license to --

7          THE COURT:  You can certainly ask him if they

8    didn't have the right to bring the suit when they did and if

9    your lost profits started too early based on that, then

10   these numbers wouldn't be right.

11         MR. RALEY:  Fair enough.

12         THE COURT:  But you can't ask him about a

13   cost-sharing agreement and ask him to interpret a legal

14   document before this jury when he's a damages expert.

15         MR. RALEY:  Yes, Your Honor.

16         THE COURT:  And I'm not going to permit that.

17         MR. RALEY:  Yes, Your Honor.

18         MR. BOWICK:  Thank you, Your Honor.

19         THE COURT:  Mr. Payne, I'm going to hear from you

20   before we leave here.

21         MR. PAYNE:  Thank you.  I'll be short.

22         It is calling for a legal conclusions, number one.

23         Number two, it's beyond his report.

24         Number three, Mr. Bowick has once again misstated

25   the record.  PX-6 clearly says, as Mr. Porter testified to,

1  that as of December 31, 2005, this particular entity,

2  Weatherford U.S., L.P., had a perpetual exclusive license.

3          I want to state that for the record.  Thank you.

4          THE COURT:  I have read the cost-sharing agreement.

5  I've read the other documents.  I'm assuming that when the

6  evidence is over, I'm going to get a motion to limit the

7  damages period to whatever the Defendants say the only open

8  window is, and the Plaintiffs are going to argue otherwise.

9          And the Court, if necessary, will construe the

10  legal impact of the agreements.  But a damages expert is not

11  going to testify about what legally is enforceable or not

12  enforceable.

13          MR. RALEY:  Understood, Your Honor.

14          MR. PAYNE:  Thank you.

15          THE COURT:  All right.  Let's proceed.

16          (Bench conference concluded.)

17          THE COURT:  Let's proceed.

18  Q.  (By Mr. Raley)  Without asking you to interpret this,

19  are you aware that there is an exclusive license agreement,

20  Plaintiffs' Exhibit 219, between Weatherford Technology

21  Holdings LLC and Weatherford U.S., L.P.?

22  A.  I was aware that there was such an agreement.

23  Q.  I didn't hear your answer.

24  A.  I said, I'm aware there was such an agreement.

25  Q.  Thank you, sir.  And were you aware that the date of the

1   agreement is May 25th, 2017?

2   A.  That's the date of this agreement.

3   Q.  Is it your understanding that that is one day before

4   this lawsuit was filed?

5   A.  I don't recall the precise date when the suit was filed.

6   Q.  Thank you.  Mr. Bratic, you agree that as an expert in

7   this case, you should focus your calculations on the

8   asserted Claims 34 to 36, correct?

9   A.  Yes.

10  Q.  Those are the claims at issue that the Judge and the

11  jury will be considering in this case.

12  A.  That's my understanding.

13  Q.  You have not limited your damage analysis solely to the

14  34 to 36 claims, correct?

15  A.  I don't know how to answer that question.

16          MR. RALEY:  May I approach, Your Honor?

17          THE COURT:  You want to approach the witness?

18          MR. RALEY:  Yes.

19          THE COURT:  You may.

20          MR. RALEY:  Tender a copy of the witness's

21  deposition.

22          THE WITNESS:  Thank you.

23  Q.  (By Mr. Raley)  Mr. Bratic, do you remember testifying

24  in this case on September 21st, 2018?

25  A.  I do.

1   Q.  And during your deposition, you understood that you were

2   under oath, correct?

3   A.  Yes, absolutely.

4   Q.  And you told the truth at that time?

5   A.  Yes.

6   Q.  If you would look to Page 141 of your deposition,

7   starting with Line 24?

8   A.  I'm sorry, Page 141?

9   Q.  141, yes, sir.

10  A.  Okay.

11  Q.  To 142, Line 7.  Let me know when you've found it.  Have

12  you found Page --

13  A.  I'm sorry, 1 --

14  Q.  -- 141?

15  A.  I have that.  But where did you want me to end?

16  Q.  141, Line 24.

17  A.  Oh, I'm sorry.  Okay.  One second.  Okay.

18  Q.  I asked you:  At a minimum, you agree that you have not

19  limited your damage analysis to solely the 34 to 36 claims.

20          What did you respond?

21  A.  My answer was on Page 142:  As to non-infringing

22  alternatives, that's correct.

23  Q.  Then the next question:  As to other aspects of

24  consideration of damages beyond non-infringing alternatives,

25  correct?

1          And what did you say, sir?

2    A.   That's correct.

3    Q.   Thank you.  You agree that Claims 34 to 36 are not

4    essential to Weatherford's market share because they don't

5    practice them?

6    A.   That's true.  That's my understanding, I should say.

7    Q.   And if Frank's does not practice Claims 34 to 36, they

8    also have a market share with their tool that is not

9    dependent on Claims 34 to 36, correct?

10   A.   That would not be dependent on those claims

11   specifically, yes.

12   Q.   Isn't it true, Mr. Bratic, that you didn't even ask

13   Weatherford's expert, Mr. Zaleski, if Frank's practiced

14   Claims 34 to 36?  You didn't even ask him, did you, sir?

15   A.   I don't believe I asked that specific question.

16   Q.   And Frank's has a very large market share in Gulf of

17   Mexico completions, don't they, sir?

18   A.   They do.

19   Q.   How high is that share?  Do you have a current

20   understanding?

21   A.   Well, it's gotten -- I can tell you.

22   Q.   That's in your second supplemental report.

23   A.   It's also in the trial demonstratives.  Depending on the

24   time period, it's gotten as high as 50 percent.

25   Q.   Has it been as high as 75 percent before?

1    A.   As high as 75 percent -- currently, yes.

2    Q.   Are you aware of any requirements that completion

3    service providers are required to practice Claims 34 to 36?

4    A.   Not specifically.

5    Q.   So those claims themselves, in practicing the methods of

6    those claims, is not essential to competing in the

7    marketplace, correct?

8    A.   That's not my understanding.

9    Q.   If you could look on Page 80 of your deposition, sir?

10   A.   Yes.

11   Q.   Starting with Line --

12   A.   I'm sorry, let me get there.

13   Q.   Yes, sir.  I'll wait until you're there.

14   A.   Page 80?

15   Q.   Yes, sir.

16   A.   Okay.

17   Q.   My -- my question in your deposition under oath in -- in

18   September:  As we discussed, Weatherford's able to compete

19   in -- compete in the marketplace without practicing Claims

20   34 through 36.  So those claims themselves and the

21   practicing of the method of those claims is not essential to

22   competing in the marketplace, fair statement?

23          And what was your response?

24   A.   I would agree generally with that.

25   Q.   And yet you did not, Mr. Bratic, in your list of

1   examples of market demand limit those examples to the

2   practice of the method of Claims 34 to 36, did you, sir?

3   A.   For Panduit 1?

4   Q.   In your examples of market demand, you did not limit the

5   examples to the practice of the methods of Claims 34 to 36,

6   did you, sir?

7   A.   I don't believe so.

8   Q.   You gave an expert opinion in the Interplan Architects

9   versus C.L. Thomas case, U.S. District Court, Southern

10  District of Texas, Houston Division?

11  A.   I did.

12  Q.   In 2010, that Court ruled that Mr. Bratic's methodology

13  and resulting calculations are unreliable; is that correct?

14  A.   Generally is my recollection.

15  Q.   And in that case, the Court granted Defendants' motion

16  to exclude Mr. Bratic's opinions as to Defendant Thomas's

17  gross revenues, correct?

18  A.   Yes.

19  Q.   You gave an expert opinion in -- let me get my glasses.

20          Xpert Universe versus Osco Systems in the District

21  of Delaware in 2013?

22  A.   Cisco Systems.

23  Q.   My apologies.  With that clarification, you did give an

24  opinion in that case?

25  A.   I gave several opinions.

1    Q.  In that case, the Court held Bratic's numerous

2    methodological flaws are thrown into sharp relief by his

3    conclusion.  The Court found the evidence on which Bratic

4    relied to be lacking in foundation and faulty for other

5    reasons; is that correct?

6    A.  Well, I don't have the opinion in front of me, but I

7    have a general recollection there were some rulings from the

8    Court about that.

9    Q.  Does that generally comport with your memory?

10   A.  Well, the Court did exclude some of the evidence I

11   relied on, yes.

12   Q.  Here is an article on the case, Mr. Bratic.

13          MR. PAYNE:  Objection to publishing this.

14          THE COURT:  Sustained.

15          Take that off the ELMO.

16          MR. RALEY:  Yes, sir.

17          THE COURT:  Approach the bench.

18          (Bench conference.)

19          THE COURT:  Mr. Raley, you argued vehemently

20   against the Plaintiff showing my orders in this case

21   regarding Mr. Meeks to the jury.  And yet you're going to

22   publish orders from another case where another Judge has

23   found this witness to have a flaw in his analysis or reason

24   to strike it?

25          MR. RALEY:  There was a motion in limine on this

1   which they withdrew, Your Honor.

2          THE COURT:  I'm aware of that.  I'm just asking

3   about fundamental fairness.  On the one hand you say it's

4   highly prejudicial to you to show the jury an order I've

5   signed in this case about your witness, but you want to show

6   the jury an order from another federal court in another case

7   unrelated to this one to the same jury, and you don't find

8   that prejudicial?

9          MR. RALEY:  It's a completely different situation,

10  Your Honor.  This is about an expert's testimony.  I'm not

11  saying he's a liar.  I'm not attacking his credibility.  I

12  just --

13         THE COURT:  Well, you can -- you can ask him about

14  what's happened in prior cases.

15         MR. RALEY:  Sure.

16         THE COURT:  But you're not going to publish written

17  opinions or articles or other documents.

18         MR. RALEY:  Agreed.

19         THE COURT:  Okay.

20         MR. RALEY:  Thank you.

21         (Bench conference concluded.)

22       THE COURT: Let's proceed.

23  Q.  (By Mr. Raley) Finally, Mr. Bratic, you gave an expert

24  opinion in this court in the Eastern District of Texas,

25  United States District of in Mobile Telecom Tech versus

1    Sprint Nextel in 2014, correct?

2    A.   I filed an expert report in that proceeding, yes.

3    Q.   That's my question.

4    A.   Oh, I'm sorry.  Yes.

5    Q.   And the Court ruled that Defendant Samsung's motion to

6    strike the damages report of Walter Bratic is granted as to

7    overall profits and revenues, correct?

8    A.   Yes.  I was not allowed to talk about profits and

9    revenues.

10          MR. RALEY:  No further questions, Your Honor.

11          THE COURT:  You pass the witness?

12          MR. RALEY:  Yes, Your Honor.  I pass the witness.

13          THE COURT:  Redirect by the Plaintiff?

14          MR. PAYNE:  May it please the Court.

15          THE COURT:  Proceed.

16                    REDIRECT EXAMINATION

17   BY MR. PAYNE:

18   Q.   Mr. Bratic, do you recall questions from Tesco's counsel

19   about whether you considered some of the claims in the '637

20   patent that were not asserted as being infringed?

21   A.   Correct.  I do.

22   Q.   And with respect to your analysis of whether there are

23   acceptable non-infringing substitutes, is it proper or

24   improper to consider all of the claims of the '637 patent?

25   A.   My understanding, it's proper to consider all the claims

1  of the '637 patent.

2  Q.  Even the unasserted claims?

3  A.  Correct.

4  Q.  Why?

5  A.  Why?  Because, for example, as Mr. Zaleski explained,

6  that Frank's -- Frank's infringes other claims of the '637

7  patent other than Claims 34 through 36.  Weatherford

8  practices other claims of the '637 patent.  As he explained,

9  it's the commercial embodiment of the '637 patent as found

10  in the AutoCLAMP.

11       So you have to look at other claims of the patent

12  to see if you can get similar benefits from other claims of

13  the patent as well.

14  Q.  And in your 30-plus-year career, about how many reports

15  have you authored?

16  A.  Something over 2,000 reports.

17  Q.  And did Mr. Raley ask you about 3 out of the 2,000?

18  A.  He did.

19  Q.  Okay.  And is it correct that you were actually retained

20  by Mr. Raley's law firm in a current proceeding, in another

21  proceeding?

22  A.  That's correct.

23  Q.  To assess damages?

24  A.  Yes.

25  Q.  And is it also true that, in fact, you have been

1    retained by Nabors, the company that owns Tesco, to handle

2    damages issues?

3    A.   Yes, in the past.

4    Q.   Now, with respect to the CL Thomas case --

5    A.   Yes.

6    Q.   -- that Mr. Raley asked you about --

7    A.   Yes.

8    Q.   -- can you explain to the jury what you recall happening

9    in that case?

10   A.   Well, that was an architectural copyright case, not a

11   patent case.  There were three Defendants that were accused

12   of copying an architectural design for high-end gasoline

13   stations.

14        And I expressed an opinion regarding copyright

15   damages with respect to -- all three defendants.  The Court

16   ruled that I had not established a causal connection between

17   the revenues generated by the convenience stores, the

18   gasoline stations, and the architectural drawings.

19        The Court excluded my report as to one of the

20   defendants, not the other two defendants, allowed me to

21   supplement my report to establish a causal connection.  And

22   of course, I went and interviewed the architectural expert

23   in that case and submitted a report based on connecting the

24   drawings to the revenues, and the Court accepted that --

25   that -- that supplemental report, and the parties settled

1   that litigation.

2   Q.  And did the Court strike your supplemental report?

3   A.  No.

4   Q.  Can you tell the jury what happened in the Cisco case to

5   which Mr. Raley referred?

6   A.  Cisco was a case that had a combination of -- I'm going

7   by recollection -- I think, 42 trade secrets, 2 patents, and

8   I think 10 counts of fraud.  So I was asked to quantify

9   damages as to all fraud counts, all the trade secrets, and

10  the patents.

11       The Court ruled right before trial.  The Court

12  excluded all the trade secrets.  The Court ruled that I was

13  only allowed to testify as to one fraud count because the

14  Court had dismissed nine fraud counts.  And in that case,

15  then I also testified as to patent damages.

16       The Court ruled that on patent damages, I was not

17  allowed to rely on Cisco's projections and that I -- so that

18  evidence was not coming in.  I did actually issue another

19  expert opinion on patent damages, which was allowed, and the

20  jury actually awarded a higher royalty rate than what I

21  testified to.

22  Q.  And with respect to the third case that he asked you

23  about, the Sprint case, can you explain that case to the

24  jury?

25  A.  Yes.  The Court did not exclude my opinions regarding

1   royalty damages.  The Court just said I couldn't publish to

2   the jury the amount of revenues and profits that Sprint

3   generated on the sales of the wireless network.  But my

4   opinion regarding royalty damages wasn't -- was not affected

5   by that ruling.

6   Q.  So in all three of those cases, did you ultimately go

7   forward with your damages opinions?

8   A.  I did.

9           MR. PAYNE:  Pass the witness.

10          THE COURT:  Further cross-examination?

11          MR. RALEY:  No further questions, Your Honor.

12          THE COURT:  You may step down, Mr. Bratic.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  Plaintiff, call your next witness.

15          MR. PAYNE:   Your Honor, Plaintiff rests.

16          THE COURT:  All right.  Plaintiff has rested its

17  case-in-chief.

18          Is Defendant prepared to call its first witness in

19  its case-in-chief?

20          MR. BOWICK:  Yes, Your Honor.

21          THE COURT:  Proceed to call your first witness,

22  Mr. Bowick.

23          MR. BOWICK:  Defendant Tesco calls Dr. John P.

24  Rodgers.

25          THE COURT:  All right.  Dr. Rodgers, if you'll come

 1  forward and be sworn by the courtroom deputy.

 2          (Witness sworn.)

 3          THE COURT:  Please come around, sir, and have a

 4  seat on the witness stand.

 5          MR. BOWICK:  Dr. Rodgers, here's a notebook of

 6  exhibits.

 7          THE WITNESS:  Thank you.

 8      JOHN P. RODGERS, Ph.D., DEFENDANTS' WITNESS, SWORN

 9                   DIRECT EXAMINATION

10  BY MR. BOWICK:

11  Q.  Good morning, Dr. Rodgers.

12  A.  Good morning.

13  Q.  Could you please explain to the jury what your role in

14  this lawsuit is?

15  A.  I'm an expert witness, obviously.  I was asked to

16  evaluate the infringement and validity allegations involved

17  in this case.

18  Q.  Are you a licensed professional engineer?

19  A.  Yes, I am.

20  Q.  In which states?

21  A.  Texas, North Dakota, and Connecticut.

22  Q.  And what type of doctor are you?

23  A.  I'm an engineer.  My Ph.D. is in aerospace engineering

24  but focused on mechanical aspects, which is what most of my

25  mechanical engineering.

1          THE COURT:  Dr. Rodgers, would you pull your

2   microphone a little closer so we can hear you, please, sir?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Thank you.

5          Go ahead, Counsel.

6   Q.  (By Mr. Bowick) And where did you receive your

7   doctorate?

8   A.  I got my Ph.D. at MIT.

9   Q.  Now, Dr. Rodgers, do you have an understanding of the

10  methods of operating Tesco's Pusher Arm devices?

11  A.  Yes, I do.

12  Q.  And what's the basis of that understanding?

13  A.  Well, I've witnessed the operation in Lafayette,

14  Louisiana.  I've seen all the drawings, seen videos, you

15  know, read patents.  So there's lots of information.

16  Q.  Have you evaluated Asserted Claims 34 to 36 of the '637

17  patent as construed by this Court?

18  A.  Yes, I have.

19          MR. BOWICK:  Your Honor, may I grab a blow-up?

20          THE COURT:  You may.

21  Q.  (By Mr. Bowick)  Dr. Rodgers, does Tesco's Demonstrative

22  No. 65 accurately reflect the asserted claims as construed

23  by this Court?

24  A.  Yes, it does.

25  Q.  And after your analysis, have you reached a conclusion,

1  based on your experience and qualification, whether the

2  method of operating Tesco's Pusher Arm infringes any of

3  Claims 34, 35, or 36?

4  A.   Yeah, I've reached the conclusion that it does not

5  infringe on Claim 34 through 36.

6  Q.   Thank you.  Now, where are you employed, Dr. Rodgers?

7  A.   I'm employed in my own engineering consulting company

8  called Starboard Innovations.

9  Q.   And when did you found Starboard Innovations?

10  A.   I founded the company in the year 2000.

11  Q.   And what type of business is Starboard Innovations?

12  A.   It's an engineering consulting business founded here in

13  Texas where I basically do a lot of problem solving,

14  innovation, technology development in a variety of

15  industries, but a lot of my experience has been in the oil

16  industry.

17  Q.   Who are some of the clients that you serve?

18  A.   Well, early on, I was working with Bell Helicopter, with

19  NASA, doing more aerospace-type work, but quickly after

20  relocating to Texas, realized that the oil industry was a

21  big opportunity, so I started working in the oil industry, a

22  lot with Halliburton.  They've been my biggest client over

23  the years, but also with other oil companies like Shell,

24  Baker Hughes, GE, a few other smaller companies, as well.

25  Q.   What does Starboard mean?

```
 1   A.  Starboard is a nautical term.  It means the right side
 2   of a ship, and it comes from the days -- back when I was in
 3   college, I was on the crew team, so I rowed.  And if your
 4   ore sticks out on the right side of the boat, you're
 5   considered a starboard, so I stuck with that name.
 6   Q.  And where did you row crew?
 7   A.  That was at Duke University.
 8   Q.  And what did you study at Duke?
 9   A.  At Duke I studied mechanical engineering and
10   mathematics.
11   Q.  And did you obtain a degree from Duke?
12   A.  Yeah, I received my Bachelors of Science and Engineering
13   degree at Duke University with a double major in mechanical
14   engineering and mathematics.
15   Q.  And were you awarded any honors at Duke University?
16   A.  Yeah.  I graduated with distinction, and also received
17   an annual scholarship from a Navy nuclear program for
18   nuclear engineering.
19   Q.  And what did you do after you graduated from Duke?
20   A.  I went right from Duke to graduate school at MIT.
21   Q.  And what did you study at MIT?
22   A.  So I studied aircraft structures and structural dynamics
23   specifically -- so it was an application of the mechanical
24   engineering skills I had from undergraduate work in the
25   aerospace field.
```

1    Q.   And what year did you obtain a Master's from MIT?

2    A.   Master's degree was 1995.

3    Q.   And what year did you obtain your doctorate from MIT?

4    A.   1999.

5    Q.   Could you please describe some of your work experience

6    before you founded Starboard?

7    A.   Sure.  I worked at NASA for a period.  I worked through

8    MIT in what they call their Space Engineering Research

9    Center and with their active materials and structures lab

10   doing technical research for a variety of different

11   government agencies, the Department of Defense mostly.  And

12   then after I graduated, I worked for a company called Midé

13   Technology Company in the Boston area.  And I was also

14   working on the defense research projects for different --

15   you know, Air Force, Navy, NASA, DARPA, various

16   organizations.

17   Q.   And what brought you to the great state of Texas?

18   A.   My wife and I determined that we wanted to go someplace

19   a lot warmer than Boston where we could, you know, afford to

20   buy a house and where there was good opportunity to start a

21   business, and so Texas called to us.

22   Q.   Now, Dr. Rodgers, have you ever published any articles

23   in the oilfield?

24   A.   Yeah, I've published several articles in -- through SPE

25   and other organizations in the oilfield.

1  Q.  And what's one of your more recent articles that you've

2  published?

3  A.  A couple of the recent ones are on -- part of a

4  completion process called perforating where you put

5  explosives in the well to blow holes in the casing and open

6  up the communications so the oil and gas can flow up the

7  completion string -- production string.  And so I have a

8  couple publications on that.

9  Q.  So you know a little bit about completions?

10 A.  Yeah.  Over the years I've worked in a lot of different

11 aspects of completions.  Perforating is one of the more

12 recent ones I've been active in.

13 Q.  Are you a named inventor of any patents?

14 A.  Yes, I believe I'm a named inventor now on 33 U.S.

15 patents and also some international patents, as well.

16 Q.  Do you have any pending now patent applications before

17 the Patent and Trademark Office?

18 A.  Yeah, there are a number of them still pending, as well,

19 in addition.

20 Q.  Do you have any patents related to clamping devices onto

21 completion strings?

22 A.  Yes.  One of my patents in working with Halliburton

23 involves clamping, what I call acoustic telemetry tools on

24 the side of tubulars, and these are tools that communicate

25 by sending sound waves up and down the pipes.  So we clamp

1    those on the side of pipes.

2    Q.  Now, you've -- you've been in this courtroom during this

3    trial, correct?

4    A.  Yes.

5    Q.  Now, are you familiar with some of the rigs that have

6    been discussed in this courtroom during this trial?

7    A.  Yes, I am.  Several of the rigs or platforms that have

8    been discussed during the trial are platforms that I've been

9    involved with in doing analysis for Halliburton or preparing

10   and running tools.  So specific equipment that they run into

11   the oil wells that I've helped design have gone out on these

12   rigs, and I've received the tools and data back from the

13   rigs.

14   Q.  And what rigs have you done work on that have been

15   discussed in this court?

16   A.  It's hard to remember them all, but I know Shell Perdido

17   is one that's been mentioned quite a few times.  Also

18   rigs -- several from Shell, but also from BP, BHP, Hess,

19   several other platforms, as well.

20   Q.  Could you please describe what a perforating tool is?

21   A.  Right.  A perforating tool, they typically call them

22   guns.  It's basically a pipe that's loaded with shaped

23   charge explosives.  So you put the pipe down in the well,

24   and at the designated type, it detonates and it blows holes

25   out radially into the rock through the casing, which is the

112

1   pipe that lines the well, and basically opens up that

2   communication so the oil and gas can flow in where you want

3   it to.  And so that's -- the whole process of perforating is

4   getting those explosives where they need to go so you can

5   detonate them, blow the holes, and maintain the integrity of

6   the well and not cause any damage in the process.

7   Q.  And how does the oil -- once it goes through those holes

8   you've created, how does it get up to the -- to the rig?

9   A.  Right.  So they usually -- be a -- a tubular -- a piece

10  of tubing or pipe that runs all the way from the surface,

11  all the way down to where that zone is that they perforated

12  so the oil and gas can flow in and up that pipe.

13        MR. BOWICK:  Your Honor, at this time, Tesco

14  Offshore offers Dr. Rodgers as an expert in the field of

15  oilfield completion tools and operations.

16        THE COURT:  Is there objection?

17        MR. WILSON:  No objection, Your Honor.

18        THE COURT:  The Court will recognize the witness as

19  an expert in the stated fields.

20        MR. BOWICK:  Thank you, Your Honor.

21        THE COURT:  Continue.

22  Q.  (By Mr. Bowick)  Dr. Rodgers, did you hear Mr. Zaleski

23  talk about a person of ordinary skill in the art yesterday?

24  A.  Yes, I did.

25  Q.  A person of ordinary skill, that's not a real person, is

1  it?

2  A.  No, it's a hypothetical person.

3  Q.  And in providing your expert opinions in this case, are

4  your opinions made from the perspective of the hypothetical

5  person of ordinary skill in the art?

6  A.  Yes, I -- that's the way I viewed it.

7  Q.  And how many years experience in Tubular Running Service

8  would this hypothetical person of ordinary skill require?

9  A.  Well, either a -- the person of ordinary skill would

10  either require a Bachelor's degree or four years of

11  experience running tubulars in related equipment.

12  Q.  Thank you.

13        MR. BOWICK:   Could we pull up Tesco Demonstrative

14  No. 38, please?

15  Q.  (By Mr. Bowick)  Dr. Rodgers, what is depicted here in

16  Demonstrative No. 38?

17  A.  This is the early version of Tesco's Pusher Arm.  They

18  call it the non-knuckle version.

19  Q.  And how does the -- tell me about the hydraulic cylinder

20  at the bottom of the screen.  How does that operate?

21  A.  Well, a hydraulic cylinder just extends and contracts.

22  It gets longer or shorter, depending on what command is sent

23  to it.  And that hydraulic cylinder is what powers this --

24  this Pusher Arm to move back and forth.

25  Q.  And with the Tesco Pusher Arm, when the hydraulic

1  cylinder is retracted, what happens?

2  A.  Well, in this case, when you retract the cylinder

3  because it's hinged, the arm actually moves forward toward

4  the pipe.

5  Q.  And where is the hinge located?

6  A.  That's what's labeled as the pivot point right at the

7  top of the base assembly.

8  Q.  Does Tesco still use the non-knuckle Pusher Arm?

9  A.  My understanding is they stopped using that in late

10  2015.

11  Q.  And do you know why Tesco stopped using the non-knuckle

12  Pusher Arm?

13  A.  I think they needed a little bit more control to move

14  those control lines to be clear of some of the equipment

15  that was operating in the rig center.

16        MR. BOWICK:  Can we pull up Plaintiffs' Exhibit

17  149, please?  And let's start it 2 minutes and 35 seconds.

18        (Video clip played.)

19        MR. BOWICK:  Is this 2 minutes 35 seconds?

20        THE TECHNICIAN:  Yes.

21        MR. BOWICK:  Your Honor, I think this is slow

22  motion.  I just want to make it go normal speed.

23        THE COURT:  If you'd like leave to go to the table

24  and consult with your technical consultant, you may.

25        MR. BOWICK:  Thank you, Your Honor.  I just don't

1  want to waste the time.

2          THE COURT:  I just don't want y'all carrying on a

3  conversation back and forth.

4          (Pause.)

5          MR. BOWICK:  Could you advance it forward, please,

6  Ms. Nesser?

7          Your Honor, it's just slow.

8  Q.  (By Mr. Bowick) Dr. Rodgers, what do you -- what do you

9  see here in this video --

10         THE COURT:  Mr. Bowick, you have leave of the Court

11  to step over to the table and consult with your technical

12  person as you may need to.

13         MR. BOWICK:  Thank you, Your Honor.

14         THE COURT:  I just don't want the two of you having

15  a conversation on the record that the rest of us listen to.

16         MR. BOWICK:  Thank you, Your Honor.  I think I can

17  solve this.

18         THE COURT:  But you two consult quietly together as

19  you need to.

20         MR. BOWICK:  Ms. Lockhart, can you pull up the

21  ELMO, please?

22  Q.  (By Mr. Bowick) Dr. Rodgers, what's depicted here in

23  Tesco Demonstrative No. 50?

24  A.  This looks like a snapshot from the video you were just

25  trying to play.  It's showing the rig hands pulling on the

116

1    control line to get it clear of the large red elevators on

2    the right side there so that the control line is not

3    damaged.

4    Q.  And how many men are pulling on those control lines?

5    A.  It looks like three of them are doing the pulling right

6    there.

7    Q.  Do you know if this is the reason Tesco developed the

8    knuckle Pusher Arm?

9    A.  I think that was the major motivation so that they could

10   mechanically move that control line out of the way and not

11   have to have three guys yanking on the control line.

12   Q.  Okay.  I'm going to circle this.  Is this the elevator?

13   A.  Yes, the big red part there.

14   Q.  And what are these -- what are these two red things

15   connected to the elevator?

16   A.  Well, that's the interface, the bails that hold between

17   the derrick and the elevator itself.

18   Q.  And what is the elevator holding here?

19   A.  That's the tubular or the pipe that's being run into the

20   well.

21   Q.  Is that sometimes called a pipe stand?

22   A.  Right.  If they refer to a pipe stand, it just means

23   usually three joints or pieces of pipe are screwed together

24   in advance and stacked up so it's faster to run in.

25   Q.  And how many control line clamps are -- are connected to

1  a pipe stand?

2  A.  I understand that they typically have one pipe clamp per

3  stand of pipe.

4  Q.  Now, what was Tesco's solution to the rig hands pulling

5  on the control lines here?

6  A.  Well, they just made a simple change to make the Pusher

7  Arm a little more versatile by adding another hinge point

8  and another actuator in the middle.  So instead of just

9  going back and forth from one hinge, they put a second

10  hinge, perhaps where my wrist is, so they can pivot at the

11  top and the bottom.  So they have two degrees they can

12  change two -- or two ways to manipulate the arm.

13        MR. BOWICK:  Tesco Demonstrative 53.

14        THE TECHNICIAN:  May I have the screen?

15  Q.  (By Mr. Bowick) Dr. Rodgers, what's shown here in

16  Demonstrative No. 53?

17  A.  Well, this shows how the -- the new -- the newer Pusher

18  Arm with the knuckle.  The knuckle version, as they call it,

19  it can bend in the middle, and it can pull that control

20  line -- it's much more versatile in its ability to pull that

21  control back out of the way so that large red elevator on

22  the right there, the control line, even though it's a

23  thick -- a pretty big one in this example, it can pull that

24  out of the way now because it's got more flexibility to bend

25  in the middle and pull it back, and the old arm couldn't do

1  that.

2  Q.  Do all rigs have elevators?

3  A.  Yes.

4  Q.  And does the elevator come to the rig floor for every

5  stand of pipe?

6  A.  Yes, it does.

7  Q.  And every stand of pipe, I think you testified, has a

8  clamp?

9  A.  Right.  If you're running a control line, you have to

10  have a clamp on every joint of pipe, typically.

11  Q.  So how many times does the knuckle crouch, as shown

12  here, per stand of pipe?

13  A.  It's going to have to crouch every time one of those

14  stands of pipe is run in.

15        MR. BOWICK:  Let's look at Tesco Demonstrative

16  No. 68.

17  Q.  (By Mr. Bowick) Can you describe what's shown here?

18  A.  Those are the side-by-side photographs from the

19  Lafayette facility of Tesco showing the Pusher Arm with the

20  knuckle version on the left, which is the newer one, and

21  then the old version on the right, which is the non-knuckle

22  version.

23  Q.  And can you use your finger and show us where that hinge

24  that you referenced earlier is?

25  A.  There's the hinge right there (indicating), the spot I

1  put the green on.

2  Q.  Now, are the base assemblies of the knuckle and the

3  non-knuckle the same?

4  A.  Yes, they're the same.

5  Q.  And is the structure and geometry of the knuckle and

6  non-knuckle the same?

7  A.  Yes, they're nearly identical.

8       MR. BOWICK:  Tesco Demonstrative 39, please.

9  Q.  (By Mr. Bowick) What does Demonstrative 39 show us?

10  A.  This is showing the knuckle version of the Pusher Arm

11  and just exploding the drawing, so to speak, into the

12  different component parts.

13       MR. BOWICK:  Tesco Demonstrative 46, please.

14  Q.  (By Mr. Bowick) Can you describe for the jury how the

15  operator of the Pusher Arm controls the movement of the arm?

16  A.  Right.  So the operator has a couple of joysticks to

17  use, one for each of the two hydraulic cylinders or

18  actuators.  So by pushing on the right there, you see the

19  fixed control stand there's also a Belly-Pack, which they

20  can walk around with, but by moving each lever or joystick

21  forward and back, they're able to make that hydraulic

22  actuator get longer and shorter and command the motion

23  they're looking for.

24       So in the -- in the top image on the left, you can

25  see they're making the -- the entire arm move toward or away

120

1   from the pipe, and in the lower, you can see they're bending

2   in the middle, so they're -- they're tipping that middle

3   hinge position over with the second control.  So the

4   operator has both levers there and he can control both

5   cylinders.

6   Q.  Have you seen this or a similar hydraulic at Tesco?

7   A.  Yes, I have.

8   Q.  And how do those levers operate?

9   A.  Well, they're spring-loaded so that if you -- you can

10  push forward or pull back, and you can command the actuation

11  to go forward or back.  But if you let about go with your

12  hand, it automatically springs back to that neutral

13  position, and when it's in that neutral position, it doesn't

14  move.  It stops right where it is.

15  Q.  Now, you mentioned the Belly-Pack.

16      MR. BOWICK:  Let's look at Tesco Demonstrative 47,

17  please.

18  Q.  (By Mr. Bowick) How does the Belly-Pack operate

19  different from the hydraulic control stand?

20  A.  It really operates the same way.  It just gives the

21  operator the opportunity to walk around and not be fixed on

22  a stand, and that way he can get a better line-of-sight to

23  what's going on at the center of the rig.

24  Q.  And have you heard testimony that if you have the

25  wireless Belly-Pack, you don't need a flagger to tell you

1   when to stop the motion of the -- of the Pusher Arm?

2   A.  Yes, I believe so.  You know, I believe as long as you

3   have a line-of-sight that you can see, it's just a matter of

4   convenience, or depending on the personnel there, you just

5   need to be able to see where the position is with your eyes

6   or you rely on a flagger to see your position so you don't

7   bang into the pipe.

8   Q.  Now, have you seen the inspection video that was taken

9   by Weatherford on June 22nd, 2018?

10  A.  Yes.

11          MR. BOWICK:  Can we please pull up Plaintiffs'

12  Exhibit 148, beginning at time 7:15 and just hold it there

13  for a second?

14  Q.  (By Mr. Bowick)  Now, Dr. Rodgers, do you recall

15  testimony in this case about --

16          MR. BOWICK:  Pause.

17  Q.  (By Mr. Bowick)  -- about whether Tesco demonstrates the

18  operation of the knuckle version of the Pusher Arm?

19  A.  Yes, I recall.

20  Q.  And on the screen right now, what -- what position,

21  referenced to Tesco Demonstrative 64, is being -- is shown?

22  A.  It's what we refer to as a crouch position or No. 5 on

23  the board there.

24          MR. BOWICK:  Okay.  Can we go ahead and play?

25          (Videoclip played.)

1        MR. BOWICK:  Pause.

2  Q.  (By Mr. Bowick)  What position is shown here on the

3  video?

4  A.  Now we're paused at Position No. 6 on the board there,

5  so that's when the control line is pulled back.

6  Q.  So do we go from 5 to 6 here, from the crouched to the

7  open position?

8  A.  Correct.  That's the change from 5 to 6 there.

9  Q.  Okay.

10        MR. BOWICK:  Please play.

11        (Videoclip played.)

12        MR. BOWICK:  Pause.

13  Q.  (By Mr. Bowick)  What is shown in this demonstration of

14  the Pusher Arm here, what position?

15  A.  That would be Position 8, so we skip through 7, which is

16  really the step of the tong coming in to make up the joint

17  of pipe.  And this demonstration here out in the parking

18  lot, there was no joint of pipe, so that's why you don't see

19  that or the tong as coming in.  That would only be on the

20  rig, of course.  So Position 8 is the clamping position

21  where you're lining that control line so you can go in there

22  and clamp it.

23  Q.  Thank you.

24        MR. BOWICK:  Okay.  Let's go to 4 minutes and 55

25  seconds of Plaintiffs' Exhibit 148, please.

1            (Videoclip played.)

2            THE COURT:  Can we stop this a minute?  Can you

3    approach the bench, counsel?

4            MR. BOWICK:  Pause, please.

5            (Bench conference.)

6            THE COURT:  I recall specifically talking in the

7    pre-trial about animations and demonstratives without audio.

8    I remember telling both sides I had unintended bad

9    experiences where visuals have attached audio and the audio

10   was problematic and nobody knew it until it played.  If you

11   can get her to put her mute button on, I'd be happy to go

12   forward.

13           MR. BOWICK:  I will.

14           THE COURT:  Okay.

15           MR. BOWICK:  We had an agreement, but it's not

16   material for this.

17           THE COURT:  Well, I mean, if you all have some

18   agreement to the contrary, but without more, I recall a

19   clear discussion of it in pre-trial where I thought I gave

20   instructions that visuals would not have attached audio.

21   And nobody's approached me with some agreement to the

22   contrary.  So unless you have something like that and

23   there's a reason why we need the audio, let's put it on

24   mute.

25           MR. BOWICK:  Thank you, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. WILSON:  Thank you.

 3              (Bench conference concluded.)

 4              MR. BOWICK:  Ms. Nesser, please put it on mute.

 5              THE COURT:  Let's proceed.

 6              (Videoclip played.)

 7              MR. BOWICK:  Pause right there.

 8   Q.  (By Mr. Bowick)  Now, Dr. Rodgers, can you describe what

 9   position we went from and what position we're in now?

10   A.  Well, it looks like we've recycled, so we've gone

11   through Position 8 and back to the beginning again because

12   this process repeats itself.  So you're back to a -- moving

13   the head high again, so that -- you're out of the way and

14   also able to keep that control line coming off the sheaves,

15   efficiently.

16   Q.  So would that be -- we went from Position 3 to Position

17   4 here?

18   A.  Right.  It went through several steps there, but, yes,

19   we look like we're in Position 4 now.

20              MR. BOWICK:  Okay.  Can you go ahead and play it

21   again, please?

22              (Videoclip played.)

23              MR. BOWICK:  Pause it.

24   Q.  (By Mr. Bowick)  And what position are we in now,

25   Dr. Rodgers?
```

1   A.  Now it's back to where we started, which is Position 5.

2   Q.  Has that also been referred to as the crouching

3   position?

4   A.  Yes.

5   Q.  Did this video show the various positions of Tesco's

6   knuckle Pusher Arm as depicted in Tesco Demonstrative 64?

7   A.  Yes, it did.

8   Q.  Have you heard any evidence whatsoever that Tesco fully

9   moves its arm toward the pipe and then extends the roller

10  assembly to put the control line in a position for clamping?

11  A.  No, I haven't heard or seen any evidence to say that

12  that's exactly -- that's the process that Tesco uses when

13  operating this arm.

14  Q.  Have you prepared an animation of the operation of

15  Tesco's Pusher Arm?

16  A.  Yes, I have.  I prepared an animation based on the

17  actual drawings and measurements taken during the

18  inspection.

19          MR. BOWICK:  Please play Tesco Demonstrative

20  No. 80.

21          (Videoclip played.)

22  Q.  (By Mr. Bowick)  And, Dr. Rodgers, if you could sort of

23  explain what is being shown here and --

24  A.  Right.  This one is starting with the tongs, the red

25  part, sliding on -- on the rig floor there to make up the

1   next stand of pipe.  So what it did is it came in and

2   screwed the pipe in.  Then the control line is being moved

3   into position so that a clamp -- that blue part can slide in

4   and be attached.  Now, the --

5        MR. BOWICK:  Pause it.

6   Q.  (By Mr. Bowick)  What is being depicted in the upper

7   part of the animation there, Dr. Rodgers?

8   A.  So, you know, on the right side, you're seeing all the

9   stands of pipe which are -- they call them rack.  They're

10  stood up in racks 90 feet tall to make the process more

11  efficient.  And the elevators there shown in red are picking

12  up one stand of pipe at a time, bringing them over to the

13  center of the rig, and aligning them so that they can thread

14  them together and screw in the next part.  So the elevators

15  are lifting up that entire pipe and then holding the weight

16  of the entire string, when necessary, to run those tubulars

17  into the well.

18  Q.  Now, what position is the roller assembly in -- in this

19  animation?

20  A.  So the -- the roller head has the -- is in the high

21  position pulling the control line back so it's out of the

22  way of this process.

23  Q.  Is the roller assembly extended to make the -- the arm

24  longer or is it in its shortest position?

25  A.  No.  For this animation, the roller assembly is pinned

1    to the shortest position, so that upper part of the arm is

2    as short as it can be, and the base plate on the bottom is

3    as long as it can be so that the Pusher Arm is as far from

4    the center of the rig where the pipe is as it can get.

5            MR. BOWICK:  Okay.  Ms. Nesser, go ahead and play.

6            (Videoclip played.)

7            MR. BOWICK:  And pause it right there.

8    Q.  (By Mr. Bowick)  Dr. Rodgers, what's happening right

9    now?

10   A.  Well, now the Pusher Arm has been put into the crouched

11   position so that it can pull that control line as far out of

12   the way as possible because it would want to allow clearance

13   for the elevators to come by and not risk damage to the

14   control line.

15   Q.  And you said -- did you take measurements of the Tesco

16   Pusher Arm?

17   A.  Yes, I took measurements and had all the drawings, the

18   manufacturing drawings.

19   Q.  And does the animation here accurately reflect the

20   dimensions and the tolerances for the actual tool?

21   A.  Yes.  I did my best to match exactly the drawings and

22   then what was witnessed in the testing.

23           MR. BOWICK:  Go ahead and hit play, please.

24           (Videoclip played.)

25           MR. BOWICK:  Pause.

1   Q.  (By Mr. Bowick)  What's happening right now,

2   Dr. Rodgers?

3   A.  Well, that -- that stand of pipe was put into the well

4   by the elevators.  They set the slips, and the slips -- they

5   call them the spider slips.  They hold all the way to that

6   pipe now, and the elevators can release and lift up out of

7   the way, and the Pusher Arm can back out of the way, as

8   well, and go to that high position so it can, you know, stay

9   out of the way as the elevators move up.

10          MR. BOWICK:  Go ahead and hit play, please.

11          (Video clip played.)

12          MR. BOWICK:  Pause.

13  Q.  (By Mr. Bowick) What is shown right now, Dr. Rodgers, in

14  your animation?

15  A.  So the -- the process is repeating.  This is just a

16  different perspective angle.  The control line is, again, in

17  the aligned position, so that's next to the pipe, and the

18  clamp, the blue part, is coming in to go in and clamp on

19  that control line to the pipe.

20  Q.  Based on your review of Tesco's knuckle Pusher Arm, have

21  you seen anything that would stop the arm from hitting the

22  pipe?

23  A.  No.  In fact, quite the opposite.  What I've seen is

24  that the -- even in the shortest position, pushed as far

25  away from the pipe as possible, the -- the head of that

1    Pusher Arm will always hit the pipe.  You're going to always

2    be able to bang that right into the side of the pipe.

3    Q.  I'm going to show you real quick --

4         THE COURT:  Mr. Wilson?

5         MR. WILSON:  May I approach?

6         THE COURT:  Approach the bench, counsel.

7         (Bench conference.)

8         THE COURT:  What's the issue?

9         MR. WILSON:  I believe the opinion he just offered

10   is outside the scope of his expert report.  This is exactly

11   the issue we raised when they submitted this demonstration,

12   and we told the Court that he had originally offered the

13   opinion that the Pusher Arm would always hit the pipe, and I

14   think I just heard him testify that in that position, in

15   that clamping position, it will hit the pipe.

16        And so that's a new opinion.  It was not in his

17   original expert report.  This is exactly the issue we

18   briefed to Your Honor on these demonstratives for the new

19   November 20th demonstration.

20        THE COURT:  I recall a discussion of this.  I

21   recall at least making the comment, if the report says it

22   always hits the pipe and now he says it hits the pipe in a

23   certain position, how are you surprised or not on notice

24   that he say it hits the pipe?

25        I mean, hitting the pipe from a certain position

1  would be subsumed within the broader disclosure that it

2  always hits the pipe.

3          MR. WILSON:  There's a very specific reason, Your

4  Honor, and that is he's testifying that the tool operates --

5  in his report is based on the view that you cannot set up

6  the Pusher Arm in a position where it will not hit the pipe.

7  It will always hit the pipe no matter what the position --

8  the knuckle is.

9          What's happened is, at the November 20th

10  demonstration, he saw Mr. Zaleski demonstrate that that was

11  not true.  He subsequently changed his opinion to what you

12  just heard, which is, well, when the arm is down in the

13  clamping position, it won't hit the pipe.

14          THE COURT:  And that subsequent change of position

15  is not disclosed in any of his reports?

16          MR. WILSON:  It is not, Your Honor.

17          THE COURT:  Mr. Bowick, what's your response?

18          MR. BOWICK:  Your Honor, he relied on the

19  demonstration that was done on Weatherford's notice that was

20  done on June 22nd, 2018, which I -- we just showed the jury

21  the video of the operation of how it's operated.  That was

22  what was requested, and that was what was shown to

23  Mr. Zaleski and the lawyers.  He relied on that as his basis

24  for how the tool operates.

25          After seeing that, he said, when it operates in

1   that fashion, as demonstrated, it hits the pipe every time.

2   What -- what they've done is they created a new, I guess --

3   Mr. Zaleski --

4          THE COURT:  Well, let me ask you this, Mr. Bowick:

5   Has this witness filed a -- with the leave of the Court, has

6   this witness filed a supplemental report subsequent to that

7   last demonstration, or is his last effective report prior to

8   the demonstration?

9          MR. BOWICK:  His last report was prior to that

10  deposition, but I was fixing to go into it.  I'm going to

11  show the pictures that are included in his report that shows

12  the exact same thing that he just testified to.

13         THE COURT:  Well, let me ask the question another

14  way.  Do I need to excuse the jury and let's get his last

15  report out and look at the transcript of what he was just

16  asked and see if it falls within or outside the scope of his

17  report.  That's my question to the two of you.

18         MR. BOWICK:  I don't think so, Your Honor.  I

19  think --

20         THE COURT:  Well, Mr. Wilson, it's your objection.

21         MR. WILSON:  Yes, Your Honor, we do.

22         THE COURT:  All right.  Gentlemen, I'll do that.

23  Go get the effective -- go get the last effective report for

24  Dr. Rodgers and see if you can find the precise location

25  where you believe it's covered by the report, and then I'll

1    get my copy of it and look at it, all right?

2            MR. WILSON:  Thank you, Your Honor.

3            MR. BOWICK:  Thank you, Your Honor.

4            (Bench conference concluded.)

5            THE COURT:  Ladies and gentlemen, I know that we're

6    close to the lunch hour, but I have an issue that's arisen

7    that I need to take up with counsel outside of your

8    presence, and I'm not quite ready to excuse you for lunch,

9    but I am going to ask you to retire to the jury room for

10   just a minute.

11           If you will, leave your notebooks closed and in

12   your chairs.  Don't discuss the case.  I'm not going to tell

13   you if there's food back there, don't eat it, but I'm going

14   to expect you back in a few minutes, and then shortly

15   thereafter, we'll have a formal lunch break.

16           With those instructions, please retire to the jury

17   room.

18           COURT SECURITY OFFICER:  All rise.

19           (Jury out.)

20           THE COURT:  All right.  Please be seated.

21           Mr. Wilson, you raised at the bench an objection

22   that Defendants have asked the witness questions that go

23   beyond and outside the scope of his last effective report.

24   I have before me Dr. Rodgers's report.  It looks like it's

25   dated August the 6th, 2018?

1          MR. BOWICK:  Your Honor, that's the invalidity

2   report, which was our burden.  His rebuttal report is --

3          THE COURT:  Okay.  Let me find the right report.

4          August the 20th, 2018, report on non-infringement?

5          MR. BOWICK:  Correct, Your Honor.

6          THE COURT:  All right.

7          MR. BOWICK:  If you allow, I can direct you to --

8          THE COURT:  That's what I was going to ask,

9   Mr. Bowick, if you can direct me to the section of the

10  report where you believe the offered examination is covered

11  and set forth.

12         MR. BOWICK:  Page 33 to 34, Paragraphs 58 to 59.

13         THE COURT:  Just a moment.

14         Now, Paragraph 58 begins at the bottom of Page 32.

15  Do you want me to consider that, Mr. Bowick?

16         MR. BOWICK:  Give me a second, Your Honor.  I'm

17  sorry.  I'm looking at notes, not the -- really the issue,

18  Your Honor, is on Page 34, and it's also -- just give me a

19  second.  I have to find it, Your Honor.

20         I guess before we get into this, can have we look

21  at the transcript?  I don't remember what the witness's

22  answer was.

23         THE COURT:  Well, the objection is that you've

24  asked the witness to opine about the accused product only

25  hitting the pipe from a certain position but that his report

1  is and his opinion, as stated in his report, is that the

2  accused device, when operated, always hits the pipe.  And

3  that's the objection as I understand it.

4          Is that correct, Mr. Wilson?

5          MR. WILSON:  That's correct, Your Honor.

6          THE COURT:  So what I need you to show me is a

7  section of this report where the witness says that only --

8  that in a certain position, where it's clamped -- in a

9  certain position, that the accused device doesn't hit the

10  pipe, but, otherwise, it does, which is different from the

11  position that it always hits the pipe when it's used.

12          Mr. Wilson, just for my own benefit and for

13  purposes of opposing counsel, state your objection one more

14  time.  Make sure that we're exactly accurate here.

15          MR. WILSON:  My objection, Your Honor, is that the

16  testimony that the -- the Pusher Arm, when in a clamping

17  position or in a certain position for clamping, is advanced

18  toward the pipe, even with the shortest adjustment hole and

19  with the longest mounting base plate will always hit the

20  pipe is a new opinion that is not expressed in his expert

21  report.

22          THE COURT:  Okay.  With that clarification,

23  Mr. Bowick, can you point me to a section of the report

24  where it does -- where it does disclose that opinion?

25          MR. BOWICK:  Sure, Your Honor.  Page 57 of his

 1    report, Paragraph 77.

 2              THE COURT:  Let me get there.  Page 77?

 3              MR. BOWICK:  Page 57.

 4              THE COURT:  57, I'm sorry.  Paragraph 77?

 5              MR. BOWICK:  Yes, Your Honor.

 6              THE COURT:  Let me read that paragraph.  All right.

 7    I've read Paragraph 77.

 8              MR. BOWICK:  Yes, sir.  And if you look at the

 9    first sentence, the second line there, it talks about

10    that -- the length of the boom does not determine how close

11    the roller assembly is to the tubular when the Pusher Arm

12    aligns a first person -- first portion of control line to

13    the pipe.

14              That is the clamping position.  It's their

15    position.  I think I referenced Dr. -- I mean, Mr. Zaleski

16    in the paragraph above, that the -- when it aligns the first

17    portion of the control line, that's the clamping position as

18    called for by these claims.

19              THE COURT:  All right.  Anything further?

20              MR. BOWICK:  Yes, Your Honor.  And with respect to

21    this issue, this entire '637 patent is all talking about

22    positions for clamping, the first sentence of the abstract,

23    the field of the invention -- this whole patent is about

24    positions for clamping.

25              THE COURT:  I'm interested in the disclosures in

1  the expert's report.

2        MR. BOWICK:  Sure, Your Honor.  So the main

3  reference there is the first sentence of Claim 77 where he

4  clearly says, in a position that aligns the first portion of

5  the control line, which is right out of the -- Claim 34.

6        On Page 58, he provides photographs with both a

7  long and short plate showing that it hits the pipe in that

8  position, which is completely consistent with Exhibit 149,

9  which was the demonstration requested by Weatherford

10 demonstrating how the tool works in discovery of this case,

11 June 22nd, 2018.

12        THE COURT:  Mr. Wilson, what's your response?

13        MR. WILSON:  Your Honor, so if we take a look at

14 Paragraph 77, the first sentence reads:  The length of the

15 boom does not determine how close the roller assembly is to

16 the tubular when the Pusher Arm aligns a first portion --

17        THE COURT:  Slow down and speak up.

18        MR. WILSON:  Sorry.  When the Pusher Arm aligns a

19 first portion of the control line to the pipe.  If you

20 continue to read, it talks about the fourth hole of the

21 roller assembly's neck is chosen, making the boom the

22 shortest possible length.  The long mounting plate is

23 utilized.  The arm or boom is able to move the roller

24 assembly -- sorry, roller head and control lines into a

25 position against the pipe or position of string as shown

1    below.  And then what it says is as shown above, the roller

2    heads contact the pipe or tubing string and cannot advance

3    further, even when the length of the boom is pinned in its

4    shortest length.  In this position, the Pusher Arm cannot

5    bring the control line or lines any closer to the completion

6    string.

7            Now, if we continue down to Paragraph 79, after

8    addressing Mr. Zaleski's report --

9            THE COURT:  Paragraph 79?

10           MR. WILSON:  That's correct, Your Honor.

11           THE COURT:  Okay.

12           MR. WILSON:  He continues:  When Tesco's roller

13   assembly is pinned in the shortest position, Hole No. 4, as

14   described above, the boom -- the shortened length of the

15   boom -- which is a typographical error, I'm sure -- does not

16   prevent contact with the tubular when the hydraulic cylinder

17   is retracted.  With the full retraction of the hydraulic

18   cylinder in the base of the Pusher Arm, the cylinder moves

19   the boom and the roller assembly head past -- or pipe

20   completion string -- that's a typo -- as shown in the

21   photographs below.

22           We can continue reading this, but I think what Your

23   Honor will see is these statements are not with respect to a

24   clamping position.  These statements are unequivocal.  When

25   it's pinned in the shortest length with the longest mounting

 1  plate, it always hits the pipe.

 2       THE COURT:  Do you have anything further,

 3  Mr. Bowick?

 4       MR. BOWICK:  Yes, Your Honor.  This is a rebuttal

 5  report, and the very first sentence of Paragraph 77 is

 6  responding to Paragraph 76 which lays out and quotes

 7  Mr. Zaleski's opinions, and it prefaced all these

 8  photographs and description within -- when the Pusher Arm

 9  aligns a first person [sic] of the control line to the pipe.

10  That is the context.  That's how the tool is operated under

11  Dr. Rodgers's understanding.  And at no time did he say at

12  any position of the knuckle it always hits the pipe.  He is

13  -- he is limiting his opinion to rebuttal that when

14  Mr. Zaleski says this is how it operates, he says when it's

15  aligning a first person [sic] of the control line with a

16  pipe, the clamping position, it hits the pipe, and if the

17  pipe wasn't there, it would go past the pipe.

18       THE COURT:  Mr. Wilson, it's your objection, I'll

19  give you the final word.

20       MR. WILSON:  Your Honor, this is -- has turned into

21  a very, very significant issue in this case.  Hence, the

22  November 20th demonstration in which Mr. Zaleski

23  demonstrated that it was possible to use this tool without

24  hitting the pipe.  Subsequent to that demonstration, and

25  before that, Defendants told the Court unequivocally this

1  tool will always hit the pipe with these demonstratives,

2  these very demonstratives they showed the Court in their

3  summary judgment motion, this tool will always hit the pipe.

4  It is not possible to operate the tool without hitting the

5  pipe.

6  　　　　　When Mr. Zaleski demonstrated it at the November

7  20th demonstration, they changed their position, just as we

8  briefed to the Court, and that's what the Court is hearing

9  today.

10  　　　　　THE COURT:  All right.

11  　　　　　MR. BOWICK:  Your Honor, can I respond to that

12  briefly?

13  　　　　　THE COURT:  This will be the last word, Mr. Bowick.

14  Go ahead.

15  　　　　　MR. BOWICK:  Thank you, Your Honor.  We haven't

16  changed our position, Your Honor.  What is at issue in this

17  case is how Tesco performs the method of aligning control

18  lines.  It's not whether this device is capable of operating

19  in a way that might fit in Mr. Zaleski's new theory.

20  　　　　　And this is -- this is something they can cross

21  Dr. Rodgers on.  They made the arm straight up and down.

22  They've already showed the jury, and they can try to cross

23  Dr. Rodgers and say, well, if you do it this way, it won't

24  hit the pipe every time, will it, sir?  That's what I think

25  is proper for an issue before the jury, Your Honor.

1          THE COURT:  All right.

2          MR. BOWICK:  And, Your Honor, I'd also address that

3    they've never laid out this theory of straightening the arm

4    out in some kind of strange manipulative way in their

5    infringement contentions.  Their contentions are limited in

6    this case solely to extending the pin of the roller assembly

7    and nothing else.  So that's my last word.

8          THE COURT:  All right.  I've heard all the argument

9    I want to hear.  Give me just a moment.

10          All right.  I'm looking at the witness's testimony

11   just prior to the objection being raised.  He's being asked

12   about and commenting on the animation that's being played.

13   And he's -- and Mr. Bowick asked:  Based on your review of

14   Tesco's knuckle Pusher Arm, have you seen anything that

15   would stop the arm from hitting the pipe?

16          Answer:  No.  In fact, quite the opposite.  What

17   I've seen is that even in the shortest position, pushed as

18   far away from the pipe as possible, the head of that Pusher

19   Arm will always hit the pipe.  You're going to always be

20   able to bang that right into the side of the pipe.

21          So tell me, Mr. Wilson, how is that question and

22   answer different from the report and the sections we've just

23   looked at?

24   MR. WILSON:  It's not, Your Honor.  I apologize.  I thought

25   I heard him say in the clamping position.

1          THE COURT:  I'm reading the testimony from the

2    realtime monitor in front of me.  That testimony seems to be

3    consistent with the report of the witness.

4          It's at that point Mr. -- I said:  Mr. Wilson?  And

5    you said:  May I approach?  Then you both came to the bench,

6    and we had the discussion that led to where we are.

7          MR. WILSON:  You're correct, Your Honor.  I don't

8    see that as inconsistent.

9          THE COURT:  All right.  Then I'm going to overrule

10   the objection.  We'll leave the testimony undisturbed.  And

11   the time that we've spent from the time the parties

12   approached the bench until the jury returns will be charged

13   against the Plaintiff.

14         I'm going to bring the jury back in, Mr. Bowick,

15   and we're going to continue your direct examination.

16   However, it is about three or four minutes until noon.

17         Do you -- can you give me some idea of where you

18   are in your direct examination process, and is there a good

19   point anywhere in the near future to bring for lunch?

20         MR. BOWICK:  Can I have five minutes, Your Honor?

21         THE COURT:  You can have about 20 seconds.  I need

22   to bring the jury back in.

23         MR. BOWICK:  Okay.

24         THE COURT:  You mean five minutes before we break

25   or five minutes to determine if there's a good place for us

 1   to break?

 2          MR. BOWICK:  Just let me make a point on this, and

 3   we'll break in five minutes after the jury is brought back

 4   in.

 5          THE COURT:  In other words, in about -- you think,

 6   in five minutes, you'll get to a good place to break your

 7   examination?

 8          MR. BOWICK:  Yes, Your Honor.

 9          THE COURT:  And how will I know when that's going

10   to be?

11          MR. BOWICK:  I will inform the Court, Your Honor.

12          THE COURT:  Just look at me and smile, and I'll

13   know what you mean.

14          All right.  Take your positions and your seats,

15   counsel.

16          Let's bring in the jury, Mr. Johnston.

17          COURT SECURITY OFFICER:  All rise.

18          (Jury in.)

19          THE COURT:  Please be seated, ladies and gentlemen.

20          All right.  We'll continue with the examination of

21   the witness by the Defendants.

22          Mr. Bowick, you may continue.

23          MR. BOWICK:  Thank you, Your Honor.

24   Q.  (By Mr. Bowick) Dr. Rodgers, did you attend an

25   inspection at Tesco's office in Lafayette, Louisiana, a few

1  days before Thanksgiving?

2  A.  Yes, I did.

3  Q.  And was Mr. Zaleski present?

4  A.  Yes, he was.

5  Q.  And were Weatherford's attorneys present?

6  A.  Yes, they were.

7  Q.  And what was the purpose of this demonstration in

8  November?

9  A.  Well, I believe we were looking at the -- the issue we

10  were just talking about, is whether the head of that knuckle

11  version of the Pusher Arm was able to hit the pipe and, you

12  know, to see that go through its normal operation and to

13  allow Weatherford to run additional testing on that Pusher

14  Arm to help their case.

15        MR. BOWICK:  Can you pull up Tesco -- Tesco

16  Demonstrative No. 28 and pause it real quick once it's on

17  the screen?

18  Q.  (By Mr. Bowick) Now, Dr. Rodgers, what is the thing

19  between the base and the -- is that a spider that the pipe's

20  in?

21  A.  Right.  The -- the spider slips are holding the pipe,

22  and that part in between the base of the Pusher Arm and the

23  spider is called the base plate.

24  Q.  And does Tesco have different size base plates?

25  A.  Yes.  They have a short version and a long version.

1   Q.  And does Tesco Demonstrative No. 35, which includes two

2   different photographs, show the short and long versions?

3   A.  Yes.  It shows the short on the left and the long on the

4   right.

5   Q.  Are you aware of any other mounting plates besides the

6   short and long that Tesco uses with its Pusher Arm?

7   A.  To my knowledge, those are the two options, short and

8   long right there.

9   Q.  And does the base plate fix the Pusher Arm with respect

10  to the pipe and the well?

11  A.  Right.  Excuse me.  The base plate sets the distance

12  between the spider, which is centered on the pipe, and where

13  the base of that Pusher Arm is going to be.

14  Q.  Okay.  We're going to watch this video.

15          MR. BOWICK:  Can you go ahead and hit play?

16          (Video clip played.)

17          MR. BOWICK:  Pause.

18  Q.  (By Mr. Bowick) What position is the roller assembly

19  pinhole in in the Tesco Pusher Arm?

20  A.  It's pinned in the shortest position, so the arm is --

21  is short as it can get.

22  Q.  Could the arm or the roller assembly be retracted any

23  shorter than that so it would avoid the pipe?

24  A.  No, it can't get any shorter.  The telescoping part

25  there is retracted as far as it will go by that pin

 1   position.

 2   Q.  And what happens when the -- who operated the control

 3   panel during this demonstration?

 4   A.  I believe there were Tesco personnel operating it, and

 5   then at one point, Mr. Zaleski also operated it.

 6   Q.  And right -- is the Pusher Arm hitting the pipe there?

 7   A.  Yes.  It's hitting the pipe and pushing it over.

 8   Q.  Do you know what size tubular was used in this

 9   demonstration?

10   A.  Yes.  That was a 3-1/2-inch pipe diameter, which is the

11   smallest size tubular that they'll run offshore on rigs like

12   this.

13   Q.  And using the smallest size tubular, what happened when

14   the hydraulic cylinder in the base was retracted?

15   A.  Well, when you retract that hydraulic cylinder, the arm

16   goes forward as far as it can go and hit the pipe and pushed

17   it over, basically, the worse case combination there.  So if

18   it can reach it then, it can reach it anytime.

19           MR. BOWICK:  Could you hit play and let's watch the

20   rest of the video?

21           (Video clip played.)

22           MR. BOWICK:  Okay.  Go ahead and pause that.

23   Q.  (By Mr. Bowick) Is there any mechanisms that would stop

24   Tesco's Pusher Arm from contacting the pipe?

25   A.  I'm not sure I understand the question.

1   Q.  Is there anything that would stop it from hitting the

2   pipe before it reached the pipe?

3   A.  Not -- not in what we're seeing right here.  There's

4   nothing that's going to stop it.  It's going to go until it

5   hits the pipe.

6   Q.  So in the position shown, will the Tesco Pusher Arm

7   contact the pipe when it is advanced forward?

8   A.  Yes.

9          THE COURT:  All right.  Ladies and gentlemen, we're

10  going to take this opportunity to break for lunch.  Sorry to

11  be a little disjointed here, but it was necessary.

12          If you will, take your notebooks with you for

13  lunch, keep them in the jury room.  Follow all my

14  instructions, including, of course, not to discuss the case

15  among yourselves.  We'll try to start about 45 minutes from

16  now, about 10 minutes until 1:00.  And with those

17  instructions, the jury is excused for lunch.

18          COURT SECURITY OFFICER:  All rise.

19          (Jury out.)

20          THE COURT:  The Court stands in recess.

21          (Recess.)

22

23

24

25

CERTIFICATION

        I HEREBY CERTIFY that the foregoing is a true and
correct transcript from the stenographic notes of the
proceedings in the above-entitled matter to the best of my
ability.


 /S/ Shelly Holmes                        12/5/2018
SHELLY HOLMES, CSR-TCRR                    Date
OFFICIAL REPORTER
State of Texas No.: 7804
Expiration Date: 12/31/18